IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JEFFREY PARSONS,

     Plaintiff,

vs.                                                                                    No. CIV 20-0074 JB/KK

WILLIAM VELASQUEZ and MEGAN
CARPENTER-BARLOW,

     Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment (Qualified Immunity Raised), filed November 20, 2020 (Doc. 18)("MSJ"). The Court held hearings on the MSJ on March 29, 2021, and April 1, 2021. <u>See</u> Clerk's Minutes at 1, filed March 29, 2021 (Doc. 37); Clerk's Minutes at 1, filed April 1, 2021 (Doc. 39). The primary issues are: (i) whether the Court can consider violations of the Albuquerque Police Department's Standard Operating Procedures ("SOPs") in determining whether the Defendants William Velasquez and Megan Carpenter-Barlow, Albuquerque Police Department ("APD") officers, violated Plaintiff Jeffrey Parsons' rights under the Fourth Amendment to the Constitution of the United States of America; (ii) whether qualified immunity shields the Defendants from J. Parsons' claims under 42 U.S.C. § 1983 for violations of the Fourth Amendment's prohibition against unreasonable seizures, because no reasonable jury could find other than that (a) the Defendants' conduct did not constitute a seizure, where the Defendants did not touch J. Parsons or draw their weapons, and where the interaction occurred largely in public view; (b) even if a non-investigatory seizure occurred, exigent circumstances justified the seizure, where J. Parsons' mother, Mary Parsons, experienced a medical emergency and requested that she be taken to a hospital; (c) even

if a non-investigatory seizure occurred, the Defendants' reasonable suspicion that J. Parsons was perpetrating acts of domestic violence toward M. Parsons, where M. Parsons' granddaughter had called 911 and alleged that J. Parsons was acting threateningly toward M. Parsons, justified the seizure; or (d) there is no clearly established precedent demonstrating that the Defendants violated J. Parsons' federal constitutional right against unreasonable seizures, where controlling caselaw has not held that police officers acting under sufficiently similar circumstances unconstitutionally seized a person; (iii) whether qualified immunity shields the Defendants from J. Parsons' claims under § 1983 for violations of the Fourth Amendment's prohibition against unreasonable searches, because no reasonable jury could find other than that (a) the Defendants' conduct did not constitute a search, because J. Parsons consented to the Defendants' entry into his home by inviting them inside and by not objecting explicitly to their continued presence; (b) any search was a non-investigatory search justified by exigent circumstances, where M. Parsons experienced a medical emergency and wanted to be taken to a hospital; or (c) there is no clearly established precedent demonstrating that the Defendants violated his constitutional right against unreasonable searches, where controlling caselaw has not held that police officers acting under sufficiently similar circumstances unconstitutionally searched a person's home; (iv) whether qualified immunity shields the Defendants from J. Parsons' claim under § 1983 for violations of substantive Due Process rights the Fourteenth Amendment to the Constitution of the United States secures, because (a) the Defendants' conduct throughout their interaction with J. Parsons does not shock the judicial conscience, where their behavior toward J. Parsons was not particularly egregious; or because (b) there is no clearly established precedent demonstrating that the Defendants violated J. Parsons' substantive Due Process rights, where controlling caselaw has not held that police officers' conduct under sufficiently similar circumstances shocked the judicial conscience; (v) whether the

Court should remand the state law claims if the Court grants the Defendants summary judgment on J. Parsons' federal claims.

The Court concludes that: (i) the Court will not consider violations of the APD SOPs in deciding whether the Defendants are entitled to qualified immunity from J. Parsons' Fourth Amendment claims, because, under controlling United States Court of Appeals for the Tenth Circuit caselaw, the SOPs are irrelevant to determining whether the Defendants violated J. Parsons' federal constitutional rights; (ii) the Defendants are entitled to qualified immunity on J. Parsons' Fourth Amendment unreasonable seizure claim, because no reasonable jury could find other than that (a) the Defendants' conduct did not constitute a seizure given that they did not touch J. Parsons, they did not draw their weapons, and the alleged seizure occurred primarily in public view; (b) even if the Defendants' conduct constitutes a seizure, the exigent circumstances exception to the Fourth Amendment's warrant requirement justified the non-investigatory detention, because the Defendants reasonably believed M. Parsons' medical emergency required immediate assistance; (c) even if the Defendants' conduct constitutes an investigatory seizure, reasonable suspicion that criminal activity was ongoing justified the seizure, given that the Defendants received a 911 call from a family member alleging J. Parsons was abusing M. Parsons; and (d) there is no clearly established precedent demonstrating that the Defendants violated J. Parsons' right against unreasonable seizures; (iii) the Defendants are entitled to qualified immunity on J. Parsons' Fourth Amendment unreasonable search claim, because no reasonable jury could conclude other than that (a) the Defendants' conduct does not constitute a search, because J. Parsons consented to the Defendants' entry; and (b) even if the Defendants' conduct constitutes a search, it was a non-investigatory search exigent circumstances, namely M. Parsons' medical emergency, justified; and because (c) there is no clearly established precedent

demonstrating the Defendants violated his right against unreasonable searches; (iv) the Defendants are entitled to qualified immunity on J. Parsons' substantive due process claims, because (a) the Defendants' conduct is, as he admits, not egregious; and because (b) there is no clearly established precedent indicating that the Defendants' conduct is so egregious as to the shock the judicial conscience; and (v) the Court will remand J. Parsons' State law claims, because there are no remaining federal claims. Accordingly, the Court will grant the MSJ and dismiss the case with prejudice.

## FACTUAL BACKGROUND

J. Parsons' lawsuit arises from his encounter with the Defendants after the Defendants responded to a 911 call regarding J. Parsons' elderly mother, M. Parsons. See Recording of 911 Call at 00:09-10 (dated Nov. 17, 2017), filed November 11, 2020 (Doc. 19)(Operator)("911 Call"). The encounter in J. Parsons' home lasted less than forty minutes. See Barlow Lapel Video, filed November 11, 2020 (Doc. 19)("Barlow Lapel Video"); Velasquez Lapel Video, filed November 11, 2020 (Doc. 19)("Velasquez Lapel Video"). The Court lays out its undisputed facts below. Although the parties provided video recording of the entire encounter between the Defendants and J. Parsons, the Court describes in detail that encounter because J. Parsons disputes the characterization of that video footage extensively.

## I.     THE PARTIES.

At the time of the Defendants' encounter with J. Parsons, both Velasquez and Barlow were APD officers. See generally Barlow Lapel Video; Velasquez Lapel Video. J. Parsons was a resident of Albuquerque, New Mexico, and resided in a house there with his elderly mother, M. Parsons. See Barlow Lapel Video at 01:03-16; Velasquez Lapel Video at 01:05-18. J. Parsons' sister, Trish Hale, was a resident of Belen, New Mexico, who had driven to J. Parsons' home in

response to M. Parsons' emergency.  See 911 Call at 01:18-24 (Cardona).  Megan Cardona was

J. Parsons' niece and M. Parsons' granddaughter and was a resident of Washington state who

placed the 911 call that prompted the Defendants' dispatch.  See generally 911 Call.

## II.    THE STANDARD OPERATING PROCEDURES.

The APD operates under a set of SOPS.  Standard Operating Procedures, City of

Albuquerque, https://www.cabq.gov/police/standard-operating-procedures (last visited June 17,

2021).[1]  Many of the APD's SOPs concern police officers' interactions with persons experiencing

behavioral health crises.  See Albuquerque Police Dep't, Albuquerque Police Department Standard

Procedural Orders, Response to Behavioral Health Issues (Apr. 2, 2021),

https://documents.cabq.gov/police/standard-operating-procedures/2-19-response-to-behavioral-

health-issues.pdf.  At the time the incident took place in November 2017, the SOPs stated that,

"'[w]hen responding to an incident, officers should consider whether the person may be in" a

"behavioral health crisis.'"  Plaintiff's Complaint for Damages at ¶ 21, at 3, filed January 24, 2020

(Doc. 1)("Complaint")(quoting APD Procedural Orders SOP 2-19-5(A)).[2]  See Response ¶ 9, at

---

[1]Neither party has included this fact in their briefing.  J. Parsons, however, refers to the APD's SOPs in his Response, see Response ¶ 9, 13, at 13-14, and the Defendants do not dispute that the APD operates under SOPs, see Reply ¶ B, at 5.  Accordingly, the Court includes this information as background for the reader.

[2]In his statement of undisputed material facts, J. Parsons asserts that the "Defendants ignored and failed to follow the Standard Operating Procedures" that would have prevented the conduct of which he complains.  Response ¶ 9, at 13.  J. Parsons does not assert here which SOPs the Defendants violated, instead referring the Court to his Complaint.  See Response ¶ 9, at 13.  Elsewhere, J. Parsons asserts violations of specific SOPs: citing again to the Complaint, he states that "Velasquez failed to request an ECIT Officer (APD SOP 2-19-7), choosing to refer the case to Adult Protective Services and violated APD SOP 4-7-6(B) as he failed to follow up on the supposed referral he provided."  Response ¶ 13, at 14.  An ECIT officer is a police officer trained specially to respond to persons experiencing behavioral health crises.  See Albuquerque Police Dep't, Albuquerque Police Department Procedural Orders, 2-19-3(E) (2021), https://documents.cabq.gov/police/standard-operating-procedures/2-19-response-to-behavioral-health-issues.pdf.

13.   In addition, an ADP officer responding to an individual experiencing a behavioral health

"should specifically request an ECIT (Enhanced Crisis Intervention Team) officer . . . as

backup.'"   Complaint ¶ 21, at 3 (quoting APD Procedural Orders SOP 2-19-7(A)(2)).[3]   See

Response ¶ 13, at 14.   APD officers should "gather information from . . . family members"

_____

Since the time J. Parsons filed his Complaint in State court on November 11, 2019, the APD has revised and renumbered the SOPs relating to persons experiencing behavioral health crises, publishing the most-current version April 2, 2021.   See Albuquerque Police Dep't, Albuquerque      Police      Department      Procedural      Orders,      (2021), https://documents.cabq.gov/police/standard-operating-procedures/2-19-response-to-behavioral-health-issues.pdf.   J. Parsons does not attach these in his filings to the Court.   Moreover, J. Parsons has not notified the Court as to the current form and content of the SOPs that he alleges in the Complaint were violated.

The Defendants reply to J. Parsons' citation to the SOPs by asserting that "[t]hese purported 'facts' attempt to establish that Defendants did not follow Albuquerque Police Department standard operating procedures (SOPs).   They are not material to Plaintiff's claim or Defendants' Motion for Summary Judgment."   Reply ¶ B, at 5.   In asserting that J. Parsons' statements are "not material," the Defendants appear to dispute that his statements are relevant.   Reply ¶ B, at 5.   Rule 401 of the Federal Rules of Evidence states that evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the action."   Fed. R. Evid. 401(a)-(b).   "Irrelevant evidence is not admissible," Fed. R. Evid. 402, and in turn cannot be heard to decide a motion for summary judgment.   See Gross v. Burggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir. 1995).   The Court has previously held, however, that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis section" of the opinion. SEC v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).   Insofar as the Defendants dispute the relevance alone of J. Parsons' proffered facts -- here, the content of SOP 2-19-5(A) -- the Court concludes that they are undisputed.   The Court will discuss their relevance in the Analysis section.   See Analysis § I, infra.

[3]J. Parsons asserts that "Defendant Velasquez failed to request an ECIT Officer (APD SOP 2-19-7)."   Response ¶ 13, at 14.   As noted in note 2, supra, J. Parsons refers the Court to his Complaint for the content of this SOP provision.   See Response ¶ 13, at 14.   The Defendants reply that "these purported 'facts' attempt to establish that Defendants did not follow Albuquerque Police Department standard operating procedures (SOPs).   They are not material to Plaintiff's claim or Defendants' Motion for Summary Judgment."   Reply ¶ B, at 5.   The Defendants do not dispute that J. Parsons accurately represents the content of APD SOP 2-19-7(A) in his complaint, but merely challenges the legal relevance of this SOP and other SOP provisions.   Accordingly, the Court deems the content of SOP 2-19-7(A) undisputed for the reasons stated in note 2, supra.   The Court will discuss the materiality and relevance of the SOPs in its Analysis section.   See Analysis § I, infra.

regarding a person experiencing a behavioral health crisis and "request professional assistance, if available . . . to assist in communicating with" such an individual.  Complaint ¶ 26, at 4 (quoting APD Procedural Orders SOP 2-19-7(A)(6)).[4]  See Response ¶ 9, at 13.  When an officer refers a person to Adult Protective Services, the officer should "follow up on . . . the referral."  Complaint ¶ 38, at 6 (citing APD Procedural Orders SOP 4-7-6(B)).[5]  See Response ¶ 13, at 14.

Other APD SOPs concern more general conduct during police-citizen interactions.[6]  SOP 1-1-4(D)(19), for instance, prohibits APD officers from making false statements during police-

_____

[4]J. Parsons asserts that the "Defendants ignored and failed to follow the Standard Operating Procedures" that would have prevented the conduct of which he complains.  Response ¶ 9, at 13.  As noted in note 2, supra, J. Parsons refers the Court to his Complaint for the content of this SOP provision.  See Response ¶ 9, at 13.  The Defendants assert in the Reply that "these purported 'facts' attempt to establish that Defendants did not follow Albuquerque Police Department standard operating procedures (SOPs).  They are not material to Plaintiff's claim or Defendants' Motion for Summary Judgment."  Reply ¶ B, at 5.  The Defendants do not dispute that J. Parsons accurately represents the content of APD SOP 2-19-7(A)(6) in his complaint, but merely challenges the legal relevance of this SOP and other SOP provisions.  Accordingly, the Court deems the content of SOP 2-19-7(A)(6) undisputed for the reasons stated in note 2, supra.  The Court will address the relevance and materiality of the SOPs in its Analysis section.  See Analysis § I, infra.

[5]J. Parsons asserts that "Defendant Velasquez . . . cho[se] to refer the case to Adult Protective Services and violated APD SOP 4-7-6(B) as he failed to follow up on the supposed referral he provided."  Response ¶ 13, at 14.  As noted in note 2, supra, J. Parsons refers the Court to his Complaint for the content of this SOP provision.  See Response ¶ 13, at 14.  The Defendants reply that "these purported 'facts' attempt to establish that Defendants did not follow Albuquerque Police Department standard operating procedures (SOPs).  They are not material to Plaintiff's claim or Defendants' Motion for Summary Judgment."  Reply ¶ B, at 5.  The Defendants do not dispute that J. Parsons accurately represents the content of APD SOP 4-7-6(B) in his complaint, but merely challenges the legal relevance of this SOP and other SOP provisions.  Accordingly, the Court deems the content of SOP 4-7-6(B) undisputed for the reasons stated in note 2, supra.  The Court will address relevance and materiality in its Analysis section.  See Analysis § I, infra.

[6]Neither party has included this fact in their briefing.  J. Parsons, however, makes reference to the APD's SOPs in his Response, see Response ¶ 9, 13, at 13-14, and the Defendants do not dispute that the APD operates under SOPs, see Reply ¶ B, at 5.  Accordingly, the Court includes this information as background for the reader.

citizen interactions. <u>See</u> Complaint ¶ 21, at 3 (citing APD Procedural Orders SOP 1-1-4(D)(19));[7]

Response ¶ 9, at 13. SOP 2-64-3(B)(1)(d) requires that APD officers allow citizens "access to

food, water and restrooms." Complaint ¶ 25, at 4.[8]   <u>See</u> Response ¶ 9, at 13. SOP 2-64-1 requires

that detentions be reasonable in length. <u>See</u> Complaint ¶ 40, at 7;Response ¶ 9, at 13.[9]

## III.   <u>THE 911 CALL</u>.

On November 17, 2017, a 911 operator in Spokane, Washington, transferred a call about a

---

[7]J. Parsons asserts that the "Defendants ignored and failed to follow the Standard Operating Procedures" that would have prevented the conduct of which he complains. Response ¶ 9, at 13. As noted in note 2, <u>supra</u>, J. Parsons refers the Court to his Complaint for the content of this SOP provision. <u>See</u> Response ¶ 9, at 13. The Defendants reply that "these purported 'facts' attempt to establish that Defendants did not follow Albuquerque Police Department standard operating procedures (SOPs). They are not material to Plaintiff's claim or Defendants' Motion for Summary Judgment." Reply ¶ B, at 5. The Defendants do not dispute that J. Parsons accurately represents the content of APD SOP 1-1-4(D)(19) in his complaint, but merely challenges the legal relevance of this SOP and other SOP provisions. Accordingly, the Court deems the content of SOP 1-1-4(D)(19) undisputed for the reasons stated in note 2, <u>supra</u>. The Court will address relevance and materiality in its Analysis section. <u>See</u> Analysis § I, <u>infra</u>.

[8]J. Parsons asserts that the "Defendants ignored and failed to follow the Standard Operating Procedures" that would have prevented the conduct of which he complains. Response ¶ 9, at 13. As noted in note 2, <u>supra</u>, J. Parsons refers the Court to his Complaint for the content of this SOP provision. <u>See</u> Response ¶ 9, at 13. The Defendants reply that "these purported 'facts' attempt to establish that Defendants did not follow Albuquerque Police Department standard operating procedures (SOPs). They are not material to Plaintiff's claim or Defendants' Motion for Summary Judgment." Reply ¶ B, at 5. The Defendants do not dispute that J. Parsons accurately represents the content of APD SOP 2-64-3(B)(1)(d) in his complaint, but merely challenges the legal relevance of this SOP and other SOP provisions. Accordingly, the Court deems the content of SOP 2-64-3(B)(1)(d) undisputed for the reasons stated in note 2, <u>supra</u>. The Court will address the relevance and materiality of the SOPs in its Analysis section. <u>See</u> Analysis § I, <u>infra</u>.

[9]J. Parsons asserts that the "Defendants ignored and failed to follow the Standard Operating Procedures" that would have prevented the conduct of which he complains. Response ¶ 9, at 13. As noted in note 2, <u>supra</u>, J. Parsons refers the Court to his Complaint for the content of this SOP provision. <u>See</u> Response ¶ 9, at 13. The Defendants reply that "these purported 'facts' attempt to establish that Defendants did not follow Albuquerque Police Department standard operating procedures (SOPs). They are not material to Plaintiff's claim or Defendants' Motion for Summary Judgment." Reply ¶ B, at 5. The Defendants do not dispute that J. Parsons accurately represents the content of APD SOP 2-64-1 in his complaint, but merely challenges the legal relevance of this

"possible domestic situation" in Albuquerque, New Mexico, to an Albuquerque 911 operator. Recording of 911 Call at 00:09-10 (dated Nov. 17, 2017), filed November 11, 2020 (Doc. 19)(Operator)("911 Call").  See MSJ ¶ 1, at 2 (asserting this fact); Response ¶ 1, at 2 (admitting this fact).  Megan Cardona told the operator that her grandmother, Mary Parsons, had been released recently from a nursing rehabilitation center and was residing with her son, Cardona's uncle, J. Parsons, but that M. Parsons felt unsafe with J. Parsons and did not want to be in his home.  See MSJ ¶ 2, at 2-3 (asserting this fact); 911 Call at 00:38-48 (Cardona).[10]  Cardona

_____

and other SOP provisions.  Accordingly, the Court deems the content of SOP 2-64-1 undisputed for the reasons stated in note 2, supra.  The Court will address the relevance and materiality of the SOPs in its Analysis section.  See Analysis § I, infra.

[10]J. Parsons purports to dispute this fact, contending that Cardona "was irrationally emotional and was not aware of the entire situation regarding Plaintiff's mother."  Response ¶ 2, at 2.  J. Parsons does not dispute, however, what Cardona told the 911 Operator.  Instead, J. Parsons characterizes Cardona's state of mind during the phone call.  "All material facts set forth in the [MSJ] will be deemed undisputed unless specifically controverted."  D.N.M. LR Civ 56.1(b).  Here, because J. Parsons does not dispute that Cardona made these statements to the 911 Operator, the Court deems this fact admitted.

Additionally, under the Local Rules for the United States District Court for the District of New Mexico, the Response "must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist," and may, separately, "set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be **lettered** and must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M. LR Civ 56.1(b) (bold in original).  J. Parsons does not cite to the record regarding his statement that Cardona was "irrationally emotional."  Response ¶ 2, at 2.  Further, to the extent that the Response ¶ 2, at 2, states additional facts, it reiterates those facts in the "Plaintiff's Statemenst [sic] of Undisputed Material Facts."  Response ¶ 4, at 12.

Moreover, even if J. Parsons disputes the fact in MSJ ¶ 2, at 2-3, the Court is relying upon an audio recording of the applicable 911 Call.  In Lee v. University of New Mexico, 500 F. Supp. 3d 1181 (D.N.M. 2020)(J. Browning), the Court explained:

In Scott v. Harris, 500 U.S. 372 (2007), the video record clearly contradicted the plaintiff's version of events.  See 550 U.S. at 380-81.  The Supreme Court, therefore, concluded that a court may not adopt a "blatantly contradicted" version of the facts at the summary judgment stage. 550 U.S. at 380-81. The United State Court of Appeals for the Tenth Circuit also has concluded that, where an audio recording of an event "'blatantly contradicts'" a plaintiff's version of the facts at

expressed uncertainty as to the exact nature of J. Parsons' conduct towards M. Parsons, but stated

that M. Parsons was not safe in J. Parsons' home.  See MSJ ¶ 2, at 2-3 (asserting this fact); 911

Call at 00:56-01:02 (Cardona).[11]  Cardona informed the operator that her mother, Trish Hale was

en route from Belen, New Mexico, to J. Parsons' house.  See MSJ ¶ 6, at 3 (asserting this fact);

Response ¶ 6, at 4 (admitting this fact); 911 Call at 01:18-24 (Cardona).  Cardona stated that, to

her knowledge, J. Parsons was not acting violently towards M. Parsons, but, rather, was using

threatening language toward her.  See 911 Call at 01:36-42.[12]  Cardona related, however, that

---

the summary judgment stage, the court should not adopt the plaintiff's version of
the facts to the extent that the audio recording "'blatantly contradicted'" them.
York v. City of Las Cruces, 523 F.3d 1205, 1210-11 (10th Cir. 2008)(concluding
that a tape recording which only captured part of the events and was often
unintelligible did not blatantly contradict the plaintiff's version of the
evidence)(quoting Scott v. Harris, 550 U.S. at 380).  See Cordero v. Froats, 613 F.
App'x 768, 769 (10th Cir. 2015)(explaining that, in a police shooting case, although
evidence -- including a video, audio recordings, and physical
evidence -- undermined the plaintiff's witnesses, the video did not contradict
blatantly the plaintiff's version of events, because the video did not show clearly
the plaintiff holding a gun)(citing Scott v. Harris, 550 U.S. at 380).  Here, as in
Scott v. Harris, [the plaintiff] denies some of the police reports' contents, but clear,
intelligible audio recordings support the police reports.  To the extent that [the
plaintiff] purports that he did not provide a particular statement to the police, the
Court will not credit [the plaintiff's] testimony where the audio recordings of his
police interviews "blatantly contradict" his statements.  See Scott v. Harris, 550
U.S. at 380.

Lee v. Univ. of N.M., 500 F. Supp. 3d at 1194 n.12.  Similarly, here, to the extent that J. Parsons
purports to dispute the 911 call's contents, the Court will not credit J. Parsons' versions of events
"where the audio recordings . . . 'blatantly contradict' his statements." Lee v. Univ. of N.M., 500
F. Supp. 3d at 1194 n.12 (quoting Scott v. Harris, 550 U.S. at 380).

[11]The MSJ's summary of the 911 call does not go in chronological order.  See MSJ ¶ 5, at
3 (citing 911 Call at 5:38-6:11);  MSJ ¶ 6, at 3 (citing 911 Call at 4:11-47).  The Court has a copy
of the 911 Call recording and describes the call in chronological order.  The Court therefore does
not cite to the MSJ's facts in the order that they appear.

[12]No party has included this fact in the briefing.  The Defendants include, however, a 911
Call recording and cite it in their Response.   For the reasons stated in note 10, supra, the Court

J. Parsons had previously behaved in physically threatening ways toward M. Parsons, including "getting up in her face" and "flailing his arms around."  911 Call at 01:44-02:00 (Cardona).  <u>See</u> MSJ ¶ 3, at 3 (asserting this fact); Response ¶ 3, at 3 (admitting this fact by stating that J. Parsons "does not dispute that the niece made those allegations").  Cardona stated that J. Parsons had, in the last two weeks, "punched himself in the face a couple times," and that the atmosphere between J. Parsons and M. Parsons was "severe psychological, emotional right now."  911 Call at 01:53-59 (Cardona).[13]  Cardona asserted that she did not believe J. Parsons consumed drugs or alcohol. <u>See</u> 911 Call at 02:45-48 (Cardona, Operator).[14]

Cardona then told the operator that J. Parsons would state that M. Parsons was "not in her right mind."  911 Call at 02:50-54 (Cardona).[15]  Cardona stated that the current episode between J. Parsons and M. Parsons was an ongoing problem, because M. Parsons had suffered a stroke a few months earlier, and had been in and out of a rehabilitation facility.  <u>See</u> 911 Call at 03:00-17 (Cardona).[16]  Cardona told the operator that M. Parsons wanted to go to a hospital.  <u>See</u> MSJ ¶ 2,

---

concludes that the 911 call's contents are not in dispute, and thus includes additional details from the 911 call that are relevant to this Memorandum Opinion and Order.

[13]No party has included this fact in the briefing.  The Defendants include, however, a 911 Call recording and cite it in their Response.   For the reasons stated in note 10, <u>supra</u>, the Court concludes that the 911 call's contents are not in dispute, and thus includes additional details from the 911 call that are relevant to this Memorandum Opinion and Order.

[14]No party has included this fact in the briefing.  The Defendants include, however, a 911 Call recording and cite it in their Response.   For the reasons stated in note 10, <u>supra</u>, the Court concludes that the 911 call's contents are not in dispute, and thus includes additional details from the 911 call that are relevant to this Memorandum Opinion and Order.

[15] No party has included this fact in the briefing.  The Defendants include, however, a 911 Call recording and cite it in their Response.   For the reasons stated in note 10, <u>supra</u>, the Court concludes that the 911 call's contents are not in dispute, and thus includes additional details from the 911 call that are relevant to this Memorandum Opinion and Order.

[16]No party has included this fact in the briefing.  The Defendants include, however, a 911 Call recording and cite it in their Response.   For the reasons stated in note 10, <u>supra</u>, the Court

at 2-3 (asserting this fact); 911 Call at 03:22-25 (Cardona).[17]  Cardona described the emergency as a "domestic violence situation."  911 Call at 03:58-04:00.[18]  Cardona told the operator that Hale informed M. Parsons' hospice care service that M. Parsons felt unsafe at J. Parsons' home and wanted to leave.  See MSJ ¶ 2, at 2-3 (asserting this fact); 911 Call at 04:20-30.[19]  Cardona told the operator that she thought, therefore, that hospice care workers might be present at J. Parsons' home when police officers arrived.  See 911 Call at 04:40-45 (Cardona).[20]

Cardona said that she believed her grandmother was in "distress," noting that M. Parsons had been screaming for help on the telephone with Cardona moments before the 911 call, and explaining that she was concerned that M. Parsons "was going to have a heart attack."  911 Call at 05:02-30.  MSJ ¶ 4, at 3 (asserting this fact).[21]  The operator informed Cardona that police officers

_____

concludes that the 911 call's contents are not in dispute, and thus includes additional details from the 911 call that are relevant to this Memorandum Opinion and Order.

[17]For the reasons stated in note 10, supra, the Court deems this fact undisputed.

[18]No party has included this fact in the briefing.  The Defendants include, however, a 911 Call recording and cite it in their Response.   For the reasons stated in note 10, supra, the Court concludes that the 911 call's contents are not in dispute, and thus includes additional details from the 911 call that are relevant to this Memorandum Opinion and Order.

[19]For the reasons stated in note 10, supra, the Court deems this fact undisputed.

[20]No party has included this fact in the briefing.  The Defendants include, however, a 911 Call recording and cite it in their Response.   For the reasons stated in note 10, supra, the Court concludes that the 911 call's contents are not in dispute, and thus includes additional details from the 911 call that are relevant to this Memorandum Opinion and Order.

[21]Parsons states that Cardona "was reporting her *perceptions* regarding the incidents for which she had no understanding or actual experience of with regard to the events unfolding at Plaintiff's home as she was thousands of miles away."  Response ¶ 4, at 3 (emphasis in original).  Cardona's statements are relevant to show what information the 911 Operator told the Defendants before they arrived at Parsons' home.  The Defendants do not assert that all of Cardona's statements were factually accurate; instead, they summarize what Cardona told the operator.  The Plaintiff's characterization of Cardona's statements does not specifically dispute that she made the statement to the operator.  See D.N.M. LR Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  To the extent that

would be sent to J. Parsons' home; Cardona replied that she was concerned that J. Parsons would

not let the officers reach M. Parsons, whose room was toward the rear of J. Parsons' house.  See

MSJ ¶ 5, at 3 (asserting this fact); 911 Call at 05:50-06:00 (Cardona, Operator).[22]  The operator

told Cardona that he would provide the responding officers with all the information which Cardona

had provided him.  See MSJ ¶ 7, at 3 (asserting this fact); Response ¶ 7, at 4 (stating that "the

Plaintiff does not dispute that his niece made those allegations"); 911 Call at 06:10-15 (Operator).

## IV.    THE DEFENDANTS' ENCOUNTER WITH J. PARSONS.

The Defendants arrived together at J. Parsons' house, and Hale met them at the door.  See

MSJ ¶ 9, at 3-4 (asserting this fact); Response ¶ 9, at 5 (admitting this fact); Barlow Lapel Video

at 00:40-56; Velasquez Lapel Video at 00:42-58.  Hale stated: "Thank god you guys are here."

Barlow Lapel Video at 00:56-59; Velasquez Lapel Video at 00:58-01:01.[23]  She informed the

Defendants  that M. Parsons had lived with J. Parsons for eight years, and had suffered a series of

strokes, some as recently as the prior day.  See MSJ ¶ 10, at 4 (asserting this fact); Response ¶ 10,

---

J. Parsons attempts to dispute this fact, for the reasons stated in note 10, supra, the Court deems
this fact undisputed.  In sum, the Court looks at Cardona's 911 call statements to show what she
told the 911 operator, but does not rely upon those statements for their truth.

[22]J. Parsons purports to dispute this statement, stating that "this statement is refuted by the
record of the defendants" and citing to the lapel videos.  Response ¶ 5, at 3-4.  For the reasons
stated in note 21, supra, the Court deems this fact undisputed.

[23]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  Per Scott v. Harris, the
Court may not adopt a party's characterization of the events in question that "blatantly contradicts"
clear, intelligible video recordings of those events.  550 U.S. at 380-81.  Where such recordings
are available, as here, the Court may rely upon them in deciding an MSJ.  See York v. City of Las
Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008).  Accordingly, the Court concludes that the contents
of the Defendants' lapel camera recordings are not in dispute, and thus includes additional details
from the recordings of the Defendants' encounter with J. Parsons that are relevant to this
Memorandum Opinion and Order.

at 5 (admitting this fact); Barlow Lapel Video at 01:03-16; Velasquez Lapel Video at 01:05-18.

Hale stated that M. Parsons "wants out of this house. She wants taken . . . to the hospital."

Barlow Lapel Video at 01:17-24; Velasquez Lapel Video at 01:19-26 (same). See MSJ ¶ 10, at 4

(asserting this fact); Response ¶ 10, at 5 (admitting this fact). Hale added that M. Parsons "doesn't

want to be here with [J. Parsons]. She does not feel safe." Barlow Lapel Video at 01:36-41;

Velasquez Lapel Video at 01:38-43 (same). See MSJ ¶ 10, at 4 (asserting this fact); Response

¶ 10, at 5 (admitting this fact). Hale told the Defendants that care workers from M. Parsons'

hospice facility, Ambercare Hospice,[24] were present in the house. See MSJ ¶ 15, at 4 (asserting

this fact); Response ¶ 15, at 7-8 (admitting this fact). See also Response ¶ 1, at 12 (asserting that

J. Parsons had earlier contacted Ambercare Hospice for assistance); Barlow Lapel Video at 01:40-

47; Velasquez Lapel Video at 01:42-49.[25] Hale stated that M. Parsons "does not have power of

---

[24]Ambercare Hospice is a New Mexico-based healthcare company offering, among other
services, end-of-life care for terminally ill persons. "Ambercare also provides medical,
psychological, spiritual, and emotional support for the terminally ill. Ambercare is focused on
alleviating the pain experienced during this difficult time and helping individuals cope with dying,
death, and grief." Hospice Care, Ambercare, http://www.ambercare.com/hospice-care.aspx (last
visited June 14, 2021).

[25]The Defendants assert in the Reply that J. Parsons' statements "pertain to hospice care
and social workers; they are not material to Defendants' Motion for Summary Judgment." Reply
¶ A, at 4. In asserting that J. Parsons' statements are "not material," the Defendants appear to
dispute that his statements are relevant. Reply ¶ A, at 4. Rule 401 of the Federal Rules of Evidence
states that evidence is relevant if it "has any tendency to make a fact more or less probable than it
would be without the evidence" and that fact "is of consequence in determining the action." Fed.
R. Evid. 401(a)-(b). "Irrelevant evidence is not admissible," Fed. R. Evid. 402, and in turn cannot
be heard to decide a motion for summary judgment. See Gross v. Burggraf Const. Co., 53 F.3d
1531, 1541 (10th Cir. 1995). The Court has previously held, however, that a "relevance argument
similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the
Analysis section" of the opinion. SEC v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27
n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). Insofar as the Defendants dispute the relevance alone
of J. Parsons' proffered facts, therefore, the Court concludes that they are undisputed.

The Defendants also assert in their Reply that J. Parsons relies on hearsay, although they
do not specify which of J. Parsons' proffered facts they dispute on this ground. See Reply ¶ A, at
4. They appear to target those factual assertions on which J. Parsons relies in his affidavit, such

attorney, so she can go where she wants to, when she wants to." Barlow Lapel Video at 01:44-50;

Velasquez Lapel Video at 01:46-52.  See MSJ ¶ 17, at 5 (asserting this fact); Response ¶ 17, at 8-

9 (admitting this fact).[26]

J. Parsons opened the door during this exchange and said to the Defendants: "Come on in,

---

as that he had contacted Ambercare Hospice earlier in the day.  See Response ¶ 1, at 12; Reply ¶ A, at 4.  That J. Parsons contacted Ambercare does not, however, constitute hearsay.  J. Parsons asserts in his affidavit that "Francisco Bussetti from Ambercare Hospice was on scene at our home when the 911 call came" and that J. Parsons "had been in touch with Laurie Norine, the Emergency Supervisor for Ambercare Hospice."  Affidavit of Jeff Parsons ¶¶ 8, 14 at 2, 3 (executed December 14, 2020), filed December 18, 2020 (Doc. 25-1)("J. Parsons Aff.").  J. Parsons also supplies a Patient Note at 7 (dated November 19, 2017), filed December 18, 2020, that Ambercare Hospice produced.  See Attachment 2 (Doc. 25-1).  This Patient Note -- time-stamped 2:11 p.m. on November 19, 2017 -- states that "Jeff called to ask for assistance as his mother wants to go to the hospital and he does not want to her to go."  Patient Note at 7.

The affidavit's assertions do not recount out-of-court statements, and, even if they did, they are not offered for the truth the of the matter asserted.  See Fed. R. Evid. 801(c).  The Patient Note, moreover, falls under rule 803(4) of the Federal Rules of Evidence exception to the hearsay rule as a statement concerning M. Parsons' medical care.  See Fed. R. Evid. 803(4).  J. Parsons and Norine, who wrote the Patient Note, both intended to testify at trial .  See Plaintiff's Witness List, filed March 12, 2021 at 1 (Doc. 31)("J. Parsons Witness List")(listing J. Parsons and Norine as witnesses).  J. Parsons also intends to call as witnesses Jessica Durbin, an Ambercare Hospice nurse who responded to J. Parsons' call, and other Ambercare Hospice employees to testify to the day's events.  See J. Parsons Witness List at 2-3.  Accordingly, the Court concludes that J. Parsons' assertion that he contacted Ambercare Hospice is not hearsay, and, even if it were, would be admissible under rule 803(4).  For this reason -- and for the reasons stated above regarding that assertion's disputed "material[ity]," Reply ¶ A, at 4 -- the Court deems undisputed the fact that J. Parsons had earlier contacted Ambercare Hospice.

[26]In New Mexico, "'power of attorney' means a writing or other record that grants authority to an agent to act in the place of the principal."  N.M.S.A. § 45-5B-102(G).  In the relevant context, a power of attorney is used to grant to one person legal decision-making power over another, mentally or physically incapacitated person.  See CITE.  Under the statute, the definition of this form of incapacity is the

> inability of an individual to manage the individual's estate or financial affairs, or
> both, because . . . of gross mismanagement, as evidenced by recent behavior, of
> the individual's income and resources or the individual's medical inability to
> manage the individual's income and resources that has led, or is likely in the near
> future to lead, to financial vulnerability.

N.M.S.A. § 45-5B-102(E)(1).

guys.  Come on in."  Barlow Lapel Video at 01:56-02:00; Velasquez Lapel Video at 01:58-02:02.

See MSJ ¶ 11, at 4 (asserting this fact); Response ¶ 11, at 5-6 (admitting this fact).  Velasquez then

asked J. Parsons to step outside and speak with Barlow.  See Barlow Lapel Video at 02:01-03;

Velasquez Lapel Video at 02:03-05.[27]  J. Parsons did so, while Velasquez entered the house with

Hale.  See MSJ ¶ 12, at 4 (asserting this fact); Response ¶ 12, at 6 (admitting this fact);  Barlow

Lapel Video at 02:10-15; Velasquez Lapel Video at 02:12-17.[28]

Barlow asked J. Parsons to sit at a table on the porch, and J. Parsons complied.  See Barlow

---

J. Parsons does not dispute the Defendants' assertion that "Plaintiff and Trish Parsons represented to Defendants that neither they nor any other individuals could make legal decisions on Ms. Parsons' behalf."  MSJ ¶ 17, at 5.  See Response ¶ 17, at 8-9.  J. Parsons adds, however, that "after requesting and receiving Mary Parsons' full record from Ambercare Hospice, he discovered that Mrs. Parsons had signed the Family Requested Surrogate Healthcare Decision Maker form on November 4, 2017 appointing Plaintiff to stand in as Surrogate Healthcare Decision maker on her behalf."  Response ¶ 17, at 8-9.  J. Parsons includes in his briefing a document produced by Ambercare Hospice bearing the title Family Requested Surrogate Healthcare Decision Maker at 9 (no date), filed December 18, 2020 (Doc. 25-1)("Surrogate Form").  The Surrogate Form states that "[a]ccording to family, patient has not completed or is unable to provide a medical power of attorney.  The patient's medical condition prohibits him/her from completing one at this time."  Surrogate Form at 9.  The form states, however, that M. Parsons elects J. Parsons as her "Surrogate Healthcare Decision Maker."  Surrogate Form, at 9.  The form is not completed, and in the space for "Signature of Appointed Family Member" it appears to bear M. Parsons' signature rather than J. Parsons'.  Surrogate Form at 9.  J. Parsons does not include these facts in his statement of undisputed facts, and the Defendants do not address the issue in their Reply.  The Court includes this as background information for the reader and discusses its relevance in the Analysis section.  See Analysis § II(C), infra.  For the reasons stated in note 23, supra, the Court thus deems undisputed the fact that Hale and J. Parsons contemporaneously represented to the Defendants that they did not have decision-making over M. Parsons.

[27]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[28]The Defendants assert that, "[w]ithout objection, Plaintiff stayed on the porch with Officer Barlow."  MSJ ¶ 12, at 4.  Although J. Parsons does not state explicitly that he disputes this characterization, he disputes implicitly that, "without objection," he remained outside with Barlow.  MSJ ¶ 12, at 4.  He maintains, rather, that he "stayed on the porch because he was ordered to by

Lapel Video at 02:11-18.[29]   As he was taking a seat, J. Parsons told Barlow that the "girl wants

you to call her from hospice."   Barlow Lapel Video at 02:15-16.   See Response ¶ 5, at 12-13

(asserting this fact).[30]   Barlow asked: "What's going on today?"   Barlow Lapel Video at 02:17-

_____

the Defendants."   Response ¶ 12, at 6.   J. Parsons apparently interprets the Defendants' assertion
that he remained outside "without objection" to mean that he did so willingly.   This he disputes,
stating that Velasquez placed him "in the custody of Officer Barlow, who then detained Plaintiff
on the porch."   Response ¶ 12, at 6.   J. Parsons maintains further that he "repeatedly requested to
enter the home and provide" for the Defendants the telephone number of an Ambercare Hospice
supervisor.   Response ¶ 12, at 6.   See also Response ¶ 5, at 12-13 (stating that the "Plaintiff
repeatedly requested to enter the home to provide" the supervisor's contact "information for
Defendants"); Reply ¶ A, at 4 (disputing the materiality, not veracity, of J. Parsons' assertions in
Response ¶ 5, at 12-13).
       Although J. Parsons may have objected silently to his treatment, he did not voice any
explicit objection to remaining outside or request to go back inside until Velasquez emerged onto
the porch fifteen minutes later.   See Barlow Lapel Video at 02:03-18:30.   Moreover, although he
requested repeatedly that Barlow contact Ambercare Hospice, he did not request that he be allowed
back inside to retrieve the telephone number.   See Barlow Lapel Video at 02:15-16, 03:00-05,
03:48-05:00.   Rather, J. Parsons requested that either Barlow retrieve the telephone number or that
another person bring it to her.   See Barlow Lapel Video at 02:15-16, 03:00-05, 03:48-05:00.   For
the reasons stated in note 23, supra, the Court will not credit J. Parsons' assertions to the extent
that they contradict the Defendants' lapel camera recordings.   Accordingly, the Court deems
undisputed the fact that J. Parsons did not object to remaining outside with Barlow.
       J. Parsons further asserts in his statement of undisputed facts that he "was removed from
his home, detained on his front porch, and then detained on his living room couch by Defendants."
Response ¶ 7, at 13.   The Defendants dispute this assertion as "a compilation of conclusory
arguments."   Reply ¶ E, at 6.   For the reasons stated in note 23, supra, the Court deems undisputed
the fact that the Defendants did not "remov[e]" J. Parsons from his home, forcibly or otherwise,
but that he stepped outside voluntarily.   Response ¶ 7, at 13.   The latter two statements -- that
J. Parsons was "detained on his front porch" and "detained on his living room couch" -- are not
factual assertions but rather legal conclusions more appropriate for the Analysis section.   Response
¶ 7, at 13.

       [29]No party has included this fact in the briefing.   The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, so the
Court includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

       [30]In his statement of undisputed material facts, J. Parsons asserts that he "was attempting
to get Defendants to contact the Emergency Supervisor for Ambercare Hospice in order to facilitate
their help for Mary Parsons in accordance with the hospice directive which was on the dining room
table."   Response ¶ 5, at 12-13.   The Defendants dispute the materiality, not the veracity, of

18.[31]   J. Parsons explained that his mother had just returned home from a rehabilitation facility, had experienced strokes, and was "not lucid."  Barlow Lapel Video at 02:20-30.[32]  J. Parsons stated that he told M. Parsons that she "ha[d] everything [she] need[ed] right here" and did not need to go to the emergency room, as she had been requesting.  Barlow Lapel Video at 02:33-40.[33] J. Parsons stated that he had told M. Parsons that she was "not going to go survive another roundtrip, ER thing."  Barlow Lapel Video at 02:40-44.[34]  He told Barlow that he was "doing what the hospice people told me to do."  Barlow Lapel Video at 02:50-53.[35]  J. Parsons stated again that

---

J. Parsons' assertion.  Reply ¶ A, at 4.  Accordingly, the Court deems the fact that J. Parsons attempted to have the Defendants contact Norine undisputed for the reasons stated in note 2, supra.

[31]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[32]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[33]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[34]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[35]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and

Laurie Norine, an Ambercare Hospice emergency supervisor, had requested that the responding police officers contact her once they arrived and said that the telephone number to call was on the table inside the house.  See Response ¶ 2, at 12 (asserting that Norine had requested that the Defendants contact her upon their arrival); Barlow Lapel Video at 03:00-05.[36]  J. Parsons explained that he owns the house where he and M. Parsons resided, as well as the house next door.  See MSJ ¶ 13, at 4 (asserting this fact); Response ¶ 13, at 7 (admitting this fact); Barlow Lapel Video 3:05-35.

Barlow told J. Parsons that they were contacted about a "domestic dispute" and were "trying to figure out what's going on."  Barlow Lapel Video at 03:44-47.[37]  J. Parsons again requested that Barlow contact Ambercare Hospice and "they'll tell you all about it."  Barlow Lapel Video at 03:48-53.  See Response ¶ 5, at 12-13 (asserting this fact).[38]  Barlow expressed confusion why the Defendants needed to call Ambercare Hospice when two employees were already present

---

thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[36]The Defendants assert in the Reply that J. Parsons' statements "pertain to hospice care and social workers; they are not material to Defendants' Motion for Summary Judgment."  Reply ¶ A, at 4.  The Defendants dispute the materiality -- that is the relevance -- not the veracity, of J. Parsons' assertion.  Reply ¶ A, at 4.  Accordingly, the Court deems the fact that J. Parsons attempted to have the Defendants contact Norine undisputed for the reasons stated in note 2, supra.

[37]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[38]In his statement of undisputed material facts, J. Parsons asserts that he "was attempting to get Defendants to contact the Emergency Supervisor for Ambercare Hospice in order to facilitate their help for Mary Parsons in accordance with the hospice directive which was on the dining room table."  Response ¶ 5, at 12-13.  The Defendants dispute the relevance, not the veracity, of J. Parsons' assertion.  See Reply ¶ A, at 4.  Accordingly, the Court deems the fact that J. Parsons attempted to have the Defendants contact Norine undisputed for the reasons stated in note 2, supra.

at the house.  See Barlow Lapel Video at 04:08-23.[39]  When J. Parsons raised an eyebrow and

reiterated, "so she can tell you what's going on," Barlow asked why J. Parsons "ha[s] so much

attitude with me."  Barlow Lapel Video at 04:15-21.[40]

Barlow asked J. Parsons, "were you guys arguing" whether M. Parsons should go to the

hospital.  Barlow Lapel Video at 05:46-50.[41]  J. Parsons responded: "If you want to call it that."

Barlow Lapel Video at 05:47-50.[42]  J. Parsons affirmed that, "if [M. Parsons] wants to go to the

hospital, [the Defendants] can't deny her that  . . .  and [he] can't deny her that either."  Barlow

Lapel Video at 06:40-47.  See MSJ ¶ 17, at 5 (asserting this fact); Response ¶ 17, at 8-9 (admitting

this fact).

While Barlow spoke to J. Parsons, Velasquez went with Hale to M. Parsons' room in the

---

[39]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[40]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[41]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[42]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

rear of house.  See MSJ ¶ 15, at 4 (asserting this fact); Response ¶ 15, at 7-8 (admitting this fact);

Velasquez Lapel Video at 02:11-03:23.  M. Parsons was lying in bed and two Ambercare Hospice

aides -- a social worker, Francisco Bussetti, and a nurse -- stood around her.  See MSJ ¶ 15, at 4

(asserting this fact); Response ¶ 4, at 12 (admitting that Bussetti was present); Velasquez Lapel

Video at 03:23.[43]  Hale said to M. Parsons, "here's the police officer.  You wanted to talk to a

police officer."  Velasquez Lapel Video at 03:33-36.[44]  M. Parsons responded, "I would like four

of them," and told Velasquez to call "two more."  Velasquez Lapel Video at 03:42-50.[45]  Velasquez

declined to call more police, stating, "we don't have enough to call two  . . . .  We're here to handle

your call, so you can talk to me."  Velasquez Lapel Video at 03:44-52.[46]

     Bussetti and the nurse left the room and M. Parsons asked Hale to leave, telling her in a

---

[43]J. Parsons asserts in his statement of undisputed facts that "licensed medical social worker Francisco Bussetti arrived at the home of Plaintiff and Mary Parsons at 2:22 pm Sunday November 19, 2017, at the request of Plaintiff."  Response ¶ 4, at 12.  The Defendants assert in the Reply that J. Parsons' statements "pertain to hospice care and social workers; they are not material to Defendants' Motion for Summary Judgment."  Reply ¶ A, at 4.  The Defendants dispute the materiality -- that is, the relevance -- not the veracity, of J. Parsons' assertion.  See Reply ¶ A, at 4.  For the reasons stated in note 2, supra, the Court deems undisputed the fact that Francisco Bussetti was present at J. Parsons' residence at J. Parsons' request.  The Court will discuss the relevance of this fact, if any, in the Analysis section.  See Analysis § I, infra.

[44]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[45]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[46]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and

loud voice to "go, go, go."  Velasquez Lapel Video at 04:18-25.[47]  For the next three minutes,

Velasquez and M. Parsons were left alone in her bedroom.  See Velasquez Lapel Video at 04:25-

08:18.[48]  M. Parsons told Velasquez she wanted him to "get me out of this place."  Velasquez

Lapel Video at 04:51-53.  See MSJ ¶ 16, at 5 (asserting this fact); Response ¶ 16, at 8 (admitting

this fact).  Throughout the exchange, M. Parsons' speech was halting.  See Velasquez Lapel Video

at 04:25-08:18.[49]  More than once, M. Parsons did not complete sentences she had begun.  See,

e.g., Velasquez Lapel Video at 04:58, 05:08, 05:20.[50]  When Velasquez asked M. Parsons if she

was in pain and needed an ambulance, she responded: "Honey, you are almost atrophied, is that

what you call it?  And they's keep putting me.  When you start losing your bowels, then you start,

---

thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[47]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[48]No party has included this fact in the briefing.  The Defendants include, however,
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[49]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[50]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

you [unintelligible], [unintelligible]."  Velasquez Lapel Video at 05:28-06:00.[51]  Throughout the

remainder of the conversation, she similarly did not respond to Velasquez' questions.  See, e.g.,

Velasquez Lapel Video at 06:06-10; id. at 07:12-45.[52]

Velasquez stepped out of the room and spoke with Hale, Bussetti, and the nurse, stating

that he was "totally lost" and had "no idea what's going on."  Velasquez Lapel Video at 08:19-20.

See MSJ ¶ 15, at 4 (asserting this fact); Response ¶ 17, at 7-8 (admitting this fact).  Bussetti told

Velasquez that he and the nurse were called in to "assess whether [M. Parsons] could make

decisions, which it doesn't seem like she can."  Velasquez Lapel Video at 08:34-37.[53]  Velasquez

agreed, stating "yeah.  It doesn't seem like she's very coherent."  Velasquez Lapel Video at 08:37-

38.[54]

Velasquez informed Bussetti and the nurse that the 911 operator received a "call from a

---

[51]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[52]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[53]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[54]In his additional material facts, J. Parsons asserts that "Francisco Bussetti was not
interviewed by Defendants regarding the situation in which he found Mary Parsons," and that the
Defendants had "not interviewed or questioned [the Ambercare workers] regarding the situation."
Response ¶ 4, at 12.  The Defendants dispute the relevance, not the veracity of J. Parsons'
assertion.  Reply ¶ A, at 4.  Accordingly, the Court deems the fact that the Defendants did not

third party." Velasquez Lapel Video at 08:50.[55] Hale stated that her daughter, Cardona, was the

caller. *See* Velasquez Lapel Video at 08:53.[56] Velasquez stated that Cardona "was upset because

apparently Jeffrey was yelling at [M. Parsons] or something," to which Hale replied, "yes, yes."

Velasquez Lapel Video at 08:54-09:05.[57] Hale noted that J. Parsons "does tell [M. Parsons] to

shut up, take your medicine, do this, do that." Velasquez Lapel Video at 09:06-10.[58]

Velasquez stated that he was unsure what assistance M. Parsons needed, asking: "Do I

need to bring her an ambulance right here, right now?" Velasquez Lapel Video at 09:20-28.[59]

---

interview the Ambercare Hospice workers undisputed for the reasons stated in note 2, *supra*. The Court notes, however, that, although the Defendants may not have interviewed or questioned formally Bussetti or the Ambercare Hospice nurse, Velasquez spoke to both persons about M. Parsons' condition and what care was appropriate under the circumstances. *See, e.g.,* Velasquez Lapel Video at 08:19-09:30; 28:50-29:50. The Court will address the relevance of this fact in the Analysis. *See* Analysis § I, *infra*.

[55]No party has included this fact in the briefing. The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ. For the reasons stated in note 23, *supra*, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[56]No party has included this fact in the briefing. The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ. For the reasons stated in note 23, *supra*, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[57]No party has included this fact in the briefing. The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ. For the reasons stated in note 23, *supra*, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[58]No party has included this fact in the briefing. The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ. For the reasons stated in note 23, *supra*, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

Bussetti replied: "We're trying to figure that out too."  Velasquez Lapel Video at 09:20-28.[60]  The

nurse said to Velasquez: "I don't think she's appropriate for the hospital."  Velasquez Lapel Video

at 09:27-30.[61]

Stating that Cardona was the only person whom M. Parsons trusted, Hale called Cardona

and brought the telephone to M. Parsons in her bedroom.  See Velasquez Lapel Video at 09:56-

10:27.[62]  Velasquez followed Hale into the bedroom.  See Velasquez Lapel Video at 10:36.[63]  Hale

---

[59]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[60]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[61]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[62]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[63]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

placed the call on speakerphone and left the room.  See Velasquez Lapel Video at 10:55-11:11.[64]

Outside on the porch, Barlow and J. Parsons had continued to speak.  See Barlow Lapel Video at 06:47-11:09.[65]  As J. Parsons recounted the past two days' events, Barlow stated: "We're just trying to figure everything out."  Barlow Lapel Video at 08:51-53.[66]  J. Parsons responded: "exactly.  Good.  Thank you.  Thanks for the help.  Appreciate it."  Barlow Lapel Video at 08:52-55.  See MSJ ¶ 12, at 4 (asserting that "[J. Parsons'] conversations with [Barlow] . . . were generally cordial in nature"); Response ¶ 12, at 6 (admitting this fact).  See also MSJ ¶ 21, at 5 ("On different occasions, Plaintiff voiced appreciation for Defendants' help."); Response ¶ 21, at 10 (admitting this fact).[67]

In the middle of relating the history of M. Parsons' illnesses to Barlow, J. Parsons received

---

[64]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[65]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[66]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[67]J. Parsons disputes the Defendants' characterization that he "voiced appreciation for Defendants' help."  MSJ ¶ 21, at 5.  He contends that such exchanges were "measures to be polite, not an expression of thankfulness that the officers were at his home detaining him." Response ¶ 21, at 10.  J. Parsons does not dispute, however, that he made statements that the Defendants characterize as "voic[ing] appreciation."  MSJ ¶ 21, at 5.  He appears to dispute whether such "appreciation" was genuine and therefore whether mere "politeness" is a more appropriate

a telephone call.  See MSJ ¶ 14, at 4 (asserting this fact); Response ¶ 14, at 7 (admitting this fact);

Barlow Lapel Video at 10:53.  J. Parsons answered it, saying: "Let me call you back.  I'm talking

to the police, okay?"  Barlow Lapel Video at 10:57-11:07.  See MSJ ¶ 14, at 4 (asserting this fact);

Response ¶ 14, at 7 (admitting this fact).  J. Parsons then hung up the telephone.  See MSJ ¶ 14, at

4 (asserting this fact); Response ¶ 14, at 7 (admitting this fact); Barlow Lapel Video at 11:05-07.

For the next eight minutes, J. Parsons explained to Barlow M. Parsons' experiences in nursing

facilities, where he maintained that she received inadequate care.  See MSJ ¶ 12, at 4 (asserting

this fact); Response ¶ 12, at 6 (admitting this fact); Barlow Lapel Video at 11:07-18:30.[68]  Barlow

said at one point, "you're upset, and it's totally understandable."  Barlow Lapel Video at 16:59-

17:01.  See MSJ ¶ 12, at 4 (asserting that "[J. Parsons'] conversations with [Barlow] . . . were

generally cordial in nature"); Response ¶ 12, at 6 (admitting this fact).

     During this time, Velasquez spoke with M. Parsons and over speakerphone with Cardona.

See Velasquez Lapel Video at 11:58-18:04.[69]  When Velasquez asked whether J. Parsons was

---

characterization.   Because, however, J. Parsons does not dispute that he made the relevant
statements, only whether they were genuine, the Court deems the fact that J. Parsons made those
statements undisputed for the reasons stated in note 23, supra.

    [68]The Defendants assert that "a majority of the conversations" between J. Parsons and the
Defendants "focused on Plaintiff's many complaints about his mother's healthcare."  MSJ ¶ 12, at
4.   J. Parsons disputes that he was "complaining about Mary Parsons' current healthcare
providers," maintaining instead that "he was attempting to get Defendants to contact the
Emergency Supervisor for Ambercare Hospice."  Response ¶ 12, at 6.  J. Parsons does not dispute,
however, that he made statements that the Defendants characterize as "complaints."  MSJ ¶ 12, at
4.  Accordingly, the Court deems the fact that J. Parsons made those statements undisputed for the
reasons stated in note 23, supra.

    [69]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

M. Parsons' guardian, Cardona stated: "No . . . .  She doesn't have power of attorney to him or anything."  Velasquez Lapel Video at 12:36-44.[70]  M. Parsons confirmed, stating, "no, I have not."  Velasquez Lapel Video at 12:47.[71]

Velasquez asked Cardona: "What do we want to do?  Where does she want to go?"  Velasquez Lapel Video at 12:46-50.[72]  Cardona responded: "She wants to go to Presbyterian Hospital" in Albuquerque.  Velasquez Lapel Video at 12:51-52.[73]  Velasquez addressed M. Parsons, asking: "You want to go to the hospital?  Is that what you want to do, ma'am?"  Velasquez Lapel Video at 12:53-57.[74]  M. Parsons responded: "Yes."  Velasquez Lapel Video at

---

[70]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[71]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[72]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[73]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[74]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and

12:57-58.  <u>See</u> MSJ ¶ 16, at 5 (asserting this fact).[75]

Velasquez then called an ambulance on M. Parsons' behalf.  <u>See</u> Velasquez Lapel Video

at 14:42-47.[76]  Cardona expressed concern that M. Parsons had "medicine . . . that's ten years

old."  Velasquez Lapel Video at 15:22-30.[77]  Cardona added that J. Parsons was "trying to give

her a little bit of everything . . . .  She's taking eighteen different things."  Velasquez Lapel Video

at  16:22-28.[78]   When  Velasquez  stepped  out  of  M. Parsons'  bedroom  to  speak  to  Barlow,

---

thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[75]The Defendants assert that M. Parsons "requested to leave the residence and be taken to
the hospital because she was having difficulty swallowing."  MSJ ¶ 16, at 5.  J. Parsons purports
to dispute this fact, asserting that, per M. Parsons' Advanced Medical Care Directive, "she had
chosen to be in Hospice care, and not go to the hospital for that type of visit . . . .  As Mrs. Parsons
was in an altered mental status without proper decisional capacity, the Emergency Supervisor for
Ambercare Hospice should have been consulted as requested by Plaintiff."  Response ¶ 16, at 8.
To the extent that J. Parsons' assertions "blatantly contradict[]," <u>Scott v. Harris</u>, 550 U.S. at 380-
81, Velasquez' lapel camera recording, the Court will not credit them.  Accordingly, the Court
deems the fact that M. Parsons requested that she be taken to the hospital undisputed for the reasons
stated in note 23, <u>supra</u>.

[76]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, <u>supra</u>, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[77]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, <u>supra</u>, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[78]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, <u>supra</u>, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

M. Parsons said to him: "Please, come back."  Velasquez Lapel Video at 18:01-04.[79]

As Velasquez stepped outside onto the porch, J. Parsons said to Barlow: "Thanks for listening, anyway. I appreciate it."  Barlow Lapel Video at 18:30-32; Velasquez Lapel Video at 18:32-34.  See MSJ ¶ 21, at 5 ("On different occasions, Plaintiff voiced appreciation for Defendants' help."); Response ¶ 21, at 10 (admitting this fact).[80]  J. Parsons asked to go inside and sit on the couch because he felt cold.  See MSJ ¶ 18-19, at 5 (asserting this fact); Response ¶ 18-19, at 9-10 (admitting this fact); Barlow Lapel Video at 18:34-43; Velasquez Lapel Video at 18:36-45.  The Defendants acquiesced and followed J. Parsons inside.  See MSJ ¶ 18-19, at 5 (asserting this fact); Response ¶ 18-19, at 9-10; Barlow Lapel Video at 18:44-50; Velasquez Lapel Video at 18:46-52.[81]  J. Parsons stated, "let me get you guys that number," explaining that the number was "right there on that table."  Barlow Lapel Video at 18:46-51; Velasquez Lapel Video at 18:48-53.  See Response ¶ 5, at 12-13 (asserting this fact); Reply ¶ A, at 4 (admitting this fact).  Velasquez responded: "Just sit on the couch and I'll get whatever you need in a little bit."  Barlow Lapel

---

[79]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[80]For the reasons stated in note 67, supra, the Court deems this fact undisputed.

[81]The Defendants assert that J. Parsons "complained of being cold outside and went inside the residence and sat on his couch."  MSJ ¶ 19, at 5.  J. Parsons disputes this characterization, stating that he "request[ed] permission to be inside due to the weather." Response ¶ 19, at 9 (emphasis in original).  The Defendants exclude the fact that J. Parsons asked to go inside and that they acquiesced to his request.  See Barlow Lapel Video at 18:34-18:43; Velasquez Lapel Video at 18:36-18:45.  To the extent that the Defendants' assertion suggests that J. Parsons entered the house without their consent, the Court will deem it undisputed that J. Parsons obtained such consent where the lapel footage "blatantly contradicts" a contrary version of the events.  Scott v. Harris, 550 U.S. at 380.

Video 18:45-50; Velasquez Lapel Video 18:47-52.[82]  Barlow's hand obscured partially her lapel

camera for approximately ten seconds while she, Velasquez, and J. Parsons stepped inside the

house.  See Barlow Lapel Video at 18:41-50.[83]

As they entered the house, Velasquez again told J. Parsons to sit down on a couch just

inside the door, stating: "Have a seat right there.  Have a seat right there.  Stay right there."  Barlow

Lapel Video at 18:50-56; Velasquez Lapel Video at 18:52-58.[84]  J. Parsons obeyed, saying: "Okay,

sir.  I am.  I'm sitting.  Don't be so bossy."  Barlow Lapel Video 18:52-57; Velasquez Lapel Video

at 18:54-59.[85]  J. Parsons called for Hale to "give me that phone number."  Barlow Lapel Video at

---

[82]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[83]J. Parsons asserts that "Defendant Barlow covered her lapel camera with her hand so as not to get on record the behavior of Defendant Velasquez."  Response ¶ 8, at 13.  The Defendants dispute this characterization, stating that J. Parsons does not possess "personal knowledge as to Defendant Barlow's subjective, idiosyncratic actions."  Reply ¶ F, at 6.  Although there is no evidence about Barlow's intentions in covering her lapel camera, it appears that the camera's obscuring was not intentional, but rather that Barlow's hand happened to obscure her lapel camera as she was entering the residence.

[84]The Defendants assert that J. Parsons "complained of being cold outside and went inside the residence and sat on his couch."  MSJ ¶ 19, at 5.  J. Parsons disputes this characterization, stating that he "was ordered several times" by Velasquez "to sit on the couch."  Response ¶ 19, at 9 (emphasis in original).  The Defendants exclude the fact that Velasquez told J. Parsons to sit on the couch just inside the entrance and that J. Parsons obeyed.  See Barlow Lapel Video at 18:34-18:43; Velasquez Lapel Video at 18:36-18:45.  For the reasons stated in note 23, supra, the Court deems this fact undisputed.

[85]In his statement of undisputed material facts, J. Parsons asserts, that "because the Defendants were operating under the concept of responding to a domestic dispute, rather than a welfare check . . . they could not let Plaintiff back into the residence to remind Mrs. Parsons of her healthcare directive."  Response ¶ 11, at 13-14.  The Defendants dispute not the veracity, but the materiality of J. Parsons' assertions.  See Reply ¶ A, at 4.  Here, J. Parsons does not cite to the

19:01-03; Velasquez Lapel Video at 19:03-05.[86]  Hale retrieved the telephone number and handed

it to Barlow.  See Barlow Lapel Video at 19:12-14; Velasquez Lapel Video at 19:14-16.[87]

Hale then brought J. Parsons a blanket.  See MSJ ¶ 20, at 5 (asserting this fact); Response

¶ 20, at 10 (admitting this fact); Barlow Lapel Video at 19:50-58.  J. Parsons stated, "I'm not a

criminal," to which Barlow responded, "no  .  .  .  .  No one's saying anything about being a criminal

or anything like that."  Barlow Lapel Video at 19:56-20:06.[88]  J. Parsons asked for a drink, and

Hale brought him juice.  See MSJ ¶ 20, at 5 (asserting this fact); Response ¶ 20, at 10 (admitting

this fact); Barlow Lapel Video at 20:29-36.  Barlow then turned off the fan because J. Parsons felt

cold.  See Barlow Lapel Video at 20:38-21:10.[89]  "Thank you," J. Parsons said to Barlow.  Barlow

---

record and renders legal conclusions more appropriate for the Analysis section.  The Court thus
will not include J. Parsons' proposed fact in the text as undisputed.

[86]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[87]J. Parsons states that, "[u]pon Plaintiff's request to Trish Hale to bring the telephone
number for the Emergency Supervisor to him, so that he could call, the information was intercepted
by Defendant Barlow and removed from his reach."  Response ¶ 6, at 13.  The Defendants dispute
J. Parsons' characterization, stating that "Barlow is obviously the intended recipient of the paper."
Reply ¶ D, at 5.  The Court adopts the Defendants' characterization, because Barlow did not stop
Hale, as Hale was walking to J. Parsons with the paper; rather, Hale was stopped by the Defendants
and, turning, transferred the paper to Barlow.  See Barlow Lapel Video at 19:12-19:14; Velasquez
Lapel Video at 19:14-19:16.  For the reasons stated in note 23, supra, the Court deems this fact
undisputed.

[88]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[89]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated

Lapel Video at 21:09.  See MSJ ¶ 21, at 5 (asserting this fact); Response ¶ 21, at 10 (admitting this fact).[90]

Velasquez had returned to M. Parsons' room and asked Bussetti and the nurse where M. Parsons' medications were located.  See Velasquez Lapel Video at 20:05-30.[91]  Bussetti and the nurse said that they were not certain, but both noted that they had seen some medications on the table in the living room and in the kitchen.  See Velasquez Lapel Video at 20:26-31.[92] Velasquez stepped out again and, pointing to the living room table, asked J. Parsons: "Is this all her medications?"  Barlow Lapel Video at 21:25-27;  Velasquez Lapel Video at 21:27-29.[93] J. Parsons responded, "there's some more by the telephone in the kitchen there," pointing in the direction of the kitchen.  Barlow Lapel Video at 21:26-33; Velasquez Lapel Video at 21:28-35.[94]

---

in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[90]For the reasons stated in note 67, supra, the Court deems this fact undisputed.

[91]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[92]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[93]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

He added that there was a "whole basket full of them" in the kitchen.  Barlow Lapel Video at 21:30-32; Velasquez Lapel Video at 21:32-34.[95]

Velasquez walked into the kitchen and traversed its length, spinning his sunglasses in his hand.  See Velasquez Lapel Video at 21:37-50.[96]  Velasquez need not have entered the kitchen to reach M. Parsons' bedroom and had not done so before when entering her bedroom.  See Floorplan of J. Parsons' Residence (no date), filed December 18, 2020, at 11 (Doc. 25-1)("Floorplan"); Velasquez Lapel Video at 02:11-03:23, 20:05-30.[97]  Velasquez changed the direction that he was

_____

[94]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[95]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[96]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[97]The Defendants assert that they "only entered Plaintiff's mother's bedroom and the rooms that necessarily had to be traversed to get to that bedroom." MSJ ¶ 15, at 4.  J. Parsons disputes this claim, stating that Velasquez "was not required to traverse" the dining room and kitchen, "but entered into anyway searching for Mary Parsons' medications."  Response ¶ 15, at 7-8.  See also Response ¶ 10, at 13; Reply ¶ G, at 6 (disputing J. Parsons' assertions in Response ¶ 10, at 13, that Velasquez performed an unlawful search).  J. Parsons' kitchen was located to the left at the far end of the living room, while a short hallway leading to M. Parsons' bedroom was located to the right.  See Floorplan at 11.   The Court may not credit a party's factual assertions that "blatantly contradict[]" the record, Scott v. Harris, 550 U.S. at 380-81, particularly when that party is the movant.  Accordingly, the Court deems undisputed that Velasquez need not have traversed the kitchen to reach M. Parsons' bedroom.

facing as he walked.  See Velasquez Lapel Video at 21:37-50.[98]  Velasquez' presence in the kitchen

lasted fourteen seconds and he did not touch any objects there.  See Velasquez Lapel Video at

21:37-50.[99]

An ambulance arrived, and Velasquez went outside to meet it.  See Velasquez Lapel Video

at 22:15-30.[100]  He explained to the paramedics his understanding of the situation -- that

M. Parsons wanted to go to the hospital and that J. Parsons was preventing her from doing so.  See

Velasquez Lapel Video at 23:05-20.[101]  The paramedics reached M. Parsons and assessed her

physical and mental condition.  See MSJ ¶ 23, at 5 (asserting this fact); Response ¶ 23, at 11

(admitting this fact); Velasquez Lapel Video at 24:04-32:00.  A second set of paramedics arrived

---

[98]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[99]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[100]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[101]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

assisted with the interaction with M. Parsons.  See Velasquez Lapel Video at 30:20-32:00.[102]

While the paramedics attended to M. Parsons, Velasquez discussed with the nurse M. Parsons' situation and the abuse allegations, although their conversation is sometimes inaudible.  See Velasquez Lapel Video at 28:50-29:50.[103]  The nurse can be heard saying to Velasquez: "There are some pretty harsh allegations."  Velasquez Lapel Video at 28:50-53.[104]  The nurse added that "this granddaughter Megan is making allegations emotional [inaudible] . . . not physical but emotional  . . .  abuse."  Velasquez Lapel Video at 29:01-18.[105]

Throughout this time, J. Parsons remained seated on the couch with Bussetti, speaking with him about M. Parsons' future care.  See MSJ ¶ 22, at 5 (asserting this fact); Response ¶ 22, at 10 (admitting this fact); Barlow Lapel Video at 22:15-36:50.  J. Parsons also spoke by speakerphone

---

[102]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.  For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[103]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[104]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[105]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

with Norine, the supervisor at Ambercare Hospice.  See Barlow Lapel Video at 27:24-28:53.[106]

J. Parsons informed her that the police were present and offered Barlow the telephone to speak to

Norine.  See Barlow Lapel Video at 27:27-38.[107]  Barlow declined the offer, stating that she was

not the primary officer and that Norine "would have to speak to our primary officer."  Barlow

Lapel Video at 27:31-41.[108]  J. Parsons informed Norine that he told the Defendants when they

arrived to call her, but that they "didn't want to."  Barlow Lapel Video at 27:47-51.  See Response

¶ 3, at 12 (asserting this fact).[109]

Barlow stood on the other side of the living room from J. Parsons and spoke primarily to

Hale.  See Barlow Lapel Video at 22:15-36:50.[110]  Hale said: "Thank you guys for letting us say

---

[106]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[107]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[108]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[109]J. Parsons states that, "although they repeatedly stated that they would  . . .  speak with the Emergency Supervisor for Ambercare Hospice," the Defendants "failed to do so at any time." Response ¶ 3, at 12.  The Defendants dispute this assertion.  See Reply ¶ A, at 4.  Although J. Parsons repeatedly asked the Defendants to speak to Norine, at no time did they say that they would do so.  For the reasons stated in note 23, supra, the Court deems the fact in the text undisputed.

our words and understanding." Barlow Lapel Video at 25:21-26.[111]  As Barlow stood with Hale,

a paramedic approached and confirmed from Hale that M. Parsons could make medical decisions

for herself.  See MSJ ¶ 17, at 5 (asserting this fact); Response ¶ 17, at 8 (admitting this fact);

Barlow Lapel Video at 32:36-39; Velasquez Lapel Video at 32:38-41.

The two paramedics teams placed M. Parsons on a stretcher.  See Barlow Lapel Video at

36:51-58; Velasquez Lapel Video at 36:53-37:00.[112]  Hale kissed her mother and said goodbye to

her; the Defendants then allowed J. Parsons to kiss his mother and say goodbye.  See MSJ ¶ 23, at

5 (asserting this fact); Response ¶ 23, at 11 (admitting this fact); Barlow Lapel Video at 38:10-25;

Velasquez Lapel Video at 38:12-27.  The paramedics exited J. Parsons' house with M. Parsons.

See Barlow Lapel Video at 39:05-17; Velasquez Lapel Video at 39:07-19.[113]  The Defendants

prepared to follow the paramedics out, and Barlow stopped her lapel camera recording.  See MSJ

---

[110]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[111]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[112]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

[113]No party has included this fact in the briefing.  The Defendants include, however, video
recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated
in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and
thus includes additional details from the recordings of the Defendants' encounter with J. Parsons
that are relevant to this Memorandum Opinion and Order.

¶ 24, at 6 (asserting this fact); Response ¶ 24, at 11 (admitting this fact); Barlow Lapel Video at 39:15-17; Velasquez Lapel Video at 39:29-39.

Before he left, Velasquez asked J. Parsons if J. Parsons had any questions for him.  See Velasquez Lapel Video at 39:28-31.[114]  J. Parsons answered: "I'm good. Thank you."  Velasquez Lapel Video at 39:28-31.   See MSJ ¶ 21, at 5 ("On different occasions, Plaintiff voiced appreciation for Defendants' help."); Response ¶ 21, at 10 (admitting this fact).[115]  J. Parsons added, addressing Barlow as she left: "Thanks for listening, ma'am."  Velasquez Lapel Video at 39:31-33.   See MSJ ¶ 21, at 5 ("On different occasions, Plaintiff voiced appreciation for Defendants' help"); Response ¶ 21, at 10 (admitting this fact).[116]  Once he exited the house, Velasquez terminated his lapel camera recording.  See MSJ ¶ 24, at 6 (asserting this fact); Response ¶ 24, at 11 (admitting this fact); Velasquez Lapel Video at 39:39.

At no point during the encounter did the Defendants touch J. Parsons or draw or place their hands on their weapons.  See MSJ ¶ 26, at 6 (asserting this fact); Response ¶ 26, at 11-12 (admitting this fact);  Barlow Lapel Video at 00:00-39:17; Velasquez Lapel Video at 00:00-39:39.[117]  At no point throughout the encounter did J. Parsons ask the Defendants to leave his

---

[114]No party has included this fact in the briefing.  The Defendants include, however, video recordings from the Defendants' lapel cameras and cite them in the MSJ.   For the reasons stated in note 23, supra, the Court concludes that the video recordings' contents are not in dispute, and thus includes additional details from the recordings of the Defendants' encounter with J. Parsons that are relevant to this Memorandum Opinion and Order.

[115]For the reasons stated in note 67, supra, the Court deems this fact undisputed.

[116]For the reasons stated in note 67, supra, the Court deems this fact undisputed.

[117]The Defendants assert that they "never touched or restrained Plaintiff."  MSJ ¶ 26, at 6. J. Parsons disputes implicitly the Defendants' assertion that they "never  . . .  restrained the Plaintiff."  MSJ ¶ 26, at 6.  He states that the "Defendants ordered Plaintiff out of his home, onto the front porch, not letting him move from that position  . . .  and then order[ed] him to sit on his

home.  See MSJ ¶ 25, at 6 (asserting this fact); Response ¶ 25, at 11 (admitting this fact); Barlow

Lapel Video at 00:00-39:17; Velasquez Lapel Video at 00:00-39:39.[118]  The Defendants did not

interview or question formally Francisco Bussetti or the Ambercare Hospice nurse during the

encounter with J. Parsons.  See Barlow Lapel Video at 00:00-39:17; Velasquez Lapel Video at

00:00-39:39.[119]  M. Parsons was without hospice care for three days, and J. Parsons was unable to

spend time with his mother during part of this period.  See Response ¶ 12, 14, at 14.[120]

---

living room couch and not to move from that spot."  Response ¶ 26, at 11-12.  Insofar as the
Defendants assert that they did not "restrai[n]" J. Parsons physically, he does not dispute this
assertion.  MSJ ¶ 26, at 6.  He implies, instead, that, when the Defendants did "not le[t] him move
from [his] position" outside and then ordered him "not to move from [his] spot" on the couch, they
restrained him.  Response ¶ 26, at 11-12.  J. Parsons here raises essentially a legal dispute and not
a factual one -- namely, whether the Defendants' conduct toward J. Parsons constitutes a detention.
For the reasons stated in note 23, supra, therefore, the Court deems undisputed the fact that the
Defendants at no point restrained J. Parsons physically and will analyze whether the Defendants
otherwise seized J. Parsons in the Analysis section.

[118]The Defendants' assert that "[a]t no point during Plaintiff's interaction with Defendants
did he object to their presence in the residence."  MSJ ¶ 25, at 6.  J. Parsons disputes this
characterization, stating that he "told Defendant Velasquez to stop bossing him around in his own
home, in objection to their presence in his home and their inappropriate treatment of him."  MSJ
¶ 25, at 6.  Whether telling Velasquez "to stop bossing [J. Parsons] around" constitutes an objection
or whether J. Parsons otherwise silently objected, see note 23, supra, the Court deems undisputed
the fact that J. Parsons did not tell the Defendants to leave his home for the reasons stated in note
23, supra.

[119]For the reasons stated in note 54, supra, the Court deems this fact undisputed.

[120]J. Parsons asserts that, "[d]ue to the actions of Defendants, Mary Parsons[] was without
proper hospice care for three days  . . .  and lost her preferred and trusted hospice provider at a
very crucial time in her life."  Response ¶ 12, at 14.  He asserts further that the "Plaintiff was
deprived of the opportunity to spend quality time with his mother during the last days of her life
by the actions of Defendants."  Response ¶ 14, at 14.  The Defendants dispute that such assertions
constitute facts material to the liability inquiry and contends that they are instead "inadmissible
arguments respecting alleged damages."  Reply ¶ C, at 5.  The Defendants do not dispute the
veracity of J. Parsons' proposed fact, only its legal relevance.  Accordingly, the Court deems
J. Parsons' proposed fact undisputed.  The Court will address the fact's relevance in the Analysis
section.  See Analysis § II(C), infra.

## V.   SOP VIOLATIONS.[121]

The Defendants did not request an ECIT officer to assist in the encounter with M. Parsons.[122]   The Defendants did not follow up on M. Parsons' referral to Adult Protective Services.[123]   Velasquez gathered information from Hale and Cardona regarding M. Parsons' mental and physical condition.   See Velasquez Lapel Video at 09:06-10, 11:58-18:04.[124]   The

---

[121]Although whether officers violated the SOPs is a legal question, here the parties do not dispute that the Defendants violated some of the SOPs and the Court therefore includes them here.

[122]J. Parsons asserts in his statement of facts that "Defendant Velasquez failed to request an ECIT Officer (APD SOP 2-19-7)."  Response ¶ 13, at 14.  The Defendants purport to dispute this fact, asserting that "[t]hese purported 'facts' attempt to establish that Defendants did not follow Albuquerque Police Department standard operating procedures (SOPs). They are not material to Plaintiff's claim or Defendants' Motion for Summary Judgment."  Reply ¶ B, at 5.  Here, the Defendants' dispute only the materiality or legal relevance of J. Parsons' proffered fact, not its veracity.  For the reasons stated in note 2, supra, the Court deems undisputed the fact that the Defendants' conduct violated SOP 2-19-7.  The Court will address the fact's materiality and relevance in the Analysis section.  See Analysis § I, infra.

[123]J. Parsons asserts in his statement of facts that Velasquez chose "to refer the case to Adult Protective Services and violated APD SOP 4-7-6(B) as he failed to follow up on the supposed referral he provided."  Response ¶ 13, at 14.  The Defendants purport to dispute this fact, asserting that "[t]hese purported 'facts' attempt to establish that Defendants did not follow Albuquerque Police Department standard operating procedures (SOPs). They are not material to Plaintiff's claim or Defendants' Motion for Summary Judgment."  Reply ¶ B, at 5.  Here, the Defendants' dispute only the materiality or legal relevance of J. Parsons' proffered fact, not its veracity.  For the reasons stated in note 2, supra, the Court deems undisputed the fact that the Defendants' conduct violated SOP 4-7-6(B).  The Court will address the fact's materiality and relevance in the Analysis section.  See Analysis § I, infra.

[124]J. Parsons asserts in his statement of facts that "Defendants ignored and failed to follow the Standard Operating Procedures that would have preempted the actions undertaken to detain Plaintiff and deprive him of his liberty to properly care for his mother in her final days."  Response ¶ 9, at 13.  J. Parsons cites his Complaint for the content of the SOPs.  See Response ¶ 9, at 13.  Among the SOPs cited in the Complaint, SOP 2-19-7(A)(6) requires police officers to "gather information from . . . family members" regarding a person experiencing a behavioral health crisis.  Complaint ¶ 26, at 4 (quoting APD Procedural Orders SOP 2-19-7(A)(6)).  See Response ¶ 9, at 13.  The Defendants' dispute only the materiality or legal relevance of J. Parsons' proffered fact, not its veracity.  Reply ¶ B, at 5.  The Court, however, deems undisputed for the reasons stated in note 23, supra, that Velasquez gathered information from Hale and Cardona regarding M. Parsons' mental and physical state.

Defendants allowed Hale to bring J. Parsons juice.  See Barlow Lapel Video at 20:29-36.[125]

## PROCEDURAL BACKGROUND

J. Parsons filed a Complaint in State court on November 15, 2019.  See Complaint at 1. Alleging that the Defendants unlawfully seized him and searched his home, J. Parsons seeks damages under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act, N.M.S.A. §§ 41-4-1 ("NMTCA") for violations of his constitutional rights.   Complaint ¶¶ 44-60, at 8-10.   The Defendants removed the case to the United States District Court for the District of New Mexico on January 24, 2020, based on the Court's original jurisdiction over J. Parsons' § 1983 claims.  See Notice of Removal at 1, filed January 24, 2020 (Doc. 1).

After a period of discovery, the Defendants moved for summary judgment.  See MSJ at 1. J. Parsons filed his Response, and the Defendants in turn filed their Reply.  On March 29 and April 1 of 2021, the Court held hearings on the MSJ.  See Clerk's Minutes at 1, filed March 29, 2021 (Doc. 37); Clerk's Minutes at 1, filed April 1, 2021 (Doc. 39).

### I.    The Defendants' MSJ.

In their MSJ, the Defendants raise a qualified immunity defense to J. Parsons' federal law claims.  See MSJ at 1.  The Defendants argue that no genuine issue of material fact exists, and that, therefore, they are entitled to judgment as a matter of law on J. Parsons' claims.  See MSJ at 1.

---

[125]J. Parsons asserts in his statement of facts that "Defendants ignored and failed to follow the Standard Operating Procedures that would have preempted the actions undertaken to detain Plaintiff and deprive him of his liberty to properly care for his mother in her final days."  Response ¶ 9, at 13.  J. Parsons cites his Complaint for the content of the SOPs.  See Response ¶ 9, at 13. Among the SOPs cited in the Complaint, SOP 2-64-3(B)(1)(d) requires that in police-citizen interactions, citizens be allowed "access to food, water and restrooms."  Complaint ¶ 25, at 4 (quoting APD SOP 2-64-3(B)(1)(d)).  See Response ¶ 9, at 13.  The Defendants' dispute only the materiality or legal relevance of J. Parsons' proffered fact, not its veracity.  Reply ¶ B, at 5.  The Court, however, deems undisputed for the reasons stated in note 23, supra, that Barlow allowed Hale to bring J. Parsons juice.

Citing Scott v. Harris, 550 U.S. 372 (2007), they ask that the Court review video footage from the Defendants' lapel cameras, which they maintain supports the MSJ.  See MSJ at 1-2.

The Defendants argue that their search of J. Parsons' home was not unconstitutional, because J. Parsons consented to the search.  See MSJ at 15.  The Defendants note that J. Parsons' verbal communications and gestures suggest "a clear invitation for Defendants to enter the residence."  MSJ at 15.  Citing United States v. Pena, 143 F.3d 1363 (10th Cir. 1988), they argue that J. Parsons' consent takes this situation out of the Fourth Amendment's domain.  See MSJ at 15.  In the alternative, they argue that they obtained consent to enter the residence from either J. Parsons' sister, J. Parsons' mother, or both.  See MSJ at 17.

The Defendants further assert that, even if J. Parsons did not consent to the search, the search was constitutional, because it falls under the exigent-circumstances exception to the Fourth Amendment's warrant requirement.  See MSJ at 17 (citing Brigham City v. Stuart, 547 U.S. 398 (2006)).  The Defendants maintain that their search was reasonable because: (i) exigent circumstances exist that justify any non-consensual search; (ii) the Defendants reasonably believed that the search was necessary; and (iii) the search's manner and scope were reasonable.  See MSJ at 18 (citing United States v. Najar, 451 F.3d 710 (10th Cir. 1988)).  The Defendants note that, per the 911 call that dispatch received, they reasonably believed that J. Parsons' elderly mother was in immediate need of assistance and that justifies non-consensual entry into J. Parsons' home.  See MSJ at 18.  They maintain that their entry into J. Parsons' home is limited in scope, confined to the home's common areas and M. Parsons' quarters, and that they did not search any other areas of the home.  See MSJ at 19.  The Defendants maintain, therefore, that they did not unconstitutionally search J. Parsons' home.  See MSJ at 19.  They suggest that, even if J. Parsons can establish a Fourth Amendment violation, he still is unable to show that the right was clearly

established.  See MSJ at 19-20.  The Defendants argue, therefore, that they are entitled to qualified immunity.  See MSJ at 20.

The Defendants next contend that their actions do not constitute an unconstitutional seizure.  See MSJ at 20.  Pointing to the factors that United States v. Jones, 701 F.3d 1300 (10th Cir. 2012), articulates for holding that a seizure occurred, the Defendants argue primarily that they did not seize J. Parsons.  See MSJ at 22.  They emphasize that J. Parsons' movements were not constrained, that he was brought refreshments during the interaction with the Defendants, and that the they did not prevent him from interacting with a social worker who was attending to M. Parsons.  See MSJ at 21-22.

In the alternative, the Defendants argue that, even if they seized J. Parsons, the seizure is lawful, because police officers' community caretaking function justifies reasonable detentions of persons not suspected of criminal activity.  See MSJ at 22 n.3 (citing United States v. King, 990 F.2d 1552 (10th Cir. 1993)).  They maintain that the 911 call from Cardona, J. Parsons' niece, "supplied the necessary level of justification" for J. Parsons' detention, and stress that J. Parsons was not handcuffed, nor did the Defendants use force to restrain him.  MSJ at 22 n.3.  Accordingly, the Defendants assert that no Fourth Amendment violation occurred, and that, even if one did, they are entitled to qualified immunity.  See MSJ at 22.

The Defendants also move for summary judgment on J. Parsons' State law claims.  See MSJ at 23.  They argue that New Mexico has not waived its qualified immunity to suit either under the "building waiver" theory, NMTCA § 41-4-6, or under the "law enforcement waiver" theory, § 41-4-12.  See MSJ at 23.  The Defendants contend that the former theory -- which waives qualified immunity when a government employee's negligent maintenance of government property creates a danger to the public -- is inapplicable, because this situation does not implicate

any public property or facility's operation.  See MSJ at 24.  They stress that, instead, "this matter took place exclusively at a private residence" and that, therefore, there is no valid "building waiver" under the NMTCA.  MSJ at 24.  The Defendants next maintain that they did not waive qualified immunity to NMTCA suit under the "law enforcement waiver" theory.  See MSJ at 25. They argue that no facts in the record support waiver under § 41-4-12, which waives qualified immunity for a number of enumerated injuries, along with constitutional violations under the constitutions of the United States or New Mexico.  See MSJ at 24-25.  They first note that one of J. Parsons' proffered grounds for waiver -- the Defendants' allegedly negligent conduct during this episode -- is invalid.  See MSJ at 25.  In addition to arguing that J. Parsons' claim is based on conclusory statements, the Defendants note that the Supreme Court of New Mexico has held that "'simple negligence in the performance of a law enforcement officer's duty'" does not constitute grounds for qualified immunity waiver under the NMTCA.  MSJ at 25 (quoting Bober v. N.M. State Fair, 111 N.M. 644, 653, 808 P.2d 614, 624, 1991-NMSC-031, ¶ 32).

The Defendants contend that  the same analysis arguing against constitutional violations in the § 1983 context should apply in the NMTCA context.  See MSJ at 26.  Specifically, they reiterate their position that they did not unconstitutionally search J. Parsons' home or unconstitutionally seize him.  See MSJ at 26.  The Defendants also assert that J. Parsons' allegation that he was "treat[ed] . . . as someone with criminal intent [without] probable cause," Complaint ¶ 46, at 8, is not cognizable as grounds for waiver under the NMTCA.  See MSJ at 26.  On the above grounds, the Defendants urge the Court to grant summary judgment on J. Parsons' pendant state law claims.

### 2.     The Plaintiff's Response to Defendants' MSJ.

In his Response, J. Parsons argues that there are issues of material fact regarding his

consent to the Defendants' entry into his home and their conduct in his home.   See Response at 19, 21.  He maintains that "he did not consent to the search of his home, he merely consented to the welfare check of his mother."  Response at 19.  J. Parsons argues that the Defendants' conduct exceeds the scope of his consent to their presence in his home; they conducted a search as part of "an investigation into abuse of [J. Parsons'] mother."   Response at 20.   He notes that the Defendants entered J. Parsons' dining room and kitchen -- a path that he maintains was unnecessary to reach M. Parsons and to "sear[ch] for Mary Parsons' medications."  Response at 20. See also Response at 21.   He suggests that, because his consent to the Defendants' entry did not extend to such conduct, the Defendants' entry was non-consensual, and, therefore, implicates the Fourth Amendment's warrant requirement.   See Response at 19-20 (citing United States v. Taverna, 348 F.3d 873 (10th Cir. 2003)).  Because the Defendants lacked such a warrant, J. Parsons implies, their search of his home was unlawful.  See Response at 19-20.

J. Parsons next suggests that, because the Defendants did not follow the APD's SOPs, their search was unreasonable and thus cannot fall under the exigent-circumstances exception to the Fourth Amendment's warrant requirement.  Response at 20.  J. Parsons notes two ways in which the Defendants' conduct violates their department's SOPs.  See Response at 20-21.  First, J. Parsons asserts that the Defendants did not "'request professional assistance'" on M. Parsons' behalf by preventing J. Parsons from speaking by phone with a supervisor from his mother's hospice care.  Response at 20 (citing SOP 2-19-7(A)(6)).  Second, J. Parsons contends that the Defendants did not properly "deal[] with and recogniz[e] behavioral health issues," in violation of APD SOP 2-19-5.  MSJ at 21.  J. Parsons argues that the Defendants were thus not "reasonably operating in exigent circumstances," which means that their warrantless search was therefore

unconstitutional.  Response at 21.

J. Parsons next argues that the Defendants unlawfully seized him, because they detained him on his front porch and then in his home.  See Response at 21.  J. Parsons argues that, when "he was directed to stay outside" and then "directed to stay on the couch" by the Defendants, Defendants seized him.  Response at 22.  J. Parsons states that he was "'not free to terminate his conversation with the officer[s] and proceed on his way'" under these circumstances.  Response at 22 (quoting United States v. Hernandez, 847 F.3d 1257, 1266 (10th Cir. 2017)).  Referencing two of the factors in United States v. Jones, J. Parsons further notes that he "was in the presence of several officers" and that he "was not in a public place" when interacting with the Defendants. Response at 22 (citing Jones, 701 F.3d 1300, 1313 (10th Cir. 2012)).  He urges the Court to deny the Defendants' MSJ and to hold that, on the totality of the circumstances, the Defendants seized him without a warrant in violation of the Fourth Amendment.  See Response at 21-22.

J. Parsons contends that the same analysis supports denying the Defendants' MSJ for on his NMTCA claims.  See Response at 23.  Focusing on the unlawful detainment issue, J. Parsons reemphasizes that the Defendants did not act reasonably and therefore cannot benefit from the exigent-circumstances exception.  See Response at 23.  He argues that, upon "determin[ing] that there were no dire circumstances warranting emergen[cy] response," the Defendants lacked a justification to continue to detain him on his porch.  Response at 23.  J. Parsons contends that for this reason, the Defendants' conduct was unreasonable and therefore unconstitutional.  See Response at 23.  He thus urges the Court not to grant the Defendants summary judgment on his NMTCA claims.  See Response at 23.

### 3.   Defendants' Reply in Support of Defendants' MSJ.

On January 15, the Defendants filed a Reply to J. Parsons.  See Reply at 1.  The Defendants

largely recite the Motion's arguments.  See Reply at 6-11.  First, the Defendants again stress that, if the Court holds that their conduct constitutes a search or seizure, it is not unconstitutional, because they acted reasonably within the exercise of their community-caretaker function.  See Reply at 6-7.  They contend that the 911 call from Cardona provides sufficient justification for their conduct, that their actions "at no point" constitute a criminal investigation, and that the interaction with J. Parsons did not last longer than was necessary to ensure that M. Parsons received emergency medical care.  Reply at 7.

Next, the Defendants contend that J. Parsons' Response relies on his subjective perceptions to argue that the Defendants performed an unlawful search and seizure, and that those perceptions are insufficient legally to defeat consent to their entry into his home.  See Reply at 8.  The Defendants stress that the "consent analysis is an *objective* inquiry to be viewed in light of the totality of the circumstances."  Reply at 8 (citing Florida v. Bostick, 501 U.S. 429, 436 (1991))(emphasis in original).  They contend that such circumstances support a holding that J. Parsons consented unconditionally to their entry.  See Reply at 8.

The Defendants next maintain that they did not conduct a search of J. Parsons' kitchen within the Fourth Amendment's meaning.  See Reply at 8.  They first note that, rather than searching the kitchen for M. Parsons' medicine, Velasquez asked its location and J. Parsons informed him where he would find it in the kitchen -- this statement, the Defendants argue, confers J. Parsons' consent to enter the kitchen for the purpose of finding M. Parsons' medicine there.  See Reply at 9.  They note, moreover, that, even if entry into the kitchen was non-consensual, Velasquez did not move or otherwise touch any objects in the kitchen, and that "'merely looking at what is already exposed to view'" does not constitute a search under the Fourth Amendment.

Reply at 9 (quoting <u>Arizona v. Hicks</u>, 480 U.S. 321, 328 (1987)).

Last, the Defendants argue that the SOPs are irrelevant to the qualified immunity inquiry. <u>See</u> Reply at 10.  They cite precedent from the Supreme Court of the United States of America holding that officers' violations of SOPs do not constitute Fourth Amendment violations.  <u>See</u> Reply at 10 (citing <u>Whren v. United States</u>, 517 U.S. 806, 807 (1996)).  The Defendants thus urge the Court to disregard J. Parsons' arguments regarding their departure from SOPs as grounds for waiving qualified immunity.  <u>See</u> Reply at 10-11.

### 4.      <u>The March 29 Hearing</u>.

At the March 29, 2021, hearing on the MSJ, the Defendants argued that the essential facts of the case were not disputed.  <u>See</u> Draft Transcript of Hearing at 3:9-12 (taken March 29, 2021)("March 29 Tr.")(Jahner).[126]  The Defendants emphasized that J. Parsons, M. Parsons, and Hale all consented to their entry.  <u>See</u> March Tr. at 6:3-9 (Jahner).  The Defendants, moreover, questioned whether "the law recognizes such a thing" as J. Parsons' legal theory that his consent to their entry only allowed the Defendants to conduct a welfare check on M. Parsons.  March 29 Tr. at 6:2-3 (Jahner).  The Defendants stated that neither Velasquez nor Barlow touched or restrained J. Parsons, and that, apart from Barlow's conversation with J. Parsons on his front porch, the Defendants' interaction with J. Parsons throughout the encounter was minimal.  <u>See</u> March 29 Tr. at 6:10-14 (Jahner).  Noting that they could not identify a sufficiently similar case, the Defendants argued that they were entitled to qualified immunity, based in part on the Supreme Court and Tenth Circuit's "strong inclination" to decide such disputes on the clearly established

---

[126]The Court's citations to the transcript of the hearings refer to the court reporter's original, unedited versions.  Any final transcript may contain slightly different page and/or line numbers.

prong alone.  March 29 Tr. at 7:3-4 (Jahner).  See March 29 Tr. at 7:10-17 (Jahner).

The Defendants reiterated their position that, based on the record, Velasquez did not search J. Parsons' home and, in particular, did not search his kitchen.  See March 29 Tr. at 9:1-5 (Jahner).  They insisted that Velasquez merely "rov[ed] about the kitchen," March 29 Tr. at 9:10-11 (Jahner), and did not touch or move any objects there, see March 29 Tr. at 9:12-13 (Jahner).  They emphasized, further, that any search for M. Parsons' medication was at J. Parsons' "consensual directive" regarding where Velasquez would find the medication.  March 29 Tr. at 9:16 (Jahner).

The Defendants maintained, moreover, that they did not seize J. Parsons.  See March 29 Tr. at 9:22-23 (Jahner).  They noted that multiple factors of United States v. Jones, 701 F.3d 1300 (10th Cir. 2012), counsel against finding that the Defendants seized J. Parsons: the Defendants did not physically touch J. Parsons, did not retain any of J. Parsons' personal effects, and many members of the public were present throughout the interaction -- among them nurses, paramedics, and Hale.  See March 29 Tr. at 10:5-25 (Jahner).  As in their Motion, the Defendants asserted that, if the Court holds that their conduct constitutes a seizure, such seizure is lawful based on their community-caretaking function.  See March 29 Tr. at 11:11-14 (Jahner).  They contended that Cardona's 911 call provides a sufficient justification for J. Parsons' detention and that his detention lasted no longer than was necessary to secure M. Parsons' safe transport to the hospital.  See March 29 Tr. at 11:21-12:9 (Jahner).  Such circumstances, the Defendants contended, make J. Parsons' warrantless detention lawful and, would not have provided reasonable police officers with sufficient notice of unconstitutionality to deprive them of qualified immunity assuming the detention is unconstitutional.  See March 29 Tr. at 12:9-16 (Jahner).

Finally, the Defendants contended that New Mexico did not waive its sovereign immunity. See March 29 Tr. at 12:20-13:24 (Jahner).  They suggested that J. Parsons' assertion that waiver

under the "Building Theory" of NMSA § 41-4-6 applied is "facially invalid."  March 29 Tr. at

12:21 (Jahner).  The Defendants concluded by noting that waiver under N.M.S.A. § 41-4-12 would

have to be predicated on J. Parsons' false imprisonment, which they contended is improper,

because his detention, assuming he was detained, was lawful.  See March 29 Tr. at 13:1-21

(Jahner).

In response to the Court's question whether any of the facts of the case were truly disputed,

given the existence of the Defendants' lapel footage, J. Parsons stated that factual ambiguity exists

whether Barlow had covered her lapel camera.  See March 29 Tr. at 15:1-17 (Court, Dunn).

J. Parsons argued that such a fact would go to the United States v. Jones, 701 F.3d 1300 (10th Cir.

2012), analysis.  See March 29 Tr. at 15:1-17 (Dunn).  J. Parsons also contended that whether he

consented to the Defendants' entry, particularly into his kitchen, is not unambiguous in the record.

See March 29 Tr. at 16:3-6 (Dunn).

J. Parsons then challenged the Defendants' characterization that their conduct fulfilled a

community caretaking function, rather than an investigatory function.  See March 29 Tr. at 17:20-

23 (Dunn).  Asserting that M. Parsons was "not in her right mind," March 29 Tr. at 17:15-16

(Dunn), J. Parsons stressed that the Defendants made no effort to ascertain M. Parsons' mental

state from hospice workers present throughout the interaction or to determine whether M. Parsons

was empowered to make medical decisions for herself.  See March 29 Tr. at 16:3-6 (Dunn).  This

was because, J. Parsons suggested, the Defendants' were focused solely on investigating J. Parsons

for elder abuse -- a crime of which "he was convicted by the officers in their minds before they

ever got there."  March 29 Tr. at 15:1-17 (Dunn).

When the Court asked what motivated J. Parsons to maintain this lawsuit, J. Parsons

responded that the encounter with the Defendants' conduct "was offensive to him."  March 29 Tr.

at 18:1-9 (Court, Dunn).  J. Parsons insisted that the interaction could have been avoided if the Defendants had "listen[ed] to him for a moment" or spoken to M. Parsons' care-workers about her unstable mental condition and that, because the Defendants did not, they did not follow their SOPs. See March 29 Tr. at 19:8-21 (Dunn).  In response to the Court's questions, however, J. Parsons acknowledged that the Defendants' SOPs could not be considered on a motion for summary judgment for the purpose of establishing constitutional violations.  See March 29 Tr. at 20:1-21:3 (Court, Dunn).

J. Parsons admitted, at the Court's urging, that the Defendants initially operated under a reasonable suspicion of criminal activity and so had the power to separate him out and require that he remain outside on the porch.  See March 29 Tr. at 21:14-22:18 (Court, Dunn).  He maintained, however, that reasonable suspicion "dissipated," March 29 Tr. at 22:24 (Court), once the Defendants ascertained that M. Parsons was not in immediate danger, and yet did not "ask the hospice workers what's going on" or ask them to contact the "supervising nurse or doctor in that situation."  March 29 Tr. at 24:16-19 (Dunn).  Although, J. Parsons maintained, it was not an egregious example of search and seizure, the Defendants' actions are still improper.  See March 29 Tr. at 24:10-11 (Dunn).  Recognizing that the import of the relevant case law was undisputed, J. Parsons suggested that the Motion turns on how the Court construes the lapel footage.  See March 29 Tr. at 25:4-12 (Dunn).

In their final remarks, the Defendants asserted that J. Parsons' presentation at the hearing consisted of attorney editorializing and assertions of fact not contained in the record.  See March 29 Tr. at 25:24-26:1 (Jahner).  In particular, the Defendants emphasized that J. Parsons' assertions that they acted negligently are not factual allegations and, regardless, should not inform the Court's analysis.  See March 29 Tr. at 26:6-10 (Jahner).  They insisted, moreover, that J. Parsons'

averments of negligence did not account for undisputed fact seventeen[127] -- namely, that J. Parsons and Hale informed the Defendants upon their arrival that neither sibling was empowered to make medical decisions on M. Parsons' behalf.  See March 29 Tr. at 26:13-18 (Jahner).

The Court stated that it would likely issue an oral ruling at a subsequent meeting.  See March 29 Tr. at 28:19-23 (Court).  The Defendants informed the Court that they would likely appeal a denial of the Motion, noting that the Tenth Circuit would be able to review the lapel footage de novo per Scott v. Harris, 550 U.S. 372 (2007).  See March 29 Tr. at 29:1-9 (Jahner). They submitted that J. Parsons is seeking a "platform to air all" his "grievances" against the Defendants, implying that J. Parsons' suit is frivolous.  March 29 Tr. at 29:10-11 (Jahner).

5.    **The April 1 Hearing**.

At the April 1, 2021 hearing, the Court stated that it would not consider the Defendants' SOPs for establishing unconstitutional search or seizure, citing its own precedent, as well as Supreme Court and Tenth Circuit precedent, for the proposition that "such evidence is irrelevant to Fourth Amendment inquiry."   See Draft Transcript of Hearing at 3:1-2 (taken April 1, 2021)("April 1 Tr.")(Court).[128]   Reiterating that J. Parsons' consent to the Defendants' entry removes the situation from the Fourth Amendment's warrant requirement, the Court concluded based on the totality of the  circumstances that J. Parsons did in fact consent voluntarily and that, therefore, the Defendants' conduct did not violate the Fourth Amendment.  See April 1 Tr. at 3:22-5:11 (Court).  The Court explained that J. Parsons told the Defendants to "come on in, guys," that

---

[127]The Defendants' undisputed fact seventeen states: "Plaintiff and Trish Parsons represented to Defendants that neither they nor any other individuals could make legal decisions on Ms. Parsons' behalf."  MSJ ¶ 17, at 5.

[128]The Court's citations to the transcript of the hearings refer to the court reporter's original, unedited versions.  Any final transcript may contain slightly different page and/or line numbers.

he never requested they leave, and that M. Parsons requested they stay and requested that additional police officers be present.  April 1 Tr. at 4:15-5:7 (Court).

The Court then turned to J. Parsons' seizure allegations and held that, here, too, the Defendants' conduct was constitutional.   See April 1 Tr. at 5:12-13 (Court).  The Court again considered the totality of the circumstances, including: (i) that J. Parsons interacted with only one police officer throughout most of the encounter; (ii) that the interaction on the porch took place in public view; and (iii) that the Defendants did not touch J. Parsons or retain any of his personal effects.  See April 1 Tr. at 6:14-7:7.  The above grounds satisfied the Court that J. Parsons' encounter with the Defendants was consensual and that, therefore, there was no seizure that would implicate the Fourth Amendment.  See April 1 Tr. at 7:17-24.

The Court further stated that the Defendants' conduct did not violate J. Parsons' substantive due process rights, because their conduct does not shock the judicial conscience.  See April 1 Tr. at 7:25-8:3 (Court).   The Court dismissed without prejudice the claim that the Defendants did not disclose exculpatory information relating to a criminal investigation, because the Defendants' conduct did not constitute a criminal investigation.  See April 1 Tr. at 8:11-9:2 (Court).  The Court held that the Defendants' conduct, though upsetting to J. Parsons, is not so egregious as to shock the judicial conscience.  See April 1 Tr. at 9:10-9:25 (Court).

Having dismissed J. Parsons' claims under federal law, the Court stated its intention to remand J. Parsons' NMTCA claims.  See April 1 Tr. at 10:1-18 (Court).  The Court concluded that it would grant Defendants' MSJ.  See April 1 Tr. at 10:19-21 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

- 54 -

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Sch.)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[129] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

---

[129]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

(1986)("Liberty Lobby").  In American Mechanical Solutions, LLC Northland Piping, Inc., 184 F.3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  See 184 F.3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "'an essential element of the nonmoving party's case,'" rendering "'all other facts immaterial.'"  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1 (quoting Celotex, 477 U.S. at 323)).  Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment.  See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating

that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).   See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue

Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary

judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction;

it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the
> facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting
> Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v.
> Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in Rhoads v. Miller,

[352 F. App'x 289 (10th Cir. 2009)] explained that the blatant contradictions of the record must

be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp. 2d

1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

To allege a claim for relief, rule 8 of the Federal Rules of Civil Procedure requires a

pleading to contain

> (1)    a short and plain statement of the grounds for the court's jurisdiction, unless
>        the court already has jurisdiction and the claim needs no new jurisdictional
>        support;
>
> (2)    a short and plain statement of the claim showing that the pleader is entitled
>        to relief; and
>
> (3)    a demand for the relief sought, which may include relief in the alternative
>        or different types of relief.

Fed. R. Civ. P. 8.  Parties may allege new claims in motions for summary judgment.  See Evans v.

McDonald's Corp., 936 F.2d at 1090-91.  When this occurs, courts treat the motion for summary

judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil

Procedure.  See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998).  The Tenth

Circuit has stated that "[a]s a general rule, a plaintiff should not be prevented from pursuing a valid

claim just because she did not set forth in the complaint a theory on which she could recover,

provided always that a late shift in the thrust of the case will not prejudice the other party in

maintaining his defense upon the merits."  Evans v. McDonald's Corp., 936 F.2d at 1090-91

(quotation marks omitted).  While the purpose of "fact pleading" is to give defendants fair notice

of claims against them "without requiring the plaintiff to have every legal theory or fact developed

in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs

may not "wait until the last minute to ascertain and refine the theories on which they intend to

build their case."  Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  United States v. Christy, No. CR 10-1534

JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802).

Rule 801(c) of the Federal Rules of Evidence defines hearsay: "a statement that: (1) the declarant

does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to

prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  Courts deem hearsay

generally unreliable and untrustworthy.   See Chambers v. Mississippi, 410 U.S. 284, 298

(1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability);

United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible

as evidence because it is considered unreliable." (citing Williamson v. United States, 512 U.S.

594, 598 (1994))); United States v. Console, 13 F.3d 641, 656 (3d. Cir. 1993)(stating hearsay is

"'inherently untrustworthy'" because of the lack of an oath, presence in court, and cross

examination quoting United States v. Pelullo, 964 F.2d 193, 203 (3rd Cir. 1992))).  Testimonial

proof is necessarily based upon the human senses, which can be unreliable.  See 5 Jack Weinstein & Margaret Berger, Weinstein's Federal Evidence § 802.02[1][b], at 802-5 (Joseph McLaughlin ed., 2d ed. 2017)("Weinstein's Federal Evidence").  The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination.  See Weinstein's Federal Evidence § 802.02[2][a], at 802-5.  Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination, see, e.g., United States v. Console, 13 F.3d at 656; it is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable, see Weinstein's Federal Evidence § 802.02[3], at 802-6 to -7.

"Hearsay within hearsay" is admissible only "if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.  See, e.g., United States v. DeLeon, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018)(Browning, J.)(noting, after concluding that rule 803(8) provides an exception for law enforcement reports, that a hearsay issue remains regarding the statements within the reports); Wood v. Millar, No. CIV 13-0923 RB/CG, 2015 WL 12661926, at *4 (D.N.M. Feb. 19, 2015)(Brack, J.)(stating that witness statements in police reports, to which rule 803(8) applies, may be admissible under hearsay exclusions other than rule 803(8)); Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 6632524, at *7 (D.N.M. Oct. 31, 2012)(Browning, J.)(excluding medical records, which themselves were inadmissible hearsay, although the statements within the medical records were opposing party statements).  A statement that is otherwise hearsay, however, may be admissible for a purpose, such as impeachment, other than to prove the truth of the matter asserted.  See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay.  If admitted for impeachment purposes, however, it

is not hearsay.").  Likewise, "'[i]f the significance of an offered statement lies solely in the fact

that it was made, no issue is raised as to the truth of anything asserted, and the statement is not

hearsay.'"  Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th

Cir. 2001)(quoting Fed. R. Evid. 801 advisory committee's note).  Statements in the latter category

include verbal acts --

> "statement[s] offered to prove the words themselves because of their legal effect
> (e.g., the terms of a will)."  Black's Law Dictionary (10th ed. 2014).  "A contract,
> for example, is a form of verbal act to which the law attaches duties and liabilities
> and therefore is not hearsay." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992).
> *See also Cagle v. The James St. Grp.*, 400 F. App'x 348, 356 (10th Cir. 2010).

Farley v. Stacy, No. 14-CV-0008-JHP-PJC, 2015 WL 3866836, at *5 (N.D. Okla. June 23,

2015)(Payne, J.), aff'd, 645 F. App'x 684 (10th Cir. 2016)(unpublished).

### 1.    **Rule 801(d)(2).**

An opposing party's statement is not hearsay.  See Fed. R. Evid. 801(d)(2).  Rule 801(d)(2)

specifically excludes from hearsay a statement that is offered against an opposing party and:

> (A)    was made by the party in an individual or representative capacity;
>
> (B)    is one the party manifested that it adopted or believed to be true;
>
> (C)    was made by a person whom the party authorized to make a
>        statement on the subject;
>
> (D)    was made by the party's agent or employee on a matter within the
>        scope of that relationship and while it existed; or
>
> (E)    was made by the party's coconspirator during and in furtherance of
>        the conspiracy.

> The statement must be considered but does not by itself establish the declarant's
> authority under (C); the existence or scope of the relationship under (D); or the
> existence of the conspiracy or participation in it under (E).

Fed. R. Evid. 801(d)(2).  "The admissibility of opposing-party statements 'is not based on

reliability; rather, they are admitted as part of the adversary system'; they are admitted, in short,

because the party said the words and should be stuck with them, regardless of their accuracy."

United States v. Ballou, 59 F. Supp. 3d 1038, 1074 (D.N.M. 2014)(Browning, J.)(quoting Stephen

A. Saltzburg et. al, Federal Rules of Evidence Manual § 801.02[b], at 801-13 (2011)).   "[T]he

Tenth Circuit has stated that proponents of such evidence 'need only show by a preponderance of

the evidence that the opposing party had made the statement.'"   United States v. Shirley, No. CR

15-1285 JB, 2016 WL 9021832, at *7 (D.N.M. Dec. 21, 2016)(Browning, J.)(citing United States

v. Brinson, 772 F.3d 1314, 1320 (10th Cir. 2014)).

"Rule 801(d)(2)(A) does not  . . .  permit such a statement to be used against anyone other

than the party who made the statement, such as codefendants."   United States v. DeLeon, 287

F. Supp. 3d 1187, 1256 (D.N.M. 2018)(Browning, J.)(citing United States v. Wolf, 839 F.2d 1387,

1393 & n.4 (10th Cir. 1988); Stephen A. Saltzburg, et al., Federal Rules of Evidence Manual

§ 801.02(6)(c) (11th ed. 2017)).   Statements made during closing argument by an attorney qualify

as an admission by a party opponent under rule 801(d)(2)(A).   See United States v. Ganadonegro,

854 F. Supp. 2d 1088, 1121 & 1121 n.11 (D.N.M. 2012)(Browning, J.)(citing United States v.

McElhiney, 85 F. App'x 112, 115 (10th Cir. 2003)(unpublished)).   The Court has determined that

rule 806 of the Federal Rules of Evidence, which permits attacking hearsay statements with "any

evidence that would be admissible for those purposes if the declarant had testified as a witness,"

Fed. R. Evid. 806, "does not apply to rule 801(d)(2)(A) statements," United States v. DeLeon, No.

CR 15-4268 JB, 2018 WL 878121, at *2 n.1 (D.N.M. Feb. 12, 2018)(Browning, J.).   "Party

opponents can, however, impeach their own admissions, i.e., rule 801(d)(2)(A) statements, even

though rule 806 does not apply.   If a party opponent admission is relevant, then anything that

impeaches such a statement is also relevant."   United States v. DeLeon, 2018 WL 878121, at *2

n.1.

## LAW REGARDING QUALIFIED IMMUNITY

Government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

Section 1983 creates a cause of action for a plaintiff to seek money damages from state officials who have violated his or her constitutional or statutory rights.  42 U.S.C. § 1983.  Under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 397 (1971), a plaintiff may seek money damages from federal officials who have violated his or her constitutional rights.[130]  The Supreme Court, however, deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits

---

[130]Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics has been extended, however, to only a handful of constitutional rights.  See Davis v. Passman, 442 U.S. 228, 248 (1979)(finding an implied cause of action for violations of the equal protection principles enmeshed within the due process clause of the Fifth Amendment to the United States Constitution, U.S. Const. amend V); Carlson v. Green, 446 U.S. 14 (1980)(extending Bivens to allow for damages for violations of the cruel-and-unusual punishment clause of the Eighth Amendment to the United States Constitution).  The Supreme Court has expressed hesitation about federal courts extending Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics into new contexts.  See Hernandez v. Mesa, 140 S. Ct. 735, 750 (2020)("When evaluating whether to extend Bivens, the most important question 'is "who should decide" whether to provide for a damages remedy, Congress or the courts?' The correct 'answer most often will be Congress'" (quoting Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017), quoting Bush v. Lucas, 462 U.S. 367, 380 (1983))).

brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  Officials may assert qualified immunity to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties." Anderson v. Creighton, 483 U.S. 635, 638, (1987).  See Green v. Padilla, 484 F. Supp. 1098, 1129.

If a government official has not violated a "clearly established" right, the official is shielded from personal liability.  Harlow v. Fitzgerald, 575 U.S. 800, 818 (1982).  Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  Qualified immunity protects officers who have "reasonable, but mistaken beliefs" and operate at the sometimes "hazy border" of the laws.  Saucier v. Katz, 533 U.S. 194, 205 (2001).  A court

> can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).  A series of policy considerations guide the Tenth Circuit's qualified-immunity analysis:  "(1) protecting against 'unwarranted timidity on the part of public officials;' (2) ensuring 'that talented candidates are not deterred by the threat of damages suits from entering public service;' and (3) guarding against employees being distracted from their duties."  Estate of Jensen by Jensen v. Clyde, 989 F.3d 848, 856 (10th Cir. 2021)(citing Richardson v. McKnight, 521 U.S. 399, 408 (1997)).

Qualified immunity therefore shields government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. at 818).  When a defendant asserts qualified immunity, it "creates a

presumption that they are immune from suit," not a presumption that they are immune from liability.  Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016).  When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct, such that "every reasonable officer would have understood" as much.  Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

### 1.    The Procedural Approach to Qualified Immunity.

The Supreme Court has clarified the proper procedure for lower courts to evaluate a qualified-immunity defense.  Before the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223 (2009), lower courts were directed to decide, first, whether the facts alleged or shown by the plaintiff make out a constitutional violation, and, if so, then decide whether the right at issue was clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Supreme Court's decision in Pearson v. Callahan, however, made the so-called "Saucier two-step" advisory rather than mandatory, noting that Saucier v. Katz's "'rigid order of battle'" had faced criticism from lower courts on "'practical, procedural, and substantive grounds.'"  Pearson v. Callahan, 555 U.S. at 234 (quoting Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1275, 1277 (2006)).  Though the Supreme Court recognizes that the Saucier rule was "beneficial" and "often appropriate," lower courts are now permitted to exercise their "sound discretion" when deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. at 236-37.

In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise." Pearson v. Callahan, 555 U.S. at 237.  The Supreme Court explains that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." Pearson v. Callahan, 555 U.S. at 241 (alterations omitted).  See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[131] qualified immunity's clearly established prong: when (i) the first, constitutional violation question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at

---

[131]In Camreta v. Greene, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707.  In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), then-Judge Gorsuch, writing for the Tenth Circuit, interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  See Kerns v. Bader, 663 F.3d at 1180-81 (10th Cir. 2011).  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018).  This language suggests that the inquiry is still discretionary, although the Court should exercise its discretion carefully.

the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify";

(v) tackling the first element "may create a risk of bad decision making," because of inadequate

briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly

convinced that the law is not clearly established and is thus inclined to give little thought to the

existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the

wisdom of passing on the first constitutional question when "it is plain that a constitutional right

is not clearly established but far from obvious whether in fact there is such a right." Kerns v.

Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555

U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified

that courts may "avoid avoidance" and address the first prong before the second prong in cases

involving a recurring fact pattern, where guidance on the constitutionality of the challenged

conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity

context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[132]

---

[132]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress

wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a

---

compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[133]   See Camreta v. Greene, 563 U.S. at 707 ("In general, courts

_____

establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[133]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.  The "Saucier two-step" encourages courts to articulate the constitutional rights at issue.  Before Pearson v. Callahan, 555 U.S. 223 (2009), made the "Saucier two-step" discretionary, it faced criticism from numerous Supreme Court members.  Associate Justice of the United States Supreme Court Stephen Breyer wrote, before Pearson v. Callahan, that he "would end the failed Saucier experiment now."  Morse v. Frederick, 551 U.S. 393, 432 (2007)(Breyer, J., concurring in the judgment and dissenting in part).  Joined by Associate Justices of the United States Supreme Court Ruth Bader Ginsburg and Stephen Breyer, Associate Justice of the United States Supreme Court John Paul Stevens criticized Saucier v. Katz because it was an "unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity." Bunting v. Mellon, 541 U.S. 1019, 1019 (2004).  Joined by Chief Justice of the United States William Rehnquist, Associate Justice of the United States Supreme Court Antonin Scalia wrote: "We should either make clear that constitutional determinations are *not* insulated from our review . . . or else drop any pretense at requiring the ordering in every case." Bunting v. Mellon, 541 U.S. at 1025 (Scalia, J., dissenting from the denial of certiorari).

Judicial resources are valuable and scarce, but they should not be conserved at the expense of protecting constitutional rights.  In addition to being easier in practice, Saucier v. Katz also increases the frequency and depth with which courts articulated constitutional law.  See Nancy Leong, The Saucier Qualified Immunity Experiment, An Empirical Analysis, 36 Pepp. L. Rev. 667 (2009).  Chief Justice Rehnquist opined that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Wilson v. Layne, 526 U.S. 603, 609 (1999).  The evidence to support Chief Justice Rehnquist's assertion, however, is mixed. See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights, 80 U. Colo. L. Rev. 401 (2009)("[T]he proof of the pudding is in the eating; levels of constitutional articulation increased dramatically following the Court's

should think hard, and then think hard again, before turning small cases into large ones."). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong. See Kerns v. Bader, 663 F.3d at 1182. See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1028, 1082-83 (D.N.M. 2016)(Browning, J.).

## 2.    **Clearly Established Rights.**

A right is "clearly established" when it was "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015)(quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). A clearly established right is "generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colorado Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was

---

development of the Wilson-Saucier sequencing doctrine."). See also Leong, 36 Pepp. L. Rev. at 670 (finding that mandatory sequencing "leads to the articulation of more constitutional law, but not the expansion of constitutional rights"). See also Greg Sobolski & Matt Steinberg, Note, An Empirical Analysis of Section 1983 Qualified Immunity Actions and Implications of Pearson v. Callahan, 62 Stan. L. Rev. 523 (2010). The bottom line is that a trial court often -- if not frequently -- needs to decide whether the constitutional right was violated before deciding if it was clearly established.

unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004). In other words, existing precedent must have placed the constitutional or statutory question "beyond debate." Ashcroft v. al-Kidd, 563 U.S. at 741.

The Supreme Court requires that courts not define the constitutional right at issue "'at a high level of generality.'" White v. Pauly, 137 S. Ct. 548, 552 (2017)(quoting Ashcroft v. al-Kidd, 563 U.S. at 742). The Supreme Court refers to this as a "longstanding principle." White v. Pauly, 137 S. Ct. at 552. Nevertheless, the clearly established law must be "particularized" to the case's facts. Anderson v. Creighton, 483 U.S. 635, 640 (1987). If the clearly established law at issue is not sufficiently particularized, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson v. Creighton, 483 U.S. at 639. "[G]eneral statements of the law" are not "inherently incapable" of clearly establishing a right, because they can sometimes give "fair and clear warning" to officers. United States v. Lanier, 520 U.S. 259, 271 (2017). See White v. Pauly, 137 S. Ct. at 552 (reiterating this principle). Importantly, the "unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. at 640. See Brosseau v. Haugen, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.")(citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)(noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially similar case for the right to be clearly established)). A court must, therefore, "inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances." Green v. Padilla, 484 F. Supp. 3d 1098, at 1134 (citing City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019)).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." Truman v. Orem City, 1 F. 4th 1227, __ (10th Cir. 2021)(quoting Thomas v. Kaven, 765F.3d 1183, 1194 (10th Cir. 2014))[134]. Although a plaintiff asserting a violation of a clearly established right must in most circumstances point to a case that is sufficiently factually similar, the Supreme Court has recently clarified that this is not always required. See Taylor v. Riojas, 141 S. Ct. 52, 54 (2020)("Taylor"). The Supreme Court, in a short per curiam opinion, suggested an objective, "no reasonable correctional officer" standard when it held that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time." Taylor, 141 S. Ct. at 53. In Taylor, corrections officers housed an inmate in "shockingly unsanitary cells." Taylor, 141 S. Ct. at 53. One cell was covered "nearly floor to ceiling, in 'massive mounts' of feces: all over the floor, the ceiling, the window, the walls, and even 'packed inside the water faucet.'" 141 S. Ct. at 53 (quoting Taylor v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019)). Correctional officers confined the plaintiff in this cell for four days, but the plaintiff did not eat or drink because he feared that his food and water would be contaminated. See 141 S. Ct. at 53. Correctional officers then moved the plaintiff to a second cell that was "frigidly cold" and was equipped with "only a clogged drain in the floor to dispose of bodily wastes." 141 S. Ct. at 53. The plaintiff held his bladder for more than twenty-

---

[134]At the time the Court is writing, there is no pagination available either for the Federal Reporter or the electronic database citation format. Citations to Truman v. Orem City, 1 F. 4th 1227 (10th Cir. 2021), therefore, lack page numbers.

four hours before finally involuntarily relieving himself, which caused the clogged drain to overflow and "raw sewage to spill across the floor."  141 S. Ct. at 53.  Because the plaintiff was not provided a bed and was confined without clothes, the plaintiff was "left to sleep naked in sewage."  141 S. Ct. at 53.

The Fifth Circuit held that these confinement conditions violated the Eighth Amendment's ban on cruel-and-unusual punishment, but it granted the corrections officers qualified immunity because the law was not clearly established.  See Taylor, 141 S. Ct. at 53 (citing Taylor v. Stevens, 946 F.3d 211, 222 (5th Cir. 2019)).  The Fifth Circuit concluded that the corrections officials did not have "fair warning" that confining the plaintiff in these conditions would be unconstitutional. Taylor v. Stevens, 946 F.3d at 222 (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).  The Supreme Court reversed, holding that the Fifth Circuit erred when it granted qualified immunity on this basis.  See Taylor, 141 S. Ct. at 53.  Although the plaintiff could not identify a case on point, the Supreme Court noted that -- even in the absence of a case clearly establishing the law -- "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."  Taylor, 141 S. Ct. at 53.  See Truman v. Orem City, 1 F. 4th at __ (summarizing the Supreme Court's conclusion and stating that the Supreme Court "made clear that [the plaintiff] did not have to" identify a case on point).

For decades, lower courts have tried diligently and faithfully to follow the unwritten signals of superior courts.[135]  One such unwritten signal is that "a nigh identical case must exist for the

---

[135]As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).

law to be clearly established."  Caldwell v. University of N.M. Bd. of Regents, No. 20-CIV-0003 JB/JFR, 2020 WL 7861330, at *33 n.14 (D.N.M. Dec. 31, 2020)(Browning, J.).[136]  As numerous

---

[136]The Court notes, as it has elsewhere, see, e.g., Caldwell v. University of N.M. Bd. of Regents, 2020 WL 7861330, at *33 n.14, that qualified immunity is a problematic doctrine.  This is particularly true of the Supreme Court's approach before Taylor.  "Factually identical or highly similar factual cases are not . . . the way the real world works."  Caldwell v. University of N.M. Bd. of Regents, 2020 WL 7861330, at *33 n.14.

Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

In most circumstances, a prior plaintiff must have been subjected to almost identical treatment, and a court must have found that law to have been clearly established for a subsequent plaintiff to get around the obstacle that qualified immunity creates.  See Stephen R. Reinhardt, The Demise of Habeas Corpus and the Rise of Qualified Immunity and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, 113 Mich. L. Rev. 1219, 1245 (2015)("[T]he Court has through qualified immunity created such powerful shields for law enforcement that people whose rights are violated, even in egregious ways, often lack any means of enforcing rights.").  See also White v. Pauly, 137 S. Ct. 548, 552 (2017)(criticizing the Tenth Circuit below, because it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment).  In most of those situations,

_____

officials can escape liability for violating someone's statutory or constitutional rights, because a prior court has not addressed the issue.  As United States Circuit Judge for the Court of Appeals for the Fifth Circuit Don Willett notes, this creates a Catch-22.  See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018)(Willett, J. concurring)(opinion withdrawn on rehearing).  The plaintiffs "must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because those questions are yet unanswered. Courts then rely on that judicial silence to conclude there's no equivalent case on the books." Zadeh v. Robinson, 902 F.3d at 499.  In short, "[n]o precedent = no clearly established law = no liability. An Escherian Stairwell. Heads defendants win, tails plaintiffs lose." Zadeh v. Robinson, 902 F.3d at 499.

The Court disagrees with the Supreme Court's approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy.  As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, (U.S. Supreme Court, filed Mar. 2, 2018)("Cato Brief").  "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2.  "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2.  See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect).  Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(internal quotation marks omitted).  "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(internal quotation marks omitted).  The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive.  If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision.  Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law.  See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g, Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba II, 844 F.3d at 874; Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018);

Courts of Appeals have recently noted, however, Taylor clarifies that it is no longer the case that an almost-identical case must exist.  See Truman v. Orem City, 1 F. 4th 1227 (10th Cir. 2021)("Just like any reasonable corrections officer should have understood the inmate in Taylor's conditions . . . offended the Constitution, so too should any reasonable prosecutor understand that that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."); Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)(explaining that the Supreme Court held in Taylor that "there does not need to be a case directly on point" when no reasonable officer could have concluded that the challenged action was constitutional); Taylor v. Ways, 2021 WL 2217474, at * 9 (7th Cir. June 2, 2021)(noting that Taylor reaffirmed that "the Supreme Court does not demand a case directly on point"); Roque v. Harvel, 993 F.3d 325 (5th Cir. 2021)(citing Taylor for the proposition that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant case law" (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004))).  See also Joanna C. Schwartz, Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 351 (2020)("The Court's decision in Taylor sends the signal to the lower courts that they can deny qualify immunity without a prior case on point."); Lawrence Rosenthal, Defending Qualified Immunity, 72 S.C.L. Rev. 547, 593 & n.193 (2020)("More recently, however, the Court has

---

Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 2017 WL 3951706, at *3; Brown v. City of Colo. Springs, 2017 WL 4511355, at *8, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

stressed that on egregious facts, qualified immunity should be denied regardless whether there are factually similar precedents.").

There are, therefore, two possible interpretations of <u>Taylor</u>.  First, <u>Taylor</u> could simply clarify that the holding in <u>Hope v. Pelzer</u>, 536 U.S. at 741 -- that identifying an earlier case with "'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," but that it is "not necessary to such a finding" -- is still good law even though it has fallen out of favor among lower courts.  This reading of <u>Taylor</u> would mean there is a narrow exception to the standard requirement that a plaintiff identify an earlier case on point that only applies in case with "extreme circumstances" or "particularly egregious" facts.  Second, <u>Taylor</u> could mean that a court must now ask whether the conduct at issue was particularly egregious such that no reasonable officer could have concluded that their actions are constitutional, and, if so, then there does not need to be a case clearly establishing the law.

Most Courts of Appeals have adopted the second interpretation.  Nonetheless, there is confusion both between and within the Courts of Appeals about <u>Taylor</u>'s scope.  <u>Compare</u> <u>Bates v. Schwarzenegger</u>, 832 F. App'x. 509, 511 (9th Cir. 2020)(mem.)(citing <u>Taylor</u> for the proposition that the "Supreme Court has repeatedly, including very recently, reaffirmed and applied the doctrine of qualified immunity"), <u>with</u> <u>Rico v. Ducart</u>, 980 F.3d 1292, 1307 (9th Cir. 2020)(Silver, J., concurring in part and dissenting in part)(explaining that, in <u>Taylor</u>, "the Court held that the prisoner's rights were so obvious that 'ambiguity in the caselaw' could not create any doubt" that the officer's conduct was unconstitutional (citing <u>Taylor</u>, 141 S. Ct. 52, 53, n.2)).  Since <u>Taylor</u>, courts have asked not just whether the law was clearly established through a factually similar case from that Circuit or from the Supreme Court, but also whether the conduct at issue was "particularly egregious" such that "no reasonable officer could have concluded that" their

actions were constitutionally permissible.  Taylor, 141 S. Ct. at 53.  See Truman v. Orem City, 1 F. 4th at __.  In other words, in addition to asking whether the officer was theoretically on notice that they were acting unlawfully,[137] the court must also ask whether the conduct at issue was "particularly egregious" -- an apparently objective question.  McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021)(vacating and remanding in light of Taylor even though the conduct at issue was likely not "particularly egregious").[138]

---

[137]The Court notes that one of the most basic premises of the law of qualified immunity -- that an officer is aware either actually or potentially that their conduct is unlawful because they know the holdings of both watershed constitutional decisions and the lower court decisions that apply them -- does not hold up to empirical scrutiny.  See Joanna C. Schwartz, Qualified Immunity's Boldest Lie, 88 U. Chi. L. Rev. 605, 610 (2021)(finding that although police departments do regularly inform officers about "watershed" decisions, officers are "not regularly informed about court decisions interpreting those decisions in different factual scenarios -- the very types of decisions that are necessary to clearly establish the law about the constitutionality of uses of force").  The Court has previously noted:

> It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).

Manzanares v. Roosevelt Cnty. Adult Detention Center, 331 F. Supp.3d 1260, 1294 n.10 (D.N.M. 2018)(Browning, J.).

[138]Professor Colin Miller of the University of South Carolina School of Law notes that there are only two likely interpretations of the Supreme Court's summary disposition of McCoy v. Alamu: (i) that the Court remanded so that the Fifth Circuit could consider whether the case involved "extreme circumstances" or "particularly egregious facts" like those in Taylor; and (ii) that the Supreme Court remanded so that the Fifth Circuit can reconsider without looking for analogous prior precedent and instead "determine whether any reasonable officer should have

The United States Court of Appeals for the Third Circuit, for example, notes that <u>Taylor</u> did not affect whether three state legislators who took a public stand against the sale of state-owned property and then tried to pass a law divesting the State's ability to sell it were entitled to qualified immunity, because the legislators' actions were "not so outrageous that 'no reasonable . . . officer could have concluded' they were permissible under the Constitution."  <u>HIRA Educ. Servs. N. Am. v. Augustine</u>, 991 F.3d 180, 191 n.7 (3d Cir. 2021)(quoting <u>Taylor</u>, 141 S. Ct. at 53).  The United States Court of Appeals for the Seventh Circuit, too, concludes that <u>Taylor</u> means an officer is not entitled to qualified immunity if his or her conduct was "particularly egregious."  <u>Lopez v. Sheriff of Cook Cnty.</u>, 993 F.3d 981, 991 (7th Cir. 2021).  In <u>Lopez v. Sheriff of Cook County</u>, the Seventh Circuit found that an off-duty correctional officer who shot and then used as a human shield a man who fired his gun into the air near a crowd after a scuffle did not act "so egregious[ly] that any reasonable officer would know they [were] violating the Constitution notwithstanding the lack of an analogous decision."[139]  993 F.3d at 991.  The United States Court of Appeals for the

---

realized" that the conduct violated the plaintiff's constitutional rights.  Colin Miller, <u>The End of Comparative Qualified Immunity</u>, 99 Tex. L. Rev. Online 217, 224 (2021)("Miller, <u>The End of Comparative Qualified Immunity</u>").  Miller argues that this second interpretation is more likely to be correct, because it "would be difficult to characterize" the officer's conduct as "'particularly egregious' without making a similar finding about most other unconstitutional behavior by government officers who seek qualified immunity."  Miller, <u>The End of Comparative Qualified Immunity</u>, at 224 (no citation for quotation).

[139]The Court does not agree with the Seventh Circuit's conclusion.  An off-duty officer using someone he had just shot multiple times as a human shield to "ward off" someone else with a gun -- the human shield had moments earlier fired a gun into the air near a crowd -- is  particularly egregious such that any reasonable officer should have realized that it violates someone's constitutional rights.  <u>Lopez v. Sheriff of Cook Cnty.</u>, 993 F.3d 992.  Even if the officer was trying to protect himself and the public, firing a gun near a crowd does not justify being used as fleshy shield to protect an off-duty officer who had shot that very shield moments earlier.  Numerous provisions of international law and the laws of war, <u>see</u>, <u>e.g.</u>, Rome Statute of the International Criminal Court, art. 8(2)(b)(xxiii)(including in the definition of "war crimes" "[u]tilizing the presence of a civilian or other protected person to render certain points, areas or military forces immune from military operations")(July 17, 1998), prohibit such conduct.  A police officer need

Ninth Circuit also distinguishes <u>Taylor</u> on the basis of the conduct's severity.  <u>See</u> <u>Rico v. Ducart</u>, 980 F.3d 1292, 1300 n.9 (9th Cir. 2020).  In <u>Rico v. Ducart</u>, the Ninth Circuit held that correctional officers who performed inmate-welfare checks that, because of the design of the prison, created loud noises every forty-five minutes were entitled to qualified immunity because the facts were not "as extreme as those present in" <u>Taylor</u>.  980 F.3d at 1300 n.9.  Similarly, the Ninth Circuit also has decided that <u>Taylor</u> "only highlights the level of blatantly unconstitutional conduct necessary to satisfy the obviousness principles."  <u>O'Doan v. Sanford</u>, 991 F.3d 1027, 1044 (9th Cir. 2021).

The other Courts of Appeals have, however, characterized <u>Taylor</u> as only reaffirming an "extreme circumstances" or "obvious clarity" exception.  The Fifth Circuit, for example, has distinguished <u>Taylor</u>, noting that it "involved a factually distinct claim involving unsanitary prison conditions," so it did not apply to a case about mental healthcare in prison.  <u>Landry v. Laborde-Lahoz</u>, 2021 WL 1537455, at * 5 (5th Cir. April 19, 2021).[140]  The Fifth Circuit, however, like

---

not be familiar with international law to know that such conduct is improper, nor should someone else have been used as a human shield previously and a Court of Appeals concluded that conduct to have violated clearly established law for a subsequent human shield to overcome the burden of qualified immunity.  The Seventh Circuit found that the situation was "too fast-moving, too unpredictable, and too volatile" for an officer to know that using as a human shield the person he had just shot multiple times was a violation that was "so egregious that any reasonable officer would know they are violating the Constitution notwithstanding the lack of an analogous decision."  993 F.3d at 992.  Instead, the Seventh Circuit appears to require the officer theoretically to be on notice that this conduct was a law violation because a prior officer must have done the same thing and an earlier court -- most likely the Seventh Circuit itself -- must have found that the use of human shields to violate some other clearly established law.  If human shields are banned in war, they should not be allowed on the Chicago's streets.  Any reasonable officer should know this conduct is not acceptable conduct under the Constitution.

[140]The Court does not agree with the Fifth Circuit's reasoning on this point, although it does not disagree with the case's result.  The Fifth Circuit reasons that <u>Taylor</u> did not support the plaintiff's argument that County officials acted with deliberate indifference in violation of the Eighth Amendment, because it was "factually distinct."  <u>Landry v. Laborde-Lahoz</u>, 2021 WL

other Courts of Appeals, has not adopted a consistent approach to <u>Taylor</u>.  The Fifth Circuit also

has noted that "it would have been 'obvious' to a reasonable officer that" several officers using

their body weight to apply pressure to an unarmed man who did not resist arrest while the man

was in the "maximal-restraint" position for five-and-a-half minutes so that the man stopped

breathing and his lips turned blue -- while officers nearby "milled around"-- would constitute "such

a severe tactic against this particular person would be constitutionally proscribed," and that the

officer would "have no recourse to qualified immunity."  <u>Aguirre v. City of San Antonio</u>, 995 F.3d

395, 403-04, 424 (5th Cir. 2020)(Jolly, J., concurring).  The Fifth Circuit has further cited <u>Taylor</u>

to support its assertion that "'in an obvious case,' general standards 'can clearly establish the

answer, even without a body of relevant law.'"  <u>Roque v. Harvel</u>, 993 F.3d 325, 335 (5th Cir.

2021)(quoting <u>Brosseau v. Haugen</u>, 542 U.S. 194, 199 (2004)).  In <u>Roque v. Harvel</u>, however,

the Fifth Circuit did not say what those "general standards" might be, from where they might come,

or where a court might look for them, and then proceeded to characterize qualified-immunity law

as requiring a case on point in almost all circumstances.  993 F.3d at 335.[141]  More recently,

---

1537455, at * 5.  That <u>Taylor</u> is factually distinct has no bearing on the merits of a deliberate-indifference claim but impacts its applicability to the qualified-immunity question.

[141]The Fifth Circuit's treatment of <u>Taylor</u> and the clearly established analysis is not consistent.  In <u>Tucker v. City of Shreveport</u>, 998 F.3d 165 (2021), the Fifth Circuit did not cite <u>Taylor</u>, but writes that

> "[q]ualified immunity is justified unless *no* reasonable officer could have acted as [the defendant officers] did here, or *every* reasonable officer faced with the same facts would *not* have [acted as the defendant officers did]."  <u>Mason v. Faul</u>, 929 F.3d 752, 764 (5th Cir. 2019, <u>cert. denied</u>, 141 S. Ct. 116, 207 (2020)(citing <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 590 (2018)("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  Otherwise, the rule is not one that 'every reasonable official' would know.")).

however, the Fifth Circuit acknowledged that Taylor excuses a plaintiff from "their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'"  Cope v. Cogdill, 2021 WL 2767581, at *4 (5th Cir. July 2, 2021)(quoting Taylor, 141 S. Ct. at 53-54).  The Fifth Circuit stressed, however, that this is a "high standard," because the facts must be "'particularly egregious.'"  Cope v. Cogdill, 2021 WL 2767581, at *4 (quoting Taylor, 141 S. Ct. at 53-54).

Most relevant here, the Tenth Circuit also has not given Taylor consistent treatment.  For example, the Tenth Circuit treated Taylor as an example of the rule of United States v. Lanier, 520 U.S. 259 (1997), that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," if it gives "fair and clear warning" that the conduct violates the plaintiff's constitutional rights.  United States v. Lanier, 520 U.S. at 271.  See Routt v. Howry, 835 F. App'x. 379, 382 (10th Cir. 2020).  This treatment of Taylor asks about the relationship between a "general constitutional rule *already identified* in the decisional law" and the "conduct in question," and asks whether that rule is applies with "obvious clarity."  United States v. Lanier, 520 U.S. at 271 (emphasis added).  Elsewhere, the Tenth Circuit states: "It suffices that 'the alleged unlawfulness [is] apparent in light of preexisting law.' That is, 'a general

--------

998 F.3d at 176-77.  The Fifth Circuit's analysis in Tucker v. City of Shreveport confuses the reasonableness of the officers' behavior with the clarity of the precedent that clearly establishes the law.  See 998 F.3d 165.  As Taylor suggests, an officer can act particularly egregiously and not be entitled to qualified immunity even if no precedent clearly establishes the law.  See 141 S. Ct. at 54.  See Ramirez v. Guadarrama, 2 F.4th 506, __ (5th Cir. 2021)(mem.)(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [on McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts.").

constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" Huff v. Reeves, 996 F.3d 1082, 1088 (10th Cir. 2021)(first quoting Riggins v. Goodman, 572 F.3d 1101, 1101 (10th Cir. 2009), then quoting Taylor, 141 S. Ct. at 53-54).

In Frasier v. Evans, however, the Tenth Circuit wrote that "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful." Frasier v. Evans, 992 F.3d 1003, 1015 (10th Cir. 2021)(quoting Taylor, 141 S. Ct. at 53). The Tenth Circuit continued by noting that the situation before them -- several police officers surrounding a man who asked one of the officers for a statement about the force the officer had just used on a "uncooperative suspect," and then one of the officers grabbing the tablet and searching it for a video of the encounter -- was "not such a rare case" as Taylor or Hope v. Pelzer, 536 U.S. 730 (2002). Frasier v. Evans, 992 F.3d at 1021-22. In other words, rather than having to point to an existing case with sufficiently analogous facts, a plaintiff instead can defeat a claim for qualified immunity by meeting Taylor's "extreme circumstances" or "particularly egregious" standard. See Frasier v. Evans, 992 F.3d at 1015.

More recently, the Tenth Circuit held that even without a prior precedent clearly establishing the law, it was "'obvious'" that a prosecutor providing materially false information to a medical examiner that influences his expert opinion whether a homicide occurred -- and then putting that medical examiner on the stand to testify about that false information -- is "'obviously egregious.'" Truman v. Orem City, 1 F. 4th at __ (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018), then Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004)). The Tenth Circuit, in Truman v. Orem City, comparing the facts directly to those in Taylor, continued: "Just

like any reasonable correctional officer should understand the inmate in Taylor's conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution." 1 F. 4th at __. In reaching its conclusion in Truman v. Orem City, the Tenth Circuit reiterated that its qualified-immunity analysis is "'not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." Truman v. Orem City, 1 F. 4th at __ (quoting Reavis v. Frost, 967 F.3d 978, 992 (10th Cir. 2020)). Because the Tenth Circuit concluded that "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established at the time of the prosecutor's conduct," 1 F. 4th at __, it found that the plaintiff had plausibly alleged a fabrication-of-evidence claim against the prosecutor.  1 F. 4th at __.  This treatment of Taylor does not just ask about the relationship between a "general constitutional rule already identified in the decisional law" and whether it applies with "obvious clarity" to the conduct, Routt v. Howry, 835 F. App'x at 382 (quoting United States v. Lanier, 520 U.S. at 271), but instead focuses on the objective "particularly egregious" standard, which applies even without any general constitutional principles that courts have already promulgated, because "no reasonable officer" could have concluded the conduct to be lawful,  Taylor, 141 S. Ct. at 53.

The Court does its best follow diligently and faithfully the unwritten signals of superior courts, but, here, the signals are not clear.[142]  The Court will therefore proceed with both lines of

---

[142]The Court agrees with the Tenth Circuit's treatment of Taylor in Truman v. Orem City, 1 F.4th 1227, that Taylor marginally expands the standard in United States v. Lanier 520 U.S. 259 and Hope v. Pelzer, 536 U.S. 730, and stands for  the proposition that an officer is not entitled to qualified immunity when their conduct is "particularly egregious" such that "any reasonable officer should have realized" that their conduct offends the Constitution.  Taylor, 141 S. Ct. at 54.

analysis.  An officer therefore is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d 1183, at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x. 382 -- at the time of the alleged misconduct, or (b)because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54.  See Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020)(quoting Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016))("'To overcome this presumption,' the plaintiffs bear the burden of 'show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right.'").  See also Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009)("When a defendant asserts qualified immunity at summary judgment . . .  the plaintiff [must] . . . demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time

---

See also Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)("[W]hen 'no reasonable correctional officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." (quoting Taylor, 141 S. Ct. at 53)).  The Court concludes this treatment to be correct, especially in light of the Supreme Court's summary disposition in McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021).  See Ramirez v. Guadarrama, 2 F.4th 506, __ (Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [on McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."); Miller, The End of Comparative Qualified Immunity, at 222-23.  On the other hand, given the Court's view on qualified immunity, the Court hopes that the lower courts patch the hole in the defense's line of reasoning, since it is so wide that the nation can run a truck through it.

of the alleged unlawful activity."); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

## LAW REGARDING REMOVAL AND REMAND

If a civil action filed in state court satisfies the requirements for original federal jurisdiction -- meaning, most commonly, federal-question or diversity jurisdiction -- the defendant may invoke 28 U.S.C. § 1441(a) to remove the action to the federal district court "embracing the place where such action is pending."  28 U.S.C. § 1441(a).  See Huffman v. Saul Holdings LP, 194 F.3d 1072, 1076 (10th Cir. 1999)("'When a plaintiff files in state court a civil action over which the federal district courts would have original jurisdiction based on diversity of citizenship, the defendant or defendants may remove the action to federal court.'")(quoting Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996)).  In a case with multiple defendants, there must be unanimous consent to removal; a single defendant may spoil removal and keep the case in state court.  See 28 U.S.C. § 1446(b)(2)(A).  Only true defendants have removal rights: plaintiffs defending counterclaims and third-party defendants may not remove an action, and their consent is not required for removal if all the true defendants consent.  See Hamilton v. Aetna Life & Cas. Co., 5 F.3d 642, 643-44 (2d Cir. 1993); Wiatt v. State Farm Ins. Co., 560 F. Supp. 2d 1068, 1078-79 (D.N.M. 2007)(Browning, J.).  "A plaintiff objecting to the removal may file a motion asking the district court to remand the case to state court."  Huffman v. Saul Holdings LP, 194 F.3d at 1076 (citing Caterpillar Inc. v. Lewis, 519 U.S. at 69).

To remove a case based on diversity, the diverse defendant must demonstrate that all of the usual prerequisites of diversity jurisdiction are satisfied.  Under 28 U.S.C. § 1332(a), a federal district court possesses original subject-matter jurisdiction over a case when the parties are diverse in citizenship and the amount in controversy exceeds $75,000.00.  See 28 U.S.C. § 1332(a);

Johnson v. Rodrigues (Orozco), 226 F.3d 1103, 1107 (10th Cir. 2000).  Diversity between the parties must be complete.  See Caterpillar Inc. v. Lewis, 519 U.S. at 68; Radil v. Sanborn W. Camps, Inc., 384 F.3d 1220, 1225 (10th Cir. 2004).  In addition to the original jurisdiction requirements, 28 U.S.C. § 1441(b)(2) lays out the "forum-defendant rule," which provides that a case may not be removed on the basis of diversity jurisdiction if any defendant is a citizen of the state in which the state-court action was brought.  The Tenth Circuit has noted:

> that § 1441(b)(2) -- the so-called forum-defendant rule -- provides as a separate requirement that "[a] civil action otherwise removable solely on the basis of [diversity] jurisdiction . . . may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."

Brazell v. Waite, 525 F. App'x 878, 884 (10th Cir. 2013)(alterations in original)(quoting 28 U.S.C. § 1441(b)(2))).   The forum-defendant rule applies to cases removed under only diversity jurisdiction; a defendant may remove a case brought against it in its home state on the basis of federal-question jurisdiction.  See 28 U.S.C. § 1441(b).  Last, a case cannot be removed if it began with a nondiverse party or a forum-citizen defendant, and only later came to satisfy the requirements of removal jurisdiction, unless: (i) the plaintiff voluntarily dismissed the removal-spoiling party, see DeBry v. Transamerica Corp., 601 F.2d 480, 488 (10th Cir. 1979);[143] Flores-Duenas v. Briones, 2013 U.S. Dist. LEXIS 173620, at *12 n.6, *26 (D.N.M. 2013)(Browning, J.)(describing the operation of the "voluntary-involuntary" rule); or (ii) the

---

[143]In DeBry v. Transamerica Corp., the Tenth Circuit explained:

The general effect of the [voluntary-involuntary] test is that a cause cannot be removed where the removability is a result of some development other than a voluntary act of plaintiff.  The cause cannot be removed as a result of evidence from the defendant or the result of a court order rendered on the merits of the case.

601 F.2d at 488 (citation omitted).

removal-spoiling party was fraudulently joined or procedurally misjoined.

1.     **The Presumption Against Removal.**

Federal courts are courts of limited jurisdiction; thus, there is a presumption against removal jurisdiction, which the defendant seeking removal must overcome.  See Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir. 1995); Fajen v. Found. Reserve Ins. Co., 683 F.2d 331, 333 (10th Cir. 1982); Martin v. Franklin Capital Corp., 251 F.3d at 1290; Bonadeo v. Lujan, 2009 U.S. Dist. LEXIS 45672, at *4 (D.N.M. 2009)(Browning, J.)("Removal statutes are strictly construed, and ambiguities should be resolved in favor of remand.").  The defendant seeking removal must establish that federal court jurisdiction is proper "by a preponderance of the evidence."  McPhail v. Deere & Co., 529 F.3d at 953.  See Bonadeo v. Lujan, 2009 U.S. Dist. LEXIS 45672, at *4 ("As the removing party, the defendant bears the burden of proving all jurisdictional facts and of establishing a right to removal.").  See also McPhail v. Deere & Co., 529 F.3d at 955 ("It would have been more precise to say that the defendant must affirmatively establish jurisdiction by proving jurisdictional facts  . . . .").  Because federal courts are courts of limited jurisdiction, the Tenth Circuit has ruled that "courts must deny such jurisdiction if not affirmatively apparent on the record."  Okla. Farm Bureau Mut. Ins. Co. v. JSSJ Corp., 149 F. App'x 775, 778 (10th Cir. 2005), abrogated on other grounds by Dart Cherokee Basin Operating Co. v. Owens, 135 S. Ct. 547 (2014).  This strict construction and presumption against removal should not, however, be interpreted as hostility toward removal cases in the federal courts.  See McEntire v. Kmart Corp., 2010 U.S. Dist. LEXIS 13373, at *2 ("Strict construction does not mean judicial hostility toward removal.  Congress provided for removal, and courts should not create rules that are at tension with the statute's language in the name of strict construction.")(citing Bonadeo v. Lujan, 2009 U.S.

Dist. LEXIS 45672, at *12).

    **2.**        **The Procedural Requirements of Removal.**

Section 1446 of Title 28 of the United States Code governs the procedure for removal. "Because removal is entirely a statutory right, the relevant procedures to effect removal must be followed." Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *5. A removal that does not comply with the express statutory requirements is defective and must be remanded to state court. See Huffman v. Saul Holdings LP, 194 F.3d at 1077. See also Chavez v. Kincaid, 15 F. Supp. 2d 1118, 1119 (D.N.M. 1998)(Campos, J.)("The [r]ight to remove a case that was originally in state court to federal court is purely statutory, not constitutional.").

Section 1446(a) of Title 28 of the United State Code provides that a party seeking removal of a matter to federal court shall file a notice of removal in the district and division where the state action is pending, "containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." 28 U.S.C. § 1446(a). Such notice of removal is proper if filed within thirty days from the date when the case qualifies for federal jurisdiction. See Caterpillar Inc. v. Lewis, 519 U.S. at 68-69; 28 U.S.C. § 1446(b). The Tenth Circuit has further elaborated that, for the thirty-day period to begin to run, "this court requires clear and unequivocal notice from the [initial] pleading itself" that federal jurisdiction is available. Akin v. Ashland Chem. Co., 156 F.3d 1030, 1036 (10th Cir. 1998). The Tenth Circuit specifically disagrees with "cases from other jurisdictions which impose a duty to investigate and determine removability where the initial pleading indicates that the right

to remove may exist." Akin v. Ashland Chem. Co., 156 F.3d at 1036.[144]

"When a civil action is removed solely under section 1441(a), [the standard removal statute,

_____

[144]In 2011, Congress clarified removal jurisdiction and procedures in the Federal Courts Jurisdiction and Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758 (2011). See Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *12 n.5.

On December 7, 2011, President Obama signed into law the Federal Courts Jurisdiction and Venue Clarification Act of 2011, which is intended to clarify the operation of federal jurisdictional statutes and facilitate the identification of the appropriate state or federal courts in which actions should be brought [see Pub. L. No. 112-63, 125 Stat. 758 (2011)].

. . . .

Section 103 of the Act makes several changes to removal and remand procedures. 28 U.S.C. § 1446 is amended to cover removal procedures for civil cases only; provisions governing removal of criminal prosecutions have been moved into new 28 U.S.C. § 1455 [Pub. L. No. 112-63, § 103(b), (c), 125 Stat. 758 (2011)].

Section 103 of the Act also amends 28 U.S.C. § 1441(c) to provide that, on the removal of any civil action with both removable claims and nonremovable claims (i.e., those outside of the original or supplemental jurisdiction of the district court), the district court must sever all nonremovable claims and remand them to the state court from which the action was removed. The amendment also provides that only defendants against whom a removable claim has been asserted need to join in or consent to removal of the action.  [Pub. L. No. 112-63, § 103(a), 125 Stat. 758 (2011)].

Section 103 also amends 28 U.S.C. § 1446(b) to provide that, in a multi-defendant case, each defendant will have 30 days from his or her own date of service (or receipt of initial pleading) to seek removal.  Earlier-served defendants may join in or consent to removal by a later-served defendant [Pub. L. No. 112-63, § 103(a), 125 Stat. 758 (2011)].  These provisions are intended to resolve a circuit split over when the 30-day removal period begins to run in cases in which not all defendants are served at the same time [see H.R. Rep. No. 112-10, at 13-14 (2011); see, e.g., Bailey v. Janssen Pharm., Inc., 536 F.3d 1202 (11th Cir. 2008)(30-day period runs from date of service on last-served defendant, and earlier-served defendants may join in last-served defendant's timely removal); Marano Enters. v. Z-Teca Rests., LP, 254 F.3d 753 (8th Cir. 2011)(each defendant has 30 days to effect removal, regardless of when or if other defendants have sought to remove); Getty Oil Corp. v. Ins. Co. of N. Am., 841 F.2d 1254 (5th Cir. 1988)(first-served defendant and all then-served defendants must join in notice of removal within 30 days after service on first-served defendant)].

which excludes multiparty, multiforum jurisdiction,] all defendants who have been properly joined and served must join in or consent to the removal of the action." 28 U.S.C. § 1446(b)(2)(A). The failure of all defendants to consent to removal will result in remand. See Bonadeo v. Lujan, 2009 WL 1324119, at *5-6 (D.N.M. Apr. 30, 2009)(Browning, J.); McEntire v. Kmart Corp., 2010 WL 553443, at *4 (D.N.M. Feb. 9, 2010)(Browning, J.)("A notice of removal fails if this procedural requirement is not met."). The rule of unanimity applies to all defendants, whether they are required parties under rule 19 or merely proper parties under rule 20. See Akin v. Ashland Chem. Co., 156 F.3d 1030, 1034 (10th Cir. 1998)(stating that the general removal rule "require[s] all defendants to join in the removal petition"); Cornwall v. Robinson, 654 F.2d 685, 686 (10th Cir. 1981)("A co-defendant, Interstate Book Company, did not join in the petition for removal and the petition was thus procedurally defective."); Bonadeo v. Lujan, 2009 WL 1324119, at *5 ("Although the procedure for a notice of removal set out in 28 U.S.C. § 1446(b) is couched in terms of a single defendant, courts have held that all defendants must join a removal petition or removal will be defective.")(citing Cornwall v. Robinson, 654 F.2d at 686). The defendants who

---

Section 103 also enacts a new subdivision (c) of 28 U.S.C. § 1446, containing provisions governing the procedures for removal. These include new authorization for a notice of removal in a diversity case to assert the amount in controversy if the initial pleading seeks (1) nonmonetary relief, or (2) a money judgment when state practice either does not permit a demand for a specific sum or permits the recovery of damages in excess of the amount demanded. Also part of a new subdivision (c) of 28 U.S.C. § 1446 is a provision allowing removal of a case based on diversity of citizenship more than one year after commencement of the action if the district court finds that the plaintiff acted in bad faith in order to prevent a defendant from removing the action (such as by deliberately failing to disclose the amount in controversy) [Pub. L. No. 112-63, § 103(b), 125 Stat. 758 (2011)].

Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *12 n.5 (quoting 16 J. Moore, D. Coquillette, G. Joseph, S. Schreiber, G. Vairo, & C. Varner, Moore's Federal Practice § 107.30[2][a][iv], at 107SA-1 to 107SA-2 (3d ed. 2013)).

have not been served, however, need not join in removal. See Kiro v. Moore, 229 F.R.D. 228, 230-32 (D.N.M. 2005)(Browning, J.).

**3.      Amendment of the Notice of Removal.**

In Caterpillar, Inc. v. Lewis, the Supreme Court held that a defect in subject-matter jurisdiction cured before entry of judgment did not warrant reversal or remand to state court. See 519 U.S. at 70-78. Citing Caterpillar, Inc. v. Lewis, the Tenth Circuit has held that "a defect in removal procedure, standing alone, is not sufficient to warrant vacating judgment and remand to state court if subject matter jurisdiction existed in the federal court." Browning v. Am. Family Mut. Ins. Co., 396 F. App'x 496, 505-06 (10th Cir. 2010)(unpublished). In McMahon v. Bunn-O-Matic Corp., 150 F.3d 651 (7th Cir. 1998)(Easterbrook, J.), the United States Court of Appeals for the Seventh Circuit noticed, on appeal, defects in the notice of removal, including that the notice of removal failed to properly allege diversity of citizenship. See 150 F.3d at 653 ("As it happens, no one paid attention to subject-matter jurisdiction . . . ."). The Seventh Circuit nevertheless permitted the defective notice of removal to be amended on appeal to properly establish subject-matter jurisdiction. See 150 F.3d at 653-54.

The Tenth Circuit has allowed defendants to remedy defects in their petition or notice of removal. See Jenkins v. MTGLQ Investors, 218 F. App'x. 719, 723 (10th Cir. 2007)(unpublished)(granting unopposed motion to amend notice of removal to properly allege jurisdictional facts); Watkins v. Terminix Int'l Co., 1997 WL 34676226, at *2 (10th Cir. 1997)(per curiam)(unpublished)(reminding the defendant that, on remand, it should move to amend the notice of removal to properly allege jurisdictional facts); Lopez v. Denver & Rio Grande W. R.R. Co., 277 F.2d 830, 832 (10th Cir. 1960)("Appellee's motion to amend its petition for removal to supply sufficient allegations of citizenship and principal place of business existing at the time of

commencement of this action is hereby granted, and diversity jurisdiction is therefore present."). The Tenth Circuit has further reasoned that disallowing amendments to the notice of removal, even after the thirty-day removal window had expired, when the defendant made simple errors in its jurisdictional allegations, "would be too grudging with reference to the controlling statute, too prone to equate imperfect allegations of jurisdiction with the total absence of jurisdictional foundations, and would tend unduly to exalt form over substance and legal flaw-picking over the orderly disposition of cases properly committed to federal courts." Hendrix v. New Amsterdam Cas. Co., 390 F.2d 299, 301 (10th Cir. 1968). The Tenth Circuit has noted that a simple error in a jurisdictional allegation includes failing to identify a corporation's principal place of business or referring to an individual's state of residence rather than citizenship. See Hendrix v. New Amsterdam Cas. Co., 390 F.2d at 301. In McEntire v. Kmart Corp., when faced with insufficient allegations in the notice of removal -- allegations of "residence" not "citizenship" -- the Court granted the defendants leave to amend their notice of removal to cure the errors in some of the "formalistic technical requirements." 2010 WL 553443, at *8 (citing Hendrix v. New Amsterdam Cas. Co., 390 F.2d at 300-02). Further, in Thompson v. Intel Corp., the Court permitted the defendant, Intel Corp., to amend its notice of removal to add missing jurisdictional elements, including evidence that its principal place of business and corporate headquarters -- the center of Intel Corp.'s direction, control, and coordination of activities -- is out of state, so that the diversity requirements were met. See 2012 WL 3860748, at *1.

There are limits to the defects that an amended notice of removal may cure, however, as Professors Charles Alan Wright and Arthur R. Miller explain:

> [A]n amendment of the removal notice may seek to accomplish any of several objectives. It may correct an imperfect statement of citizenship, state the previously articulated grounds more fully, or clarify the jurisdictional amount. In most circumstances, however, defendants may not add completely new grounds for

removal or furnish missing allegations, even if the court rejects the first-proffered basis of removal, and the court will not, on its own motion, retain jurisdiction on the basis of a ground that is present but that defendants have not relied upon

14 C. Wright & A. Miller, Federal Practice and Procedure § 3733 (Rev. 4th ed. 2020)(footnotes omitted).  Professor Moore has similarly recognized: "[A]mendment may be permitted after the 30-day period if the amendment corrects defective allegations of jurisdiction, but not to add a new basis for removal jurisdiction."  16 J. Moore, D. Coquillette, G. Joseph, S. Schreiber, G. Vairo, & C. Varner, Moore's Federal Practice § 107.30[2][a][iv], at 107-317 to -18 (3d ed. 2013).  Thus, where the defendant asserts diversity jurisdiction as a basis for removal of an action to federal court, the district court may permit the removing defendant to amend its removal notice, if necessary, to fully allege facts that satisfy the requirements of diversity jurisdiction by a preponderance of the evidence.  See Carrillo v. MCS Indus., Inc., 2012 WL 5378300, at *14 (D.N.M. 2012)(Browning, J.)(permitting party to amend its notice of removal when the removing party did "not assert[] a new basis for jurisdiction, or a new allegation not present in its Notice of Removal; rather, the . . . Amended Notice of Removal provides greater detail regarding the same basis for jurisdiction asserted in the . . . Notice of Removal").  Cf. New Mexico ex rel. Balderas v. Valley Meat Co., 2015 WL 3544288, at *25 (D.N.M. 2015)(Browning, J.)(denying amendment when it sought to assert a new jurisdictional basis that was not raised in the notice of removal).

### 4. Fraudulent Joinder.

A defendant may remove a case to federal court based upon diversity jurisdiction in the absence of complete diversity if a plaintiff joins a nondiverse party fraudulently to defeat federal jurisdiction.  See Am. Nat'l Bank & Trust Co. v. Bic Corp., 931 F.2d 1411, 1412 (10th Cir. 1991); Hernandez v. Menlo Logistics, Inc., 2013 U.S. Dist. LEXIS 156746, at *14-17 (D.N.M. 2013)(Browning, J.).  A defendant may remove on the basis of fraudulent joinder either while the

nondiverse party is still joined or after it is dismissed from the case -- the doctrine can thus function as an exception to either complete diversity or the voluntary-involuntary rule. "'[A] fraudulent joinder analysis [is] a jurisdictional inquiry,'" Bio-Tec Envtl., LLC v. Adams, 792 F. Supp. 2d 1208, 1214 (D.N.M. 2011)(Browning, J.)(quoting Albert v. Smith's Food & Drug Ctrs., Inc., 356 F.3d 1242, 1247 (10th Cir. 2004)), and, thus, the Tenth Circuit instructs that the district court should "pierce the pleadings, consider the entire record, and determine the basis of joinder by any means available," Dodd v. Fawcett Pubs., Inc., 329 F.2d 82, 85 (10th Cir. 1964)(citations omitted). "A district court may disregard a nondiverse party named in the state court complaint and retain jurisdiction if joinder of the nondiverse party is a sham or fraudulent." Baeza v. Tibbetts, 2006 WL 2863486, at *3. The Supreme Court has stated: "Merely to traverse the allegations upon which the liability of the resident defendant is rested or to apply the epithet 'fraudulent' to the joinder will not suffice: the showing must be such as compels the conclusion that the joinder is without right and made in bad faith." Chesapeake & Ohio Ry. Co. v. Cockrell, 232 U.S. 146, 152 (1914). The Tenth Circuit has explained that allegations of fraudulent joinder complicate the analysis whether removal is proper, because, "[w]hile a court normally evaluates the propriety of a removal by determining whether the allegations on the face of the complaint satisfy the jurisdictional requirements, fraudulent joinder claims are assertions that the pleadings are deceptive." Nerad v. AstraZeneca Pharms., Inc., 203 F. App'x 911, 913 (10th Cir. 2006)(unpublished).

The party asserting fraudulent joinder bears the burden of proof. See Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *1 (10th Cir. 2000)(unpublished)("The case law places a heavy burden on the party asserting fraudulent joinder.").[145]  "To justify removal

---

[145]The Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

based on diversity jurisdiction, a defendant must plead a claim of fraudulent joinder with particularity and prove the claim with certainty."  Couch v. Astec Indus., Inc., 71 F. Supp. 2d at 1146-47.  Before 2013, the most recent published Tenth Circuit decision to state the burden of proof for demonstrating fraudulent joinder was issued over forty years earlier in Smoot v. Chicago, Rock Island & Pacific Railroad Co., 378 F.2d 879 (10th Cir. 1967).  The Tenth Circuit said that fraudulent joinder must be "established with complete certainty upon undisputed evidence." Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882.

Actual fraud -- e.g., a plaintiff colluding with a nondiverse defendant to defeat removal[146] -- suffices to establish fraudulent joinder, but it is not required.  See McLeod v. Cities Serv. Gas Co., 233 F.2d 242, 246 (10th Cir. 1956)("[C]ollusion in joining a resident defendant for the sole purpose of preventing removal . . . may be shown by any means available.").  In Smoot v. Chicago, Rock Island & Pacific Railroad Co., the Tenth Circuit stated two other bases for finding fraudulent joinder: (i) "[t]he joinder of a resident defendant against whom no cause of action is stated is a patent sham"; or (ii) "though a cause of action be stated, the joinder is similarly

_____

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592 has persuasive value.

[146]Collusion might look something like this: a plaintiff names a nondiverse defendant under a highly dubious theory of liability; the plaintiff contacts the defendant and offers to dismiss the case at the end of the one-year limitation, see 28 U.S.C. § 1446(c), if the defendant agrees not to move to dismiss before the one-year mark; and the defendant agrees to the arrangement to save litigation costs, as well as to avoid any slim chance that the court decides to recognize the plaintiff's theory of liability against it.

fraudulent if in fact no cause of action exists."  378 F.2d at 882 (quoting <u>Dodd v. Fawcett Pubs.,</u> <u>Inc.</u>, 329 F.2d at 85.  The Tenth Circuit found fraudulent joinder, because the joined party's non-liability was "established with complete certainty upon undisputed evidence."  378 F.2d at 882. "This does not mean that the federal court will pre-try, as a matter of course, doubtful issues of fact to determine removability; the issue must be capable of summary determination and be proven with complete certainty."  <u>Smoot v. Chi., Rock Island & Pac. R.R. Co.</u>, 378 F.2d at 882.  The plaintiff died when his car collided with a freight train.  <u>See</u> 378 F.2d at 881.  The plaintiff's estate sued the railroad company and joined a non-diverse alleged employee as a defendant.  <u>See</u> 378 F.2d at 881.  It was undisputed that the diversity-destroying party's employment with the railroad company had "terminated almost fifteen months before the collision and that he was in no way connected with the acts of negligence ascribed to him."  378 F.2d at 881.

In recent unpublished decisions, the Tenth Circuit has adopted different articulations of the burden of proof for fraudulent joinder, two of which are from the United States Court of Appeals for the Fifth Circuit.  In <u>Montano v. Allstate Indemnity Co.</u>, the Tenth Circuit quoted favorably <u>Hart v. Bayer Corp.</u>, 199 F.3d 239 (5th Cir. 2000), which states:

> To prove their allegation of fraudulent joinder [the removing parties] must demonstrate that there is no possibility that [plaintiff] would be able to establish a cause of action against [the joined party], in state court.  In evaluating fraudulent joinder claims, we must initially resolve all disputed questions of fact and all ambiguities in the controlling law in favor of the non-removing party.  We are then to determine whether that party has any possibility of recovering against the party whose joinder is questioned.

<u>Montano v. Allstate Indemnity Co.</u>, 211 F.3d 1278, 2000 WL 525592, at *4-5 (alterations in original)(quoting <u>Hart v. Bayer Corp.</u>, 199 F.3d at 246)(internal quotation marks omitted).  The Tenth Circuit stated that the standard for proving fraudulent joinder "is more exacting than that for dismissing a claim under Fed. R. Civ. P. 12(b)(6); indeed, the latter entails the kind of merits

determination that, absent fraudulent joinder, should be left to the state court where the action commenced." Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2. The Tenth Circuit in Montano v. Allstate Indemnity Co. also quoted from Batoff v. State Farm Insurance Co., 977 F.2d 848 (3d Cir. 1992), which states: "A claim which can be dismissed only after an intricate analysis of state law is not so wholly insubstantial and frivolous that it may be disregarded for purposes of diversity jurisdiction." 977 F.2d at 853.

In Nerad v. AstraZeneca Pharmaceuticals, Inc., the Tenth Circuit adopted a different articulation of the burden of proof. The Tenth Circuit stated that, where fraudulent joinder is asserted, "the court must decide whether there is a reasonable basis to believe the plaintiff might succeed in at least one claim against the non-diverse defendant." Nerad v. AstraZeneca Pharmaceuticals, Inc., 203 F. App'x at 913 (citing Badon v. RJR Nabisco, Inc., 224 F.3d 382, 393 (5th Cir. 2000)). The Tenth Circuit explained that "[a] 'reasonable basis' means just that: the claim need not be a sure-thing, but it must have a basis in the alleged facts and the applicable law." Nerad v. AstraZeneca Pharmaceuticals, Inc., 203 F. App'x at 913.

The Fifth Circuit recognized the inconsistencies in various articulations of the standard for fraudulent joinder and directly addressed the problem in Travis v. Irby, 326 F.3d 644 (5th Cir. 2003):

> Neither our circuit nor other circuits have been clear in describing the fraudulent joinder standard. The test has been stated by this court in various terms, even within the same opinion. For example, the Griggs [v. State Farm Lloyds, 181 F.3d 694 (5th Cir. 1999),] opinion states,
>
> > To establish that a non-diverse defendant has been fraudulently joined to defeat diversity, the removing party must prove . . . that there is absolutely no possibility that the plaintiff will be able to establish a cause of action against the non-diverse defendant in state

court.

181 F.3d at 699 (emphasis added)(citing <u>Burden v. Gen. Dynamics Corp.</u>, 60 F.3d 213, 217 (5th Cir. 1995)).  The Griggs opinion later restates that test as follows --

> Stated differently, we must determine whether there is any reasonable basis for predicting that [the plaintiff] might be able to establish [the non-diverse defendant's] liability on the pleaded claims in state court.

181 F.3d at 699 (emphasis added).  Similarly, in summing up federal law, <u>Moore's Federal Practice</u> states at one point: "To establish fraudulent joinder, a party must demonstrate  . . .  the absence of any possibility that the opposing party has stated a claim under state law."  16 <u>Moore's Federal Practice</u> § 107.14[2][c][iv][A] (emphasis added).  It then comments: "The ultimate question is whether there is arguably a reasonable basis for predicting that state law might impose liability on the facts involved."  Although these tests appear dissimilar, "absolutely no possibility" vs. "reasonable basis," we must assume that they are meant to be equivalent because each is presented as a restatement of the other.

326 F.3d at 647 (emphases in original).  The Fifth Circuit has settled upon this phrasing:

> [T]he test for fraudulent joinder is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant.

<u>Smallwood v. Ill. Cent. R.R. Co.</u>, 385 F.3d 568, 573 (5th Cir. 2004)("To reduce possible confusion, we adopt this phrasing of the required proof and reject all others, whether the others appear to describe the same standard or not.").

In <u>Zufelt v. Isuzu Motors Am., L.L.C.</u>, 727 F. Supp. 2d 1117 (D.N.M. 2009)(Browning, J.), the Court addressed the standard that courts should use when addressing fraudulent joinder and concluded that, to establish that a party was fraudulently joined, a defendant has the burden of demonstrating that "there is no possibility that the plaintiff would be able to establish a cause of action" against the party alleged to be fraudulently joined.  727 F. Supp. 2d at 1124-25 (citing

Montano v. Allstate Indem. Co., 211 F.3d 1278, 2000 WL 525592, at *4-5).  The Court explained:

> [T]his District has consistently adopted the "possibility" standard when assessing fraudulent joinder claims.  See Allen v. Allstate Ins. Co., 2008 U.S. Dist. LEXIS 108948 (D.N.M. 2008)(Browning, J.)(holding that the claims asserted against the non-diverse defendant were "possibly viable under New Mexico law, and  . . . sufficient to preclude federal jurisdiction"); Baeza v. Tibbetts, 2006 U.S. Dist. LEXIS 95317, at *11, (stating that "[r]emand is required if any one of the claims against [the defendant] is possibly viable"); Provencio v. Mendez, 2005 U.S. Dist. LEXIS 39012, at *25 (D.N.M. 2005)(Browning, J.)(stating that "there must be no possibility the [p]laintiffs have a claim against [the non-diverse defendant]"); Couch v. Astec Indus., Inc., 71 F. Supp. 2d at 1147 (stating that, to defeat removal jurisdiction, "[t]he plaintiff need only demonstrate the possibility of the right to relief").  This Court, in Couch v. Astec Indus., Inc., noted with approval the language of the United States Court of Appeals for the Eleventh Circuit, which states that "if there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court."  Couch v. Astec Indus., Inc., 71 F. Supp. 2d at 1147 (quoting Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998))(emphasis in original).

Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d at 1129.

In Brazell v. Waite, the Tenth Circuit stated that the "removing party must show that the plaintiff has 'no cause of action' against the fraudulently joined defendant," but it did not further elaborate on that burden.  525 F. App'x. at 881 (citing Dodd v. Fawcett Pubs., Inc., 329 F.2d at 85; Roe v. Gen. Am. Life Ins. Co., 712 F.2d 450, 452 n.* (10th Cir. 1983)).

In 2013, the Tenth Circuit published its first opinion since 1946 regarding the burden of proof for demonstrating fraudulent joinder: "'To establish fraudulent joinder, the removing party must demonstrate either: (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court.'"  Dutcher v. Matheson, 733 F.3d at 988 (quoting Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d at 249).  In Dutcher v. Matheson, the Tenth Circuit reviewed a district court's holding that it had diversity jurisdiction over a case where Utah citizens sued ReconTrust, a Texas-based national

bank, and Stuart T. Matheson, a Utah citizen.  See 733 F.3d at 983, 987.  The plaintiffs alleged

that Matheson and his law firm enabled ReconTrust to conduct an illegal nonjudicial foreclosure

by holding the foreclosure sales on behalf of the Texas-based bank.  See 733 F.3d at 983.  The

defendants removed the case to federal court and alleged that the plaintiffs fraudulently joined the

Utah defendants.  See 733 F.3d at 983.  The Honorable Ted Stewart, United States District Judge

for the District of Utah, agreed that the plaintiffs had been fraudulently joined, concluding that,

under Utah law, "an attorney cannot be held liable to a non-client absent fraud, collusion or privity

of contract." 733 F.3d at 988.  The Tenth Circuit disagreed with the district court's characterization

of Utah law, finding instead that, in the case on which the defendants relied, the Supreme Court of

Utah "has simply limited the circumstances in which a lawyer owes a duty of care to non-clients

from actions arising out of the provision of legal services." 733 F.3d at 988.  In rejecting the claim

of fraudulent joinder, the Tenth Circuit said

> that does not mean that the plaintiffs have stated a valid claim against Matheson
> and his law firm.  Or even that Matheson and his law firm are not somehow
> fraudulently joined.  But the defendants needed to clear a high hurdle to prove
> something they have yet to prove, i.e., fraudulent joinder.

733 F.3d at 989.

The Tenth Circuit did not elaborate on the defendant's burden to show fraudulent joinder,

except to say that it is "a high hurdle." 733 F.3d at 989.  It quoted, however, Cuevas v. BAC Home

Loans Servicing, LP, a Fifth Circuit opinion that repeats the clarified standard from the Smallwood

v. Illinois Central Railroad Co. case.  See Dutcher v. Matheson, 733 F.3d at 988 (quoting Cuevas

v. BAC Home Loans Servicing, LP, 648 F.3d at 249).  In Cuevas v. BAC Home Loans Servicing,

LP, the Fifth Circuit states:

> Under the second way, the test is "whether the defendant has demonstrated that
> there is no possibility of recovery by the plaintiff against an in-state defendant,
> which stated differently means that there is no reasonable basis for the district court

to predict that the plaintiff might be able to recover against an instate defendant." [Smallwood v. Ill. Cent. R.R. Co., 385 F.3d at 573.]  If there is no reasonable basis of recovery, then the court can conclude that the plaintiff's decision to join the in-state defendant was indeed improper, unless that showing compels the dismissal of all defendants.  There is no improper joinder if the defendants' showing compels the same result for the resident and nonresident defendants, because this simply means that the plaintiff's case is ill founded as to all of the defendants.  Such a defense is more properly an attack on the merits of the claim, rather than an inquiry into the propriety of the joinder of the in-state defendant.

Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d at 249 (emphasis in original)(citations and internal quotation marks omitted).

Based on the Tenth Circuit's history of relying on Fifth Circuit analysis in fraudulent joinder cases, it is likely that it would approve this additional explanation of the fraudulent joinder standard.  The Court will accordingly use the following standard for fraudulent joinder: whether the defendant has demonstrated that there is no possibility that the plaintiff will obtain a judgment against an in-state defendant.  Cf. Zufelt v. Isuzu Motors Am., L.C.C., 727 F. Supp. 2d at 1124-25 (concluding that fraudulent joinder occurs when "there is no possibility that the plaintiff would be able to establish a cause of action" against the party alleged to be fraudulently joined).  No case sets forth the burden of proof that applies to (much rarer) allegations of actual fraud, such as plaintiff-defendant collusion, but the Court concludes that the clear-and-convincing standard -- the usual standard for fraud -- is appropriate.  See, e.g., United States v. Thompson, 279 F.2d 165, 167 (10th Cir. 1960)("An allegation of fraud is a serious matter; it is never presumed and must be proved by clear and convincing evidence.")(citations omitted).

A district court's order to remand based on a finding of fraudulent joinder is not reviewable by the Tenth Circuit.  See Nerad v. AstraZeneca Pharms., Inc., 203 F. App'x at 913 (holding that, because the district court remanded based on its conclusion that it lacked subject-matter jurisdiction at the time of removal, 28 U.S.C. § 1447(d) precluded the Tenth Circuit from

reviewing the order).  The fraudulent joinder inquiry on a motion to remand is a subject-matter jurisdiction inquiry.  See Albert v. Smith's Food & Drug Ctrs., Inc., 356 F.3d at 1247.

### LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  See also Dorato v. Smith, 108 F. Supp. 3d 1064, 1118 (D.N.M. 2015)(Browning, J.)(noting that investigative stops are seizures); United States v. Young, 347 F. Supp. 3d 747, 770 (D.N.M. 2018)(Browning, J.)(describing an arrest as a seizure).  "A police officer may seize someone either by physical force or a show of authority."  United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017)(citing United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010)).  "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'"  United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)).  "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'"  United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at 628).  "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."  United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)).  See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he

was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))).  The

standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing

United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at

minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864

F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).

### 1.    Consensual Encounters.

A consensual encounter occurs when a police officer approaches a person to ask questions

under circumstances where a reasonable person would feel free to refuse to answer and to end the

encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a

person's home to interview him."  United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990).  "It

is not improper for a police officer to call at a particular house and seek admission for the purpose

of investigating a complaint or conducting other official business," 1 Wayne LaFave, Search and

Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).

### 2.    Investigative Stops.

In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit noted: "Terry

was the first case to recognize that 'the Fourth Amendment governs 'seizures' of the person  . . .

[other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement

for lesser government intrusions into an individual's liberty."  United States v. King, 990 F.2d at

1557 (first quoting Terry v. Ohio, 392 U.S. 1, 16 (1968); and then quoting Terry v. Ohio, 392 U.S.

at 27).  The Tenth Circuit has recognized that, in Terry v. Ohio, the Supreme Court identified two

police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk."

United States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989);

- 107 -

Adams v. Williams, 407 U.S. 143, 147-48 (1972)).  The Tenth Circuit explained:

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557.  When evaluating either of these actions, a court asks whether the action was reasonable under the Fourth Amendment.  See United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004); United States v. King, 990 F.2d at 1557.

### a.   Investigative Detentions and Reasonable Suspicion.

A police-citizen encounter that is not consensual may be a constitutional investigative detention.  See Dorato v. Smith, 108 F. Supp. 3d at 1118.  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146).  Such brief investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  Dorato v. Smith, 108 F. Supp. 3d at 1118.  First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making

the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).   Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.   United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).   See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior.   See 364 F.3d at 1194.   The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.   See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").   While many of the factors that the Tenth Circuit considered would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient.   See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.   See 355 F. App'x at 227-28.   A

truck pulled alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk.  See 355 F. App'x at 228.  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  See 355 F. App'x at 228.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  See 355 F. App'x at 228.  Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled behind the truck.   355 F. App'x at 228, 229.   Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, that he did not have a driver's license, and that he had a gun and other items in his vehicle.  See 355 F. App'x at 227-29.  The Tenth Circuit concluded that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant." 355 F. App'x at 229.  The Tenth Circuit explained, in an opinion that the Honorable Michael R. Murphy, now-Senior United States Circuit Judge for the Tenth Circuit, wrote and the Honorable Mary Beck Briscoe, now-Senior United States Circuit Judge for the Tenth Circuit, and the Honorable Robert H. McWilliams, the late United States Circuit Judge for the Tenth Circuit, joined:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride.  She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.  He

parked in a dark location and turned off his lights.

. . . .

> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229. The Tenth Circuit did not require the officer to identify the particular crime of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion. See 355 F. App'x at 229. The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian." 355 F. App'x at 229. The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur. See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417. At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vázquez, United States District Court Judge for the District of New Mexico, had concluded that, because the defendant's conduct in standing outside a private residence and looking in was "'consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance,'" and that the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct. 483 F. App'x at

418 (quoting United States v. Aragones, No. CR 10-2453 MV, 2011 WL 13174481, at *19 (D.N.M. June 10, 2011)(Vázquez, J.)).  The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior." United States v. Aragones, 483 F. App'x at 418.  The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling." 483 F. App'x at 417 (quoting Albuquerque, N.M., Ordinance § 12-2-21(B)).  The Tenth Circuit, thus, reversed Judge Vázquez' decision, disagreeing with her conclusion that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 483 F. App'x at 417.

b. **Frisks.**

A "frisk" is "a protective search  . . .  which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)).  An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must  . . .  be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392

U.S. at 29.  In evaluating the validity of the stop-and-frisk, a court should consider the totality of the circumstances.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

> ### c.  Traffic Stops.

"'A traffic stop is a seizure within the meaning of the Fourth Amendment  . . . .'"  United States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)).  "'For the duration of a traffic stop,  . . .  a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'"  United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)).  "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's."  United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)).  "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop."  United States v. White, 584 F.3d at 945.  See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131; and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart."  United States v. Erwin, 875 F.2d at 270.

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion.  See United States v. Holt, 264 F.3d at 1230.  "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. 452, 459

(2011)(quoting <u>Brigham City v. Stuart</u>, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

<u>United States v. Wilson</u>, 96 F. App'x at 643 (quoting <u>United States v. Holt</u>, 264 F.3d at 1220).  A court must examine "both the length of the detention and the manner in which it is carried out," <u>United States v. Holt</u>, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" <u>United States v. Wilson</u>, 96 F. App'x at 643 (quoting <u>United States v. Caro</u>, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification.'" <u>United States v. Wilson</u>, 96 F. App'x at 644 (alterations in original)(quoting <u>United States v. Wood</u>, 106 F.3d 942, 945 (10th Cir. 1997)).  "A traffic stop is justified at its inception if an officer has  . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic  . . . regulations of the jurisdiction."  <u>United States v. Winder</u>, 557 F.3d at 1134.

### 3.    <u>Arrests</u>.

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention," <u>Oliver v. Woods</u>, 209 F.3d at 1186 (quoting <u>United States v. Cooper</u>, 733 F.2d 1360, 1363 (10th Cir. 1984)); a police-citizen encounter that goes beyond the limits of a stop under <u>Terry v. Ohio</u> is an arrest, <u>see</u> <u>United States v. Perdue</u>, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a <u>Terry</u> stop, however, may be

- 114 -

constitutionally justified only by probable cause or consent.").  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[147]  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).  See  Wilson  v.  Jara,  866  F. Supp. 2d  1270,  1292  (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy  search  or  detention.'"  (quoting  Oliver v. Woods,  209 F.3d at 1185)),  aff'd,  512 F. App'x 841 (10th Cir. 2013)(unpublished).  "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001); and citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt  . . . , it does require 'more than mere suspicion.'"  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has made the following distinction

---

[147]The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs  . . .  does not always elevate a detention into an arrest.").

between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio,

and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard. See Beck v. Ohio, 379 U.S. 89,

96 (1964). "The subjective belief of an individual officer as to whether there was probable cause

for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97 (citing

Florida v. Royer, 460 U.S. at 507; United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir.

2002)). Thus, the primary consideration is "whether a reasonable officer would have believed that

probable cause existed to arrest the defendant based on the 'information possessed by the

[arresting] offic[er].'" Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th

Cir. 2002)(alterations in Olsen v. Layton Hills Mall)(quoting Romero v. Fay, 45 F.3d 1472, 1476

(10th Cir. 1995)).

### a.     **When a Detention Becomes an Arrest.**

The Tenth Circuit has held that a police-citizen encounter which goes beyond an

investigative stop's limits is an arrest that probable cause or consent must support to be valid. See

United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which

goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable

cause or consent."). "Terry stops must be limited in scope to the justification for the stop . . .

[and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality

of the circumstances." United States v. Perdue, 8 F.3d at 1462. "The government has the burden

of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1463).  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'" (quoting United States v. Perdue, 8 F.3d at 1462)).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their

protection.'"  United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at

1462).   See  United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding

reasonableness of stop when officers detained the defendant at gunpoint, and placed him in

handcuffs where suspect had threatened to kill someone and was pounding interior of truck with

his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's

"drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United

States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers

did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when

they suspected that the defendant had "just completed a narcotics purchase," there were a number

of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially

hazardous and supports the need for added safeguards").   Similarly, there are circumstances in

which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.

See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th

Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable

precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir.

1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action

designed to provide for the safety of the agents.").   United States v. Perea was one of those unique

cases, because the police had reasonable cause to believe that the person whom they were detaining

was the suspect whom they sought to arrest -- a man wanted for murder who, it was believed,

might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's

determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to
> the perceived threat.  The measures taken during a *Terry* stop must be "reasonably
> related in scope to the circumstances which justified the interference in the first
> place" and may not go beyond what is necessary for officer safety.  *United States v.*

*King*, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting *Terry v. Ohio,* 392 U.S. 1, 20 .
. . (1968)).  The felony stop was justified by suspicion that someone in the Escalade
might have a gun, or at least was dangerous.  The officers displayed their weapons
only as long as necessary to ensure that the vehicle and its occupants posed no
threat.  The officers put their guns away as soon as they handcuffed Mr. Burciaga,
placed him in the back of a police car, and confirmed that no one else was in the
car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

### b.    Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily

available at the scene, investigate basic evidence, or otherwise inquire if a crime has been

committed at all before invoking the power of warrantless arrest and detention."  Romero v. Fay,

45 F.3d at 1476-77.  Police officers "may not ignore easily accessible evidence and thereby

delegate their duty to investigate [to others]."  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259

(10th Cir. 1998).  However, "[o]nce probable cause is established, an officer is not required to

continue to investigate for exculpatory evidence before arresting a suspect."  Garcia v. Casuas, No.

CIV 11-0011 JB/RHS, 2011 WL 7444745, at *49 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing

Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

In Romero v. Fay, the Tenth Circuit confronted the issue of when an officer must conduct

further investigation before arresting an individual.  In that case, law enforcement officers

interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff

in a murder.  See 45 F.3d at 1474.  Approximately four hours later, without conducting additional

investigation or obtaining a warrant, an officer arrested the plaintiff for murder.  See 45 F.3d

at 1474.  After he was taken into custody, the plaintiff told the officer that he was innocent and that

he had an alibi.  See 45 F.3d at 1474.  The plaintiff stated that three individuals would establish

that he was asleep at home when the murder occurred.  See 45 F.3d at 1474.  The officer refused

the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff.  45 F.3d at 1474.  The officer never interviewed the alibi witnesses.  See 45 F.3d at 1474.  The plaintiff was incarcerated for three months before the government dismissed the case and he was released.  See 45 F.3d at 1474.

The plaintiff brought a 42 U.S.C. § 1983 action for, among other things, violations of his Fourth Amendment rights.  See Romero v. Fay, 45 F.3d at 1474.  The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and of Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him.  See 45 F.3d at 1476.  The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, now-Senior United States Circuit Judge for the Tenth Circuit, authored, and the Honorable Deanall Reece Tacha, former-United States Circuit Judge for the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit joined.  See 45 F.3d at 1476.  The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention."  45 F.3d at 1476-77.  The Tenth Circuit determined:

> Once [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers

relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything.  See 147 F.3d at 1254-55.  The Tenth Circuit, in an opinion that Judge Murphy, authored, and the Honorable Stephen Hale Anderson, Senior United States Circuit Judge for the Tenth Circuit, and the Honorable James Kenneth Logan, the late United States Circuit Judge for the Tenth Circuit joined, concluded that qualified immunity did not apply.  See 147 F.3d at 1257-59.  The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape."  147 F.3d at 1257.  The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause."  147 F.3d at 1257.  The Tenth Circuit held that, consequently, "it was  . . .  not reasonable for the officers to rely on the security guards' allegations."  147 F.3d at 1257.  The Tenth Circuit added that

> police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . .  Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff].  They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest.  Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her.  See 478 F.3d at 1113.  Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend.  See 478 F.3d at 1113.  The Tenth Circuit, in an en banc opinion that the

- 121 -

Honorable Paul Joseph Kelly Jr., now-Senior United States Circuit Judge for the Tenth Circuit,

authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of
> insufficient information, . . . or inadequate corroboration, what the officers had
> fell short of reasonably trustworthy information indicating that a crime had been
> committed by [the defendant].  See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir.
> 1986)("A police officer may not close her or his eyes to facts that would help clarify
> the circumstances of an arrest.   Reasonable avenues of investigation must be
> pursued especially when, as here, it is unclear whether a crime had even taken
> place.").  Based on the facts above, [the defendant] was arrested without probable
> cause.

Cortez v. McCauley, 478 F.3d at 1116 (footnotes and citations omitted).  The Tenth Circuit further

held that

> it was established law that "the probable cause standard of the Fourth Amendment
> requires officers to reasonably interview witnesses readily available at the scene,
> investigate basic evidence, or otherwise inquire if a crime has been committed at
> all before invoking the power of warrantless arrest and detention."  Romero, 45
> F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d
> [at] 1259  ("[P]olice officers may not ignore easily accessible evidence and thereby
> delegate their duty to investigate and make an independent probable cause
> determination based on that investigation.").  In the present case, witnesses were
> readily available for interviews, physical evidence was available, and a medical
> diagnosis was forthcoming.  Defendants, however, . . . conducted no investigation.
> Instead, the Defendants relied on the flimsiest of information conveyed by a
> telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted).  The Tenth Circuit concluded,

therefore, that qualified immunity did not apply.  See Cortez v. McCauley, 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica

Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor.  See 2011 WL

7444745, at *8.  The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim

against the arresting officer and Rio Rancho for, among other things, unlawfully arresting him in

violation of his Fourth Amendment rights.  See 2011 WL 7444745, at *12.  The Court concluded

that the officer had probable cause to arrest the plaintiff based on information gleaned from other

officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a witness at the scene on the night of the incident -- Jennifer Katz. See 2011 WL 7444745, at *43-46. Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses." 2011 WL 7444745, at *15. Garcia contended that, moreover, Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him violated his constitutional rights. See 2011 WL 7444745, at *15. Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered Katz' and Odom's motivations to lie. See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits for the general proposition that officers must interview witnesses at the scene, Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to interview those witnesses again. . . . Here, the responding police officers . . . interviewed every adult alleged to be involved in the incident and briefly spoke with K.J. . . . .

> Garcia also states that, if Casuas had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him. . . . The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casuas was required to do more after [K.J.'s interview] solidified the existence of probable cause. In Romero v. Fay, the Tenth Circuit held:

>> Plaintiff contends that regardless of whether the statements by Duran and Gutierrez supplied probable cause for Defendant Fay to arrest Plaintiff, under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest. We disagree.

> 45 F.3d at 1466. In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an

arrest." 147 F.3d at 1257 n.8.

. . . .

These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses. Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J. Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom. Garcia only speculates that Casuas *might* have found something. An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment. In Romero v. Fay, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him. When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . . . Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives. The cases that Garcia cites establish only that the police may not ignore available material witnesses. Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed. Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . . Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46

(1979)).  The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview.  Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49 (alterations added).

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.  The hallmark of the Fourth Amendment is reasonableness."  United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).  "In the criminal context, reasonableness usually requires a showing of probable cause."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a

few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

1.     **Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006).   See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121.  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the

degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it

is needed for the promotion of legitimate governmental interests'" (quoting United States v.

Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the
> constitutionality of a governmental search is "reasonableness."  At least in a case
> . . . where there was no clear practice, either approving or disapproving the type of
> search at issue, at the time the constitutional provision was enacted, whether a
> particular search meets the reasonableness standard "'is judged by balancing its
> intrusion on the individual's Fourth Amendment interests against its promotion of
> legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor

Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of

reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of
> precise definition or mechanical application.   In each case [determining
> reasonableness] requires a balancing of the need for the particular search against
> the invasion of personal rights that the search entails.  Courts must consider the
> scope of the particular intrusion, the manner in which it is conducted, the
> justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the

individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting

that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because

a condition of his probation was to consent to search of his apartment without notice or probable

cause, and because he was clearly notified and informed of the provision); Banks v. United States,

490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited

expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the

fourth amendment for a person on conditional release, or a felon, may be unreasonable for the

general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining

and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights  . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."  Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations omitted).

The Supreme Court's recent decision in Carpenter v. United States, 138 S. Ct. 2206 (2018), underscores that the "reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."  United States v. Jones, 565 U.S. at 409.  In Carpenter v. United States, the Honorable John Roberts, Chief Justice for the Supreme Court, writing for the majority, relied on the Katz v. United States test to determine that the United States violated the defendant's Fourth Amendment rights by obtaining his cell-site records without a warrant.  See Carpenter v. United States, 138 S. Ct. at 2217-19.  Chief Justice Roberts wrote that "'what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected,'" Carpenter v. United States, 138 S. Ct. at 2217 (quoting Katz v. United States, 389 U.S. at 351-52), and that "[a] majority of this Court has already recognized that individuals have a reasonable

expectation of privacy in the whole of their physical movements," 138 S. Ct. at 2217 (citing United States v. Jones, 565 U.S. at 430 (Alito, J., concurring in judgment); id. at 415 (Sotomayor, J., concurring)).  Chief Justice Roberts concluded that "historical cell-site records present even greater privacy concerns than the GPS monitoring of a vehicle we considered in Jones" and allowing the government warrantless access to this information contravenes individuals' reasonable expectation of privacy in the whole of their physical movements.  Carpenter v. United States, 138 S. Ct. at 2217-18.

2.      **Consensual Searches**.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that: (i) the government "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily

given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997])(citing and quoting numerous sources). Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010)(Browning, J)(some alterations in original). See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010). The inquiry is an objective one. See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003). "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances. For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary. See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers near a building's exits, threatening no more than to question individuals if they seek to leave, "should not [result] in any

reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted). Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . .  is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205. Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words.  "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'").  For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent.  See 335 F.3d at 1175.

In United States v. Gordon, the suspect moved to suppress all physical evidence an officer seized from a locked duffle bag.  See 173 F.3d at 765.  The officer then asked to see the suspect's train passenger ticket and identification, inquired into his travel plans, and asked if he had any luggage.  See 173 F.3d at 765.  The officer did not inform the suspect that he was free to leave or not answer her questions.  See 173 F.3d at 765.  The officer asked to search the suspect's luggage

and the suspect gave his consent. See 173 F.3d at 765. She asked him whether he had any contraband, informing him that contraband was the subject of her search. See 173 F.3d at 765. When the officer encountered the suspect's locked bag, she asked him if he could open it. See 173 F.3d at 765. Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]." 173 F.3d at 766. The Tenth Circuit concluded that the suspect's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag." 173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage. See 173 F.3d at 766. The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include. See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995). The Tenth Circuit determines whether a search remains within the boundaries of the consent given based on the totality of the circumstances. See United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996). When an officer tells a suspect the object of his search and the suspect consents to a search for that object within a certain area, the Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search of any area within the confines of the officer's request where the object may be found. United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he consented to a search of any area in the motel room where one might hide drugs"). See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not exceed the scope of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in

searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent." United States v. Gordon, 173 F.3d at 766. See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics). Accordingly, in United States v. Gordon, the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags. 173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")). The Tenth Circuit emphasized: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." 173 F.3d at 766.

## LAW REGARDING EXIGENT CIRCUMSTANCES

Exigent circumstances may overcome "[t]he presumption of unconstitutionality for warrantless searches." United States v. Mongold, 528 F. App'x 944, 948 (10th Cir. 2013)(unpublished). Exigencies may arise from threats to a person's physical safety, the likely destruction of evidence, and the "'hot pursuit,'" United States v. Mongold, 528 F. App'x at 948

- 133 -

(quoting Kentucky v. King, 563 U.S. at 460), of suspects, see United States v. Mongold, 528 F. App'x at 948 (citing Kentucky v. King, 563 U.S. at 460).  In such situations, "'the exigencies . . . make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'"  United States v. Mongold, 528 F. App'x at 948 (alteration in original)(quoting Kentucky v. King, 563 U.S. at 460, and citing United States v. Martinez, 643 F.3d 1292, 1296 (10th Cir. 2011)).

    "'The existence of exigent circumstances is a mixed question of law and fact.'"  United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)).  "The government bears the burden of proving that exigent circumstances rendered a warrantless search reasonable."  United States v. Martinez, 643 F.3d at 1296 (citing United States v. Anderson, 154 F.3d at 1233).  "'[W]hen the exception must justify the warrantless entry of a home,'" the government's burden is "'especially heavy.'"  United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d at 717).

    When an exigency involves a "risk of personal danger," United States v. Najar, 451 F.3d at 718, the Tenth Circuit requires that the government satisfy a two-part test: "'(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable,'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d at 718).  The Tenth Circuit adopted this test after the Supreme Court, in Brigham City v. Stuart, 547 U.S. at 406-07, held officers' subjective motivations irrelevant and probable cause unnecessary for the emergency-aid exception.  See United States v. Najar, 451 F.3d at 718.  This holding upturned the Tenth Circuit's earlier three-part test, which required that "'the search must not be motivated by an intent to arrest or seize evidence,'" and that "'there must be some reasonable basis, approaching probable cause,

to associate the emergency with the place to be searched.'" United States v. Najar, 451 F.3d at

718 (quoting United States v. Thomas, 372 F.3d 1173, 1177 (10th Cir. 2004)).  Accordingly, now,

to satisfy "[t]he emergency aid exception," the government must demonstrate "'an objectively

reasonable basis for believing that a person within the house is in need of immediate aid,' not on

an officer's subjective belief."  United States v. Martinez, 643 F.3d at 1296 (quoting Michigan v.

Fisher, 558 U.S. 45, 47 (2009)).

That the Supreme Court rejected probable cause for the emergency-aid exception has not

affected the Tenth Circuit's test for the destruction-of-evidence exception.  See United States v.

Mongold, 528 F. App'x at 949 (applying the test from United States v. Aquino, 836 F.2d 1268

(10th Cir. 1988), for the destruction-of-evidence exception, which includes a probable cause

requirement).  Cf. United States v. Najar, No. CR 03-0735 JB, 2004 WL 3426123, at *6 (D.N.M.

Sept. 3, 2004)(Browning, J.)("For probable cause in the usual sense not to be needed, the police

must be responding to a true emergency rather than a crime, *and* the police must reasonably believe

a person inside needs immediate assistance, and entry is needed to protect or preserve life, or to

avoid serious injury." (emphasis in original)), aff'd, 451 F.3d 710 (10th Cir. 2006).  In the Tenth

Circuit, the government must meet a four-part test for such an exception:

> An exception to the warrant requirement that allows police fearing the destruction
> of evidence to enter the home of an unknown suspect should be (1) pursuant to clear
> evidence of probable cause, (2) available only for serious crimes and in
> circumstances where the destruction of the evidence is likely, (3) limited in scope
> to the minimum intrusion necessary to prevent the destruction of evidence, and
> (4) supported by clearly defined indicators of exigency that are not subject to police
> manipulation or abuse.

United States v. Aquino, 836 F.2d at 1272.  "The second element includes two components: (a) the

exception is only available for serious crimes; and (b) destruction of evidence must be likely."

United States v. Mongold, 528 F. App'x at 949.

The Brigham City v. Stuart holding likewise did not affect the hot-pursuit exception. "Hot pursuit occurs when an officer is in 'immediate or continuous pursuit' of a suspect from the scene of a crime." United States v. Jackson, 139 F. App'x 83, 86 (10th Cir. 2005)(unpublished)(quoting Welsh v. Wisconsin, 466 U.S. at 753). "In order for the hot pursuit doctrine to apply, the suspect must have been in a public place 'when the police first sought to arrest' the suspect," Schingel v. City of Albuquerque, No. CIV 07-0481 LH/RLP, 2008 WL 11399547, at *6 (D.N.M. Dec. 18, 2008)(Hansen, J.)(quoting United States v. Santana, 427 U.S. 38, 42 (1976)), and the police must have had probable cause to arrest the suspect in the public place, see Schingel v. City of Albuquerque, 2008 WL 11399547, at *7 (citing United States v. Santana, 427 U.S. at 43 ("We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under [United States v. Watson, 423 U.S. 411 (1976)], by the expedient of escaping to a private place.")). Hot pursuit then requires a chase from that public place. See Garrison v. City of Cushing, 5 F.3d 545, 1993 WL 332284, at *1, *4 (10th Cir. 1993)(unpublished table opinion)(declining to apply the hot-pursuit exception where law enforcement officers entered a home pursuant only to a tip as to a suspect's location). During the chase, if a defendant "seeks to avoid arrest by retreating into a home, an officer may enter to complete the arrest when in 'hot pursuit.'" Gutierrez v. Cobos, No. CIV 12-0980 JH/GBW, 2015 WL 13239104, at *6 (D.N.M. Aug. 25, 2015)(Herrera, J.)(quoting United States v. Santana, 427 U.S. at 42).

The hot-pursuit exception is closely related to the destruction-of-evidence exception. See United States v. Aquino, 836 F.2d at 1271. In United States v. Santana, the Supreme Court reasoned, in part, that the hot-pursuit exception protects against "the significant risk that the

[evidence] would no longer be in the [suspect's] possession if the police waited until a warrant could be obtained." United States v. Aquino, 836 F.2d at 1271 (alteration in original)(citing United States v. Santana, 427 U.S. at 44 (Stevens, J., concurring)).   Since the Supreme Court has separately recognized the destruction-of-evidence exception, courts have grounded the hot pursuit exception on "the suspect's flight, which frustrates police efforts to make a legitimate warrantless arrest." United States v. Aquino, 836 F.2d at 1271 (citing United States v. Santana, 427 U.S. at 43).  "[A] suspect may not defeat an arrest which has been set in motion in a public place  . . .  by the expedient of escaping to a private place." United States v. Shelton, No. CR 18-2045 KG, 2018 WL 6069160, at *9 (D.N.M. Nov. 20, 2018)(Gonzales, J.)(quoting United States v. Santana, 427 U.S. at 43).

The Supreme Court recently updated its position on the community caretaking exception to the Fourth Amendment's warrant requirement in Caniglia v. Strom, 141 S. Ct. 1596 (2021)("Caniglia").  Writing for the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, held that police officers' caretaking functions -- such as welfare checks -- do not "create[] a standalone doctrine . . . justif[ying] warrantless searches and seizures in the home." Caniglia, 141 S. Ct. at 1598.  Justice Thomas stresses that, without a warrant or the homeowner's consent, police officers cannot enter a home -- even for non-investigatory purposes -- unless "recognized exigent circumstances were present," such as a need to "'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" Caniglia, 141 S. Ct. at 1598-99 (quoting Kentucky v. King, 563 U.S. 452, 460, 470 (2011)).

The Supreme Court thus limits the possible scope of Cady v. Dombrowski, 413 U.S. 433 (1973), upon which the United States Court of Appeals for the First Circuit had relied.  See Caniglia, 141 S. Ct. at 1598.  In Cady v. Dombrowski, the Supreme Court held that an officer's

warrantless search of an impounded vehicle for a firearm did not violate the Fourth Amendment. See 413 U.S. at 447-48.  Justice Thomas emphasizes that, in Cady v. Dombrowski, the defendant's vehicle was "already under police control," and stresses the "'constitutional difference'" between searches of vehicles and searches of homes.  Caniglia, 141 S. Ct. at 1599 (quoting Cady v. Dombrowski, 413 U.S. 433, 439).  In Caniglia, police officers searched the plaintiff's home and seized two firearms after conducting a "welfare check" on the plaintiff, who was suicidal. Caniglia, 141 S. Ct. at 1598.  Justice Thomas explains that, although the officers were performing initially a "community caretaking" function rather than "investigatory function," their warrantless search and seizure was not justified.  Caniglia, 141 S. Ct. at 1600.  Justice Thomas clarifies that, under the Fourth Amendment, police officers may only "inva[de] . . . the home and its curtilage" where they possess

> a valid warrant.  See *Collins v. Virginia*, 138 S. Ct. 1663 (2018) . . . .  We have also held that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to "'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Kentucky v. King*, 563 U.S. 452, 460, 470 (2011); *see also Brigham City v. Stuart*, 547 U.S. 398, 403-04 (2006)(listing other examples of exigent circumstances). And, of course, officers may generally take actions that "'any private citizen might do'" without fear of liability.  *E.g., Jardines*, 569 U.S. at 8 (approaching a home and knocking on the front door).

Caniglia, 141 S. Ct. at 1599.  Justice Thomas continues that the "community caretaking" exception does not apply to home searches, concluding that it serves as a "recognition that police officers perform many civic tasks in modern society . . . , a recognition that these tasks exist, and not an open-ended license to perform them anywhere." 141 S. Ct. at 1600.

Three justices concurred.  See 141 S. Ct. at 1600-05.  The Honorable John Roberts, Chief Justice of the United States of America -- with whom the Honorable Stephen Breyer, Associate Justice of the Supreme Court, joined -- wrote a one-paragraph concurrence.  See 141 S. Ct. at 1600

(Roberts, C.J., concurring, Breyer, J., joining).  Chief Justice Roberts states that he joins Justice Thomas' opinion,  because it does not contradict the proposition that "[a] warrant to enter a home is not required . . . when there is a 'need to assist persons who are seriously injured or threatened with such injury.'"  141 S. Ct. at 1600 (Roberts, C.J., concurring)(quoting Brigham City v. Stuart, 547 U.S. at 403).

In his concurrence, the Honorable Samuel Alito, Associate Justice of the Supreme Court, suggests a number of issues that he believes Justice Thomas' opinion leaves unresolved.  141 S. Ct. at 1600 (Alito, J., concurring).  Justice Alito agrees with the Supreme Court that Cady v. Dombrowski does not recognize a freestanding "community caretaking" Fourth Amendment category, noting that "community caretaking" tasks "vary widely, and there is no clear limit on how far they might extend in the future."  141 S. Ct. at 1600 (Alito, J., concurring).  Justice Alito notes two issues implicating the Fourth Amendment that Justice Thomas' holding does not address: (i) temporary seizures "conducted for the purpose of ascertaining whether a person presents an imminent risk of suicide"; and (ii) "red flag" laws with which States are experimenting that empower police officers, upon a court order, to seize a firearm that its owner may use to harm herself or another person.  141 S. Ct. at 1601 (Alito, J., concurring).  Echoing concerns Chief Justice Roberts expressed during oral argument about elderly persons injured in their homes and reachable only by a warrantless search, Justice Alito suggests that the current exigent circumstances doctrine does not cover such a situation.  See  141 S. Ct. at 1602 (Alito, J., concurring).  Justice Alito writes that "circumstances are only exigent when there is not enough time to get a warrant . . . and warrants are not typically granted for the purpose of checking on a person's medical condition."  141 S. Ct. at 1602 (Alito, J., concurring)(citing Missouri v. McNeely,

569 U.S. 141, 149 (2013); <u>Michigan v. Tyler</u>, 436 U.S. 499, 509 (1978)).

The Honorable Brett Kavanaugh, Associate Justice of the Supreme Court, wrote the third and final concurrence.  <u>See</u> 141 S. Ct. at 1602 (Kavanaugh, J., concurring).  Justice Kavanaugh explains how, contrary to Justice Alito's suggestion, the exigent circumstances doctrine does supply justification for warrantless entry into the home to ascertain the medical state of elderly persons and suicidal persons.  <u>See</u> 141 S. Ct. at 1603 (Kavanaugh, J., concurring).  Justice Kavanaugh opines that, when police officers receive a call about a woman threatening imminent suicide in her home, they have "'an objectively reasonable basis' for believing than an occupant is 'seriously injured or threatened with such injury.'"  141 S. Ct. at 1604 (Kavanaugh, J., concurring)(quoting <u>Brigham City v. Stuart</u>, 547 U.S. at 400, 403).  The Fourth Amendment, Justice Kavanaugh writes, "does not require officers to stand idly outside as the suicide takes place."  141 S. Ct. at 1604 (Kavanaugh, J., concurring).  Justice Kavanaugh concludes that the result is the same when a concerned relative requests that police officers perform a welfare check on an elderly man and where the man does not respond to their knock on the door: "[T]he officers have an 'objectively reasonable basis' for believing that an occupant is 'seriously injured or threatened with such injury,'" and "[t]he Fourth Amendment does not prevent the officers from entering the home and checking on the man's well-being."  141 S. Ct. at 1605 (Kavanaugh, J., concurring)(quoting <u>Brigham City v. Stuart</u>, 547 U.S. at 400, 403).

## LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity."  N.M.S.A. § 41-2(A).  The New Mexico Legislature, however, also recognized

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for

the public good is almost without limit, and therefore government should not have
the duty to do everything that might be done.

N.M.S.A. § 41-4-2(A).  As a result, it was "declared to be the public policy of New Mexico that

governmental entities and public employees shall only be liable within the limitations of the Tort

Claims Act and in accordance with the principles established in that act."  N.M.S.A. § 41-4-2(A).

The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent

person's standard of care in the performance of that duty."  N.M.S.A. § 41-4-2(C).  The NMTCA

is the

> exclusive remedy against a governmental entity or public employee for any tort for
> which immunity has been waived under the Tort Claims Act and no other claim,
> civil action or proceeding for damages, by reason of the same occurrence, may be
> brought against a governmental entity or against the public employee or his estate
> whose act or omission gave rise to the suit or claim.

N.M.S.A. § 41-4-17(A).

A plaintiff may not sue a New Mexico governmental entity or its employees or agents

unless the plaintiff's cause of action fits within one of the exceptions that the NMTCA grants for

governmental entities and public employees.  See Begay v. State, 1985-NMCA-117 ¶ 10, 723 P.2d

252, 256 ("Consent to be sued may not be implied, but must come within one of the exceptions to

immunity under the Tort Claims Act."),[148] rev'd on other grounds sub nom. Smialek v. Begay,

---

[148]The Court predicts that the Supreme Court of New Mexico, if presented with the issue,
would agree with Begay v. State that, for a plaintiff to sue a governmental entity, the entity must
come within one of the NMTCA's exceptions, and that a plaintiff may not imply the governmental
entity's consent to suit.  Section 41-4-2 provides in part: "[I]t is declared to be the public policy of
New Mexico that governmental entities and public employees shall only be liable within the
limitations of the Tort Claims Act."  N.M. Stat. Ann. § 41-4-2.  The NMTCA also states that
governmental entities and public employees acting in the scope of their duties shall be immune
from liability for torts except as the NMTCA waives.  See N.M. Stat. Ann. § 41-4-4.  The Supreme
Court of New Mexico has consistently reaffirmed that, for a plaintiff to sue a governmental entity
or public employee acting within the scope of his or her duties, an NMTCA immunity waiver must
apply.  See, e.g., Thompson v. City of Albuquerque, 2017-NMSC-021 ¶ 6, 397 P.3d 1279, 1281;

1986-NMSC-049, 721 P.2d 1306.  "A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity."  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1251 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished).  Accord Barreras v. State of N.M. Corr. Dep't, 2003-NMCA-027 ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act.");[149] Chavez v. City of Albuquerque, 1998-NMCA-004 ¶ 8, 952 P.2d 474, 477 (noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity);[150] Archibeque v. Moya, 1993-NMSC-079 ¶ 5, 866 P.2d at 346 (concluding that public employees acting within the scope of their duties are "granted immunity from liability for any tort except as waived by Sections 41-

---

Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021 ¶ 6, 916 P.2d at 1313; Silva v. State, 1987-NMSC-107, ¶ 41, 745 P.2d 380, 388.

[149]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Barreras v. State of New Mexico Corrections Department that, absent affirmative legislation, New Mexico courts do not permit private lawsuits to enforce New Mexico constitutional rights if no NMTCA immunity waiver applies.  In Begay v. State, the Supreme Court of New Mexico dismissed plaintiff's state constitutional claims against a governmental entity, because no NMTCA waiver applied.  See Begay v. State, 1985-NMCA-117 ¶ 14, 723 P.2d at 257 ("We have determined that plaintiffs may not sue the state without its consent and that there is no express waiver for the medical examiner under the Tort Claims Act.").  The Court notes that in Begay v. State, as discussed supra n.148, clarifies that "[c]onsent to be sued may not be implied" under the NMTCA.  Begay v. State, 1985-NMCA-117 ¶ 10, 723 P.2d 252, 256.

[150]For the reasons discussed supra note 149, the Court concludes that the Supreme Court of New Mexico would, if presented with the issue, agree with this assertion in Chavez v. City of Albuquerque.

- 142 -

4-5 through 41-4-12"); Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127 ¶ 11, 744 P.2d 919,

922 (holding that no waiver of immunity exists for damages arising out of alleged educational

malpractice claim against a school board);[151] Begay v. State, 1985-NMCA-117 ¶ 14, 723 P.2d at

257 (finding that no waiver exists in NMTCA for suit for damages under Article II, § 11 of the

New Mexico Constitution -- a provision that protects the "free exercise of religion").  The NMTCA

does not limit the availability of many forms of equitable relief.  See N.M.S.A. § 41-4-

17(A)("Nothing in this section shall be construed to prohibit any proceedings for mandamus,

prohibition, habeas corpus, certiorari, injunction or quo warranto."); El Dorado Utils. Inc. v.

Eldorado Area Water and Sanitation Dist., 2005-NMCA-036 ¶ 28, 109 P.3d 305, 312 ("The Tort

Claims Act would not bar a claim for injunctive relief.").[152]  Thus, if no specific waiver can be

found in the NMTCA, a plaintiff's complaint against the governmental entity or its employees

must be dismissed.  See Begay v. State, 1985-NMCA-117 ¶ 8, 723 P.2d at 255.

The Court held in Williams v. Board of Regents of University of New Mexico, 20

---

[151]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the result in Rubio v. Carlsbad Municipal School District, because none of the express waivers under §§ 41-4-5 to -12 permit recovery for damages arising out of educational malpractice claims, and § 41-4-4(A) clearly exempts governmental entities and public employees acting within the scope of their duties from liability except as waived in sections 41-4-5 to -12. See N.M. Stat. Ann. §§ 41-4-5 to -12.  As discussed in note 148, supra, the Supreme Court of New Mexico requires an express NMTCA immunity waiver to permit an NMTCA suit against a governmental entity or a public employee acting within the scope of his or her duties.

[152]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with El Dorado Utilities, Inc. v. Eldorado Area Water and Sanitation District, that nothing in the NMTCA bars a separate claim for injunctive relief.  While the Supreme Court of New Mexico has clarified that the NMTCA is "the exclusive remedy for any action for damages against the government," Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046 ¶ 14, 899 P.2d 1132, 1135, the NMTCA limits only damages claims brought against the state or state employees acting within the scope of their duty and does not limit plaintiffs from seeking other forms of injunctive relief, see Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046 ¶ 14, 899 P.2d at 1135.

F. Supp. 3d 1177 (D.N.M. 2014)(Browning, J.), that the NMTCA "'grant[s] governmental entities and employees a general immunity from tort liability, [and] waives that immunity in certain defined circumstances.'"  Williams v. Board of Regents of University of New Mexico, 20 F. Supp. 3d at 1187 (quoting Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049, ¶ 6, 970 P.2d 1143, 1145)(alterations added in Williams v. Bd. of Regents of Univ. of N.M.).  See Davis v. N.M. Dep't of Game & Fish, No. CIV 18-0415 LF-SCY, 2019 WL 943514, at *6 (D.N.M. Feb. 26, 2019)(Fashing, M.J.).  Moreover, the Supreme Court of New Mexico has added that "the doctrine of respondeat superior extends liability to the public entities that have supervisory control over the tortious actors."  Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021, ¶ 14, 916 P.2d 1313, 1318 (citing Silva v. State, 1987-NMSC-107, ¶ 15, 745 P.2d 280, 385).  The Supreme Court of New Mexico has explained:

> A governmental entity is not immune from liability for any tort of its employee acting within the scope of duties for which immunity is waived.  A governmental entity is not immune from liability for any tort.  N.M.S.A. § 41-4-4(A).  When the act of the employee is the act of the public entity, let the master answer.  To the extent that prior cases have rejected the applicability of the tort doctrine of respondeat superior under the [NMTCA], . . . those cases are hereby overruled.

Silva v. State, 1987-NMSC-107, ¶ 15, 745 P.2d at 385 (alteration in the original)(citation omitted).

The NMTCA generally precludes awards of punitive damages.  See Brooks v. Bd. of Educ., No. Civ. 12-1249 MV/SMV, 2016 WL 8188562, at *17 (D.N.M. June 28, 2016)(Vázquez, J.)(concluding that "punitive damages are unavailable in this case because [New Mexico] state law bars punitive damages awards against state entities"); Torrance Cty. Mental Health Program v. N.M. Health & Env't Dep't, 1992-NMSC-026, ¶ 16, 830 P.2d 145, 149.  As the Supreme Court of New Mexico has held, the NMTCA contains an "express grant of immunity to the state from liability for punitive damages in an action for which immunity has been waived."  Torrance Cty. Mental Health Program v. N.M. Health & Env't Dep't, 1992-NMSC-026, ¶ 16, 830

P.2d 145, 149.  Specifically, N.M.S.A. § 41-4-19(D) states: "No judgment against a governmental

entity or public employee for any tort for which immunity has been waived under the Tort Claims

Act shall include an award for exemplary or punitive damages or for interest prior to judgment."

N.M.S.A. § 41-4-19(D). [153]

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State  . . .  , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress  . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action; and it does not create any

substantive rights; substantive rights must come from the Constitution or from a federal statute.

See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 did not create any

substantive rights, but merely enforces existing constitutional and federal statutory rights  . . .

.")(internal quotation marks, alteration, and citation omitted).  Section 1983 authorizes an injured

person to assert a claim for relief against a person who, acting under color of state law, violates

the claimant's federally protected rights.  To state a claim upon which relief can be granted under

§ 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who

deprived the plaintiff of that right acted under color of state law.  See West v. Atkins, 487 U.S. 42,

---

[153]The only exception of which the Court is aware is in N.M.S.A. § 41-4-4(C), which states:

> A governmental entity shall pay any award for punitive or exemplary damages awarded against a public employee under the substantive law of a jurisdiction other than New Mexico, including other states, territories and possessions and the United States of America, if the public employee was acting within the scope of his duty.

N.M.S.A. § 41-4-4(C).

- 145 -

48 (1988).  The Court has noted:

> [A] plaintiff must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Public School Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).

The Supreme Court has clarified that, in alleging a § 1983 action against a government agent in his or her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  Consequently, there is no respondeat superior liability under § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 689 (1978).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)(quoting citing 42 U.S.C. § 1983 and Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)). The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for

government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).   The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to Bivens[154] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."   Ashcroft v. Iqbal, 556 U.S. at 676.   The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . ."

614 F.3d at 1199.   The Tenth Circuit has noted, however, that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."   Dodds v. Richardson, 614 F.3d at 1200.   It concluded that Ashcroft v. Iqbal has not altered "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."   Dodds v. Richardson, 614 F.3d at 1200.   More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"   Dodds v. Richardson,

---

[154]In Bivens, the Supreme Court held that a violation of the Fourth Amendment of the Constitution "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."   403 U.S. at 389.

614 F.3d at 1200-01 (quoting <u>Rizzo v. Goode</u>, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is <u>Rizzo v.</u> <u>Goode</u>, 423 U.S. 362 (1976), where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed.  <u>See</u> <u>Dodds v. Richardson</u>, 614 F.3d at 1200 (citing <u>Rizzo v. Goode</u>, 423 U.S. at 371).  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "'crush the nascent labor organizations.'"  <u>Dodds v.</u> <u>Richardson</u>, 614 F.3d at 1200 (quoting <u>Rizzo v. Goode</u>, 423 U.S. at 371).

## ANALYSIS

The Court will grant the MSJ, because J. Parsons has not asserted successfully facts from which a reasonable jury could conclude that the Defendants violated a constitutional right.  In the summary judgment procedural posture, the Court must determine whether J. Parsons has developed a factual record that, when viewed in the light most favorable to him, would permit a reasonable jury to conclude that: (i) the Defendants violated a constitutional right that was, in turn; (ii) clearly established at the time of the alleged violations.  See <u>Estate of Jensen by Jensen v.</u> <u>Clyde</u>, 989 F.3d 848, 854 (10th Cir. 2021)(citing <u>Ullrey v. Bradley</u>, 949 F.3d 1282, 1289 (10th Cir. 2020)).  As with any motion for summary judgment, however, "'[w]hen opposing parties tell two different stories, one is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'"  <u>York v. City of Las Cruces</u>, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting <u>Scott v. Harris</u>, 550 U.S. at 280).  As a threshold matter, the Court will not consider the asserted violations of APD SOPs in determining whether the Defendants violated J. Parsons' constitutional rights, because they are not relevant to the Fourth

Amendment analysis.  See Jonas v. Bd. of Comm'rs of Luna Cty., 699 F. Supp. 2d 1284, 1299 (D.N.M. 2010)(Browning, J.).

Next, drawing from the 911 Call and the Defendants' lapel camera recordings a factual record which the Court deems largely undisputed, see n.23, supra, the Court concludes that the Defendants are entitled to qualified to immunity.  Even when the facts presented are viewed in the light most favorable to J. Parsons, they would not permit a reasonable jury to conclude that the Defendants violated Fourth Amendment rights that were clearly established at the time of the alleged violation.  Similarly, the Court will grant the Defendants qualified immunity on J. Parsons' Fourteenth Amendment claim, because -- again viewing the factual record in the light most favorable to J. Parsons -- no reasonable jury could conclude that the Defendants' conduct shocks the Court's conscience.  Having granted qualified immunity to the Defendants on J. Parsons' § 1983 claims, the Court will remand to State court J. Parsons' claims under the NMTCA.

## I.   THE COURT WILL NOT CONSIDER THE APD'S SOPS, BECAUSE THE PLAINTIFFS MAY NOT RELY UPON SOPS TO ESTABLISH CONSTITUTIONAL VIOLATIONS.

"The clearly established law requires the exclusion of any evidence regarding the violation of SOPs and training, because such evidence is irrelevant to Fourth-Amendment inquiry."  Jonas v. Bd. of Comm'rs of Luna Cty., 699 F. Supp. 2d at 1299.  Here, Parsons relies upon APD SOPs and argues that the Defendants' SOP violations establish that the Defendants also violated his constitutional rights.  See, e.g., Complaint ¶¶ 24-27, 38, 42, at 4-7; Response at 20.  "Officials sued for constitutional violations," however, "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."  Davis v. Scherer, 468 U.S. 183, 194 (1984).  In other words, "[t]hat an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation

is therefore irrelevant." Tanberg v. Sholtis, 401 F.3d 1151, 1163-64 (10th Cir. 2005).  The Court, therefore, declines to consider the SOPs or whether the Defendants have violated them.  See Solis-Marrufo v. Bd. of Comm'rs for Cty. of Bernalillo, No. CIV 11-0107 JB/KBM, 2013 WL 1658278, at *17 (D.N.M. Mar. 29, 2013)(Browning, J.)(discussing the "Tenth Circuit's proclivity to exclude SOPs as irrelevant").

## II.   THE FACTUAL RECORD DOES NOT PERMIT THE CONCLUSION THAT THE DEFENDANTS VIOLATED THE FOURTH AMENDMENT'S PROHIBITION AGAINST UNREASONABLE SEIZURES.

The Court holds that a reasonable jury could not conclude from the facts J. Parsons develops, when viewed in the light most favorable to him, that the Defendants unconstitutionally seized him.  First, no reasonable jury could find that, under the totality of the circumstances, the Defendants seized J. Parsons.  See United States v. Rogers, 556 F.3d 1130, 1138 (10th Cir. 2009). Second, even if the Defendants seized J. Parsons without a warrant, no reasonable jury could find other than that the seizure was justified because exigent circumstances existed, given that the Defendants were responding to a 911 call in which the caller, Cardona, stated that M. Parsons, an elderly woman, was in medical distress.  See 911 Call at 05:02-30 (explaining that she feared M. Parsons would "have a heart attack); MSJ ¶ 4, at 3.  Third, no reasonable jury could conclude otherwise than that, assuming the Defendants' conduct constituted an investigatory stop, the Defendants' reasonable suspicion of criminal activity  justified such a stop, see Terry v. Ohio, 392 U.S. at 17-20, because Cardona also stated during the  911 call upon which the Defendants relied that J. Parsons was abusing M. Parsons, see 911 Call at 03:58-04:00 (describing the "domestic violence situation" at issue).   See also United States v. Arvizu, 534 U.S. 266, 273 (2002)(explaining that "the Fourth Amendment is satisfied if the officer's action is supported by

reasonable suspicion to believe that criminal activity may be afoot").

A.   **THE FACTUAL RECORD DOES NOT PERMIT THE CONCLUSION THAT THE DEFENDANTS SEIZED J. PARSONS, BECAUSE J. PARSONS' ENCOUNTER WITH THE DEFENDANTS WAS CONSENSUAL.**

J. Parsons argues the Defendants seized him, when they detained him on his home's porch and his living room's couch and prevented him from leaving.  See Response at 21-22.  The Court holds, however, that no reasonable jury could conclude from the facts presented, even viewed in the light most favorable to J. Parsons, that the Defendant's conduct toward him constituted a seizure.     "Consensual encounters, as opposed to seizures, do not implicate a citizen's Fourth Amendment rights."  United States v. Woody, No. CR 18-3902 JB, 2020 WL 3513486, at *24 (D.N.M. June 29, 2020)(Browning, J.).  The Court "must review the totality of the circumstances to determine whether a reasonable person would have believed that he was not free to terminate an encounter with government officials."  United States v. Rogers, 556 F.3d at 1138.  The Court considers factors including:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997) ](citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii) ] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).  United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010)(Browning, J.)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).

United States v. Alderete, 2020 WL 2219953, at *22-23.

The Court concludes that the factual record compels the conclusion that J. Parsons'

encounter with the Defendants was consensual, the above factors relevant to holding that a seizure occurred being largely absent. Here, there were two officers, but for the majority of the encounter, J. Parsons was speaking either with one officer alone or with a healthcare worker. See Barlow Lapel Video at 02:11-18:30, 22:15-36:50. See also United States v. Woody, 2020 WL 3513486, at *24 ("That there were two agents instead of one agent does not suggest necessarily a threatening presence."). Further, the officers did not touch J. Parsons, brandish a weapon, or retain any of J. Parsons' personal effects. See Barlow Lapel Video at 00:00-39:17; Velasquez Lapel Video at 00:00-39:39. See also United States v. Alderete, 2020 WL 2219953, at *22-23 (explaining that "the display of a weapon" and "physical touching by the officer" are relevant to finding a seizure occurred) Moreover, the initial encounter, although on private property, took place in public view on J. Parsons' porch in daylight, until J. Parsons asked officers whether he could go inside. See Barlow Lapel Video at 02:11-18:34. Velasquez declined initially J. Parsons' request to go back inside, but, after J. Parsons noted that he was cold, Velasquez allowed him to go inside the home. See Barlow Lapel Video at 18:34-43; Velasquez Lapel Video at 18:36-45; MSJ ¶ 18-19, at 5; Response ¶ 18-19, at 9-10. Once J. Parsons returned inside, several persons were moving frequently around him, including his sister, Hale, Bussetti, the Ambercare Hospice nurse, and the two paramedic teams. See Barlow Lapel Video at 18:45-39:17; Velasquez Lapel Video at 18:47-39:39. Consequently, although J. Parsons was not in a public place, "members of the public" were not "absen[t]." United States v. Alderete, 2020 WL 2219953, at *22-23. Although neither Velasquez nor Barlow informed J. Parsons that he was free to leave, see Barlow Lapel Video at 00:00-39:17; Velasquez Lapel Video at 00:00-39:39, "[a]n officer's failure to inform the defendant that she is free to leave, standing alone, does not make an encounter nonconsensual," United States

v. Concepcion-Ledesma, 447 F.3d 1307, 1315 (10th Cir. 2006).

Accordingly, having considered the totality of the circumstances, the Court concludes that the factual record, viewed most favorably to J. Parsons, compels the conclusion that the entirety of J. Parsons' encounter with the Defendants was consensual. See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010). Because no reasonable jury could conclude other than that J. Parsons' encounter with the Defendants was consensual -- and remained consensual -- the encounter "does not implicate" J. Parsons' "Fourth Amendment's rights." United States v. Fox, 600 F.3d 1253, 1257 (10th Cir. 2010).

"At step two of the qualified immunity analysis, the question before" the Court is whether J. Parsons can show that the Defendants' conduct "violated clearly established Fourth Amendment law . . . ." Kerns v. Bader, 663 F.3d at 1184. J. Parsons does not identify, and the Court has not discovered, any on-point Supreme Court or Tenth Circuit precedent clearly establishing that the Defendants' conduct constituted a seizure for the Fourth Amendment's purposes. See Response at 21-22. J. Parsons cites United States v. Jones, 701 F.3d 1300 (10th Cir. 2012), only to list its factors and cites United States v. Hernandez only for the broad legal proposition that a seizure occurs when an individual "has an objective reason to believe that he is not free to terminate his conversation with the officer and proceed on his way," United States v. Hernandez, 847 F.3d 1257, 1266 (10th Cir. 2017). See Response at 21-22. J. Parsons does not engage in a searching analysis of either case, analogizing those cases' factual circumstances to his own. See Response at 21-22. See also White v. Pauly, 137 S. Ct. at 552 (holding that the lower court demonstrated it "misunderstood the 'clearly established' analysis" when "[i]t failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment."). Because J. Parsons has not identified any on-point precedent for his position -- and the Court has

found none -- and because the factual record compels the conclusion that J. Parsons interacted consensually with the Defendants, the Defendants are entitled to qualified immunity on J. Parsons' claim of unreasonable seizure.

      **B.**     **EVEN IF THE DEFENDANTS SEIZED J. PARSONS, NO REASONABLE JURY COULD CONCLUDE OTHER THAN THAT THE SEIZURE WAS JUSTIFIED UNDER THE EXIGENT CIRCUMSTANCES EXCEPTION TO THE FOURTH AMENDMENT'S WARRANT REQUIREMENT.**

Even if the encounter was not consensual and the Defendants detained J. Parsons on the porch of his home or on the couch in his living room, the factual record would compel the conclusion that the detention was lawful because exigent circumstances existed.  Officers engaged in their community caretaking functions reasonably may detain a person, regardless of any suspected criminal activity, to ensure the safety of the public or the individual.  See United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993).  See also Novitsky v. City of Aurora, 491 F.3d 1244 (10th Cir. 2007).  Seizures in the community caretaking context must be based on "specific articulable facts" and require a balancing of the governmental interest in the officer's exercise of his or her community caretaking function, and the individual interest in being free from arbitrary government interference.   United States v. King, 990 F.2d at 1560.  Recently, in Caniglia, the Supreme Court held that there is not an independently sufficient community-caretaking justification for warrantless searches or seizures.  See 141 S. Ct. at 1596.  Caniglia, therefore, invalidates the Defendants' argument that any seizure "would be justified and thus constitutionally permissible/reasonable" because the Defendants were performing a "community caretaker function . . . ."  Reply at 7.  Nonetheless, Caniglia reaffirms that police officers still may perform warrantless searches and seizures in non-investigatory, community-caretaking, contexts as long as exigent circumstances are present.  See Caniglia, 141 S. Ct. at 1599.  No reasonable jury could conclude other than that exigent circumstances existed here, given that the Defendants reasonably

believed that M. Parsons was experiencing a medical emergency; such circumstances, based on the factual record J. Parsons has developed, render the Defendants' conduct constitutionally permissible, assuming that they seized J. Parsons.

In Caniglia, the officers performed a welfare check on the plaintiff, who had been suicidal, and searched his house and seized his guns only after he had been transported to hospital for emergency mental health care.  See Caniglia, 141 S. Ct. at 1598.  Caniglia suggests that, whatever exigent circumstances may have existed initially dissipated once the plaintiff medical personnel's care.  See Caniglia, 141 S. Ct. at 1599.  Had the officers in Caniglia not met the plaintiff on the porch of his house, and had he not consented to go to a hospital for psychiatric care, the officers might have possessed the exigent circumstances necessary to justify warrantless entry into the plaintiff's home and seizure of his person or guns.  See Caniglia, 141 S. Ct. at 1598-1599. Although the Supreme Court did not determine whether there were exigent circumstances,[155] Caniglia recognizes that exigent circumstances exist where an officer must "render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  Caniglia, 141 S. Ct. at 1596 (internal quotation omitted).  See id. at 1600 (Roberts, C.J., concurring); id. at 1602 (Kavanaugh, J., concurring).  In this context, the Tenth Circuit has elaborated that the presence of exigent circumstances is often communicated by a 911 call, "'one of the most common -- and universally recognized -- means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help.'"  United States v. Najar, 451

---

[155]Because the First Circuit did not believe it was necessary to decide whether exigent circumstances existed, it did not do so.  See Caniglia, 141 S. Ct. at 1599.  The Supreme Court remanded so that this determination, among others, could be made.  See Caniglia, 141 S. Ct. at 1600.

F.3d 710 (10th Cir. 2006)(quoting United States v. Richardson, 208 F.3d 626, 630 (7th Cir. 2000)).

Here, a reasonable jury could only find that the Defendants reasonably believed that M. Parsons needed emergency assistance because: (i) Cardona informed the 911 operator that M. Parsons had been screaming for help prior to Cardona's 911 call; and (ii) Hale informed the Defendants that M. Parsons did not feel safe with J. Parsons and wanted to be taken to the hospital. See 911 Call at 05:02-30.  See also Barlow Lapel Video at 01:17-24; Velasquez Lapel Video at 01:19-26.  These facts compel the conclusion that exigent circumstances were present justifying the Defendants' entry into J. Parsons' home and detain him briefly while they attended to M. Parsons' emergency.  See Caniglia, 141 S. Ct. at 1602 (Kavanaugh, J., concurring).  A jury may have found exigent circumstances were not present if the Defendants had met M. Parsons -- instead of J. Parsons -- on the home's front porch and if she was transported to the hospital from there.   Given, however, that the Defendants sought to "render emergency assistance" to M. Parsons, who was at the rear of the house, the factual record compels the conclusion that circumstances justified detaining J. Parsons briefly as they reached her.  Caniglia, 141 S. Ct. at 1598.

If there are exigent circumstances, police officers' warrantless search or seizure must still be reasonable in scope and manner.  See United States v. Martinez, 643 F.3d 1292, 1296 (10th Cir. 2011)(noting that, where exigent circumstances exist, the Fourth Amendment requires that "the manner and scope of the search is reasonable")(citing Brigham City v. Stuart, 547 U.S. 398 (2006)).   No jury could find other than that J. Parsons' detention was reasonable in both regards: (i) it lasted approximately thirty minutes; (ii) it occurred either in full public view on the porch or in view of other persons moving about the house; (iii) J. Parsons was allowed refreshments and was seated in a comfortable spot, his couch; (iv) the officers did not handcuff or even touch

J. Parsons.  See Barlow Lapel Video at 00:00-39:17; Velasquez Lapel Video at 00:00-39:39.  The detention lasted only as long -- and was only as constraining to J. Parsons -- as was necessary to prevent J. Parsons from interfering with the Defendants as they tried to aid M. Parsons, and they left once M. Parsons was transported to the hospital in the paramedics' care.  Accordingly, even if the Defendants seized J. Parsons, no reasonable jury could find otherwise than that the seizure was justified by exigent circumstance and the seizure was reasonable in scope and manner.

Again, the above discussion of the constitutional-violation prong of the qualified immunity analysis informs the Court's discussion of the clearly established prong.  As when J. Parsons analyzed the issue of whether he was seized, he cites to Tenth Circuit precedent only for general formulations of the standards governing exigent circumstances.  See Response at 22-23.  J. Parsons does not analogize the identified precedent to his own circumstances and thus "fail[s] to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment."  White v. Pauly, 137 S. Ct. 548, 552 (2017).  Moreover, the Court has conducted a thorough search of Tenth Circuit and Supreme Court precedent, and has not discovered  any clearly established precedent demonstrating that the Defendants violated J. Parsons' Fourth Amendment rights.  Accordingly, J. Parsons' claim falters on the clearly established prong, as it does on the constitutional-violation prong of the qualified immunity analysis.

C.    EVEN IF THE DEFENDANTS SEIZED J. PARSONS AS PART OF AN INVESTIGATORY STOP, NO REASONABLE JURY COULD CONCLUDE OTHER THAN THAT SUCH A SEIZURE WAS JUSTIFIED BASED ON A REASONABLE SUSPICION OF CRIMINAL ACTIVITY.

If the Court again assumes that the Defendants seized J. Parsons on the porch of his home and then on his couch, and even if the seizure did not fall under the exigent circumstances exception, the factual record compels the conclusion that such a seizure was a lawful investigatory detention based on the Defendants' reasonable suspicion that J. Parsons was engaged in criminal

conduct, namely, domestic violence.[156]   An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146, 92 S. Ct. 1921).  The threshold for an investigatory detention is lower than that for an arrest: investigatory detentions require only a "reasonable suspicion" of criminal activity, rather than the probable cause required for an arrest.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").  Whether reasonable suspicion exists is based on the totality of the circumstances and "can arise from information that is less reliable than that required to show probable cause." United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004)(quoting United States v. Tuter, 240 F.3d 1292, 1296 n.2 (10th Cir. 2001)).  An anonymous 911 call, absent "indicia of reliability," is not enough to generate reasonable suspicion.  Florida v. J.L., 529 U.S. at 270.  Cf. United States v. Johnson, 364 F.3d at 1194 (10th Cir. 2004).

The Court concludes that no reasonable jury could find otherwise than that the Defendants had reasonable suspicion to detain J. Parson for an investigatory stop both on his porch and when he was sitting on his couch, because they had received a sufficiently reliable 911 call alleging J. Parsons was engaged in acts of domestic violence.  The Defendants arrived after Cardona, M. Parsons' granddaughter and J. Parsons' niece, called 911 and stated that she had personal knowledge that M. Parsons was in a "domestic violence situation."  911 Call at 03:58-04:00.  See

---

[156]New Mexico's criminal code contains many provisions prohibiting domestic violence under the Crimes Against Household Members Act.  See, e.g., N.M.S.A. § 30-3-10.  New Mexico also prohibits abuse and neglect of elderly persons receiving healthcare in residential facilities, including in private homes.  See N.M.S.A. § 30-47-1, et seq.

Florida v. J.L., 529 U.S. at 270.  The call provided the Defendants with reasonable suspicion that J. Parsons was abusing M. Parsons by threatening her and preventing her from going to the hospital, see 911 Call at 01:36-4:00, because Cardona's relationship with M. Parsons and J. Parsons, her recent conversations with M. Parsons, and her comprehensive description of the situation "demonstrate[d]" her "basis of knowledge or veracity" and therefore exhibited "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Alabama v. White, 496 U.S. 325 at 332.  Although once J. Parsons was seated on the couch, Barlow disclaimed that she and Velasquez were performing a criminal investigation, see Barlow Lapel Video at 19:56-20:06, Barlow's statement does not negate the reasonable suspicion justification for J. Parsons' detention: police officers may misrepresent facts in the course of an investigation.  See, e.g., Frazier v. Cupp, 394 U.S. 731, 739 (1969)(concluding that police misrepresentations were insufficient to render a confession inadmissible); United States v. Lopez, 437 F.3d 1059, 1065 (10th Cir. 2006)("It is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him.").  The Court notes, however, that the matter of Barlow's misrepresentations is not dispositive because, as discussed above, the factual record, even viewed in the light most favorable to J. Parsons, compels the conclusion that the exigent circumstances justifies independently J. Parsons' detention on the couch -- and, ultimately, because the Court holds that Defendants' conduct does not constitute a seizure at all, because the encounter was consensual.

Although in his briefing J. Parsons repeatedly stresses that Cardona was misinformed about the ongoing situation with M. Parsons, see Response ¶¶ 2-5, 7, at 2-4, the information that Cardona supplied to the Defendants was sufficient to raise a reasonable suspicion of illegality, see United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004).  Unreliable 911 calls -- frequently

those that anonymous tipsters make -- do not supply grounds for reasonable suspicion sufficient to conduct an investigatory stop.  See Florida v. J.L., 529 U.S. at 271-72.   Here, however, the 911 caller was not anonymous, but rather a close relative of M. Parsons' who had spoken to her seconds before the caller placed the 911 call.  See 911 Call at 05:02-30.  The Tenth Circuit holds that "[r]easonable suspicion may exist even where a 911 call fails to allege criminal activity and the responding officers do not observe any illegal conduct."  United States v. Conner, 699 F.3d 1225, 1231 (10th Cir. 2012).  Accordingly, because Cardona was a reliable caller explicitly alleging that J. Parsons was engaged in criminal activity -- she reported a "domestic violence situation," see 911 Call at 03:58-04:00 -- a reasonable jury could not find other than that her call supplied the Defendants with reasonable suspicion.  See United States v. Conner, 699 F.3d 1225, 1228 (10th Cir. 2012)("In determining whether reasonable suspicion exists, we look at the totality of the circumstances.").   Indeed, J. Parsons admitted at the hearing on the MSJ that the Defendants initially possessed a reasonable suspicion of criminal activity, and so had the power to separate him and require that he remain outside on the porch.  See March 29 Tr. at 21:14-22:18 (Court, Dunn).

That the Defendants were told on multiple occasions that M. Parsons, and not J. Parsons, possessed decision-making power over her medical care, reinforced the Defendants' perception that J. Parsons was preventing M. Parsons against her will from going to the hospital.  See Barlow Lapel Video at 01:44-50, 06:40-47, 32:36-39; Velasquez Lapel Video at 01:46-52, 12:36-47, 32:38-41.  Although M. Parsons had, in fact, attempted to delegate some decision-making power to J. Parsons -- M. Parsons had appointed J. Parsons her surrogate healthcare decisionmaker over her Ambercare Hospice care -- J. Parsons was himself unaware of this fact at the time.  See Barlow

Lapel Video at 06:40-47; Response ¶ 17, at 8-9.  See also Surrogate Form at 9.[157]  Accordingly, so too were the Defendants.  See United States v. Whitley, 680 F.3d 1227, at 1234 (10th Cir. 2012)("[W]e ask whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate.").

A reasonable jury would be compelled to the conclusion, on the facts before it, that the Defendants acted on a reasonable suspicion that illegal activity was occurring and detained J. Parsons no longer, and in no more intrusive a manner, than was necessary to address the situation.  See United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)("[T]here are limitations on both the length of" an investigatory "detention and the manner in which it is carried out.").  In an investigatory detention, an officer's actions must be "reasonably related in scope to the circumstances that first justified the interference."  Lundstrom v. Romero, 616 F.3d 1108, 1120 (10th Cir. 2010).  "A police officer may take such steps as are reasonably necessary to  . . . maintain the status quo during a detention."  Lundstrom v. Romero, 616 F.3d at 1120 (10th Cir. 2010).  As discussed above, the Defendants' detention of J. Parsons was of limited intrusiveness. J. Parsons conceded at the hearing on the MSJ that the Defendants' conduct was not "egregious." March 29 Tr. at 24:10 (Dunn).   The Defendants' actions were "reasonably necessary

_____

[157]As discussed in note 27, supra, the Surrogate Form does not appear to have been completed, because it does not bear J. Parsons' signature as the Appointed Family Member.  See Surrogate Form at 9.  Moreover, the form explicitly states that M. Parsons has not executed a power of attorney, implying that the Surrogate Form is distinct from a power of attorney.  See Surrogate Form at 9.  It appears to be a form that Ambercare Hospice produced that functions in lieu of a power of attorney solely within the context of care received at Ambercare Hospice -- that is, it granted to J. Parsons decision-making power over the care that M. Parsons received from Ambercare Hospice.  See Surrogate Form at 9.  The form does not confer, and does not present itself as conferring, general decision-making power over M. Parsons' medical and legal decisions as a power of attorney would.  See Surrogate Form at 9.  Accordingly, it remains true that, as J. Parsons informed contemporaneously the Defendants, he did not possess decision-making power over M. Parsons.  See Surrogate Form at 9.

to . . . maintain the status quo" while they attended to M. Parsons and helped effectuate her decision to go the hospital -- a decision which all parties then believed M. Parsons had the power to make.  Lundstrom v. Romero, 616 F.3d at 1120.  No reasonable jury could find on these facts that the Defendants' violated J. Parsons' Fourth Amendment right to be free from unreasonable seizures.

J. Parsons likewise falters on the qualified immunity analysis' clearly established prong. J. Parsons' briefing and oral argument does not identify, and the Court has not found, Tenth Circuit or Supreme Court precedent for the proposition that police officers in situations similar to the Defendants' lack reasonable suspicion sufficient to justify an investigatory stop.  See Response at 18-23; March 29 Tr. at 2:01-32:23.  J. Parsons thus did not satisfy the clearly established precedent showing a constitutional violation, see White v. Pauly, 137 S. Ct. 548, 552 (2017), in addition to his failure to show a constitutional violation in the first place.

III.   **THE FACTUAL RECORD DOES NOT PERMIT THE CONCLUSION THAT THE DEFENDANTS VIOLATED THE FOURTH AMENDMENT'S PROHIBITION AGAINST UNREASONABLE SEARCHES, BECAUSE THE DEFENDANTS DID NOT SEARCH PARSONS' HOME PARSONS' AND, EVEN IF THEY SEARCHED PARSONS' HOUSE, EXIGENT CIRCUMSTANCES JUSTIFIED THE SEARCH.**

The Court concludes that no reasonable jury could find that the Defendants unconstitutionally searched J. Parsons' home.  First, because the factual record compels the conclusion that J. Parsons consented to the Defendants' search, see Barlow Lapel Video at 01:56-02:00, their conduct does not constitute an unconstitutional search, see Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Second, regarding J. Parsons' specific contention that Velasquez searched J. Parsons' kitchen, the factual record compels the conclusion that Velasquez' conduct in the kitchen does not constitute a search, because it falls within the "plain-view" exception to the Fourth Amendment's warrant requirement.  Arizona v. Hicks, 480 U.S. at 328.  Third, even if the

Defendants searched J. Parsons' home without his consent, the factual record compels the conclusion that the search is justified under the exigent circumstances exception to the Fourth Amendment's warrant requirement.[158]  See United States v. Martinez, 643 F.3d 1292, 1296 (10th Cir. 2011).

### A.   THE FACTUAL RECORD COMPELS THE CONCLUSION THAT J. PARSONS CONSENTED TO THE DEFENDANTS' SEARCH AND, THEREFORE, THE DEFENDANTS DID NOT VIOLATE HIS FOURTH AMENDMENT RIGHTS.

Although Fourth Amendment searches typically require either a search warrant or probable cause, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. at 219.  "[C]ourts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary."  United States v. Alderete, No. CR 19-1989 JB, 2020 WL 2219953, at *22 (D.N.M. May 7, 2020)(Browning, J.).  "The government has the burden of proving valid consent to a warrantless search."  United States v. Pena, 143 F.3d 1363, 1366

---

[158]The Court notes that, unlike the exigent circumstances doctrine -- which justifies both the Defendants' non-investigatory detention of J. Parsons and the non-investigatory search of his home -- the reasonable suspicion doctrine could not justify the Defendants' search of J. Parsons' home.  Terry v. Ohio, which establishes that police officers can perform limited investigatory seizures upon reasonable suspicion alone, also establishes that warrantless searches only of a criminal suspect's person can be performed upon the same level of justification.  For searches of the home performed in the context of a criminal investigation, reasonable suspicion of criminal activity is insufficient.  See Arizona v. Hicks, 480 U.S. at 328 (holding that "[a] dwelling-place search, no less than a dwelling-place seizure" of items located therein, "requires probable cause").  The Court notes, moreover, that neither party argued that reasonable suspicion justified the Defendants' warrantless search.  Rather, the parties address only whether reasonable suspicion justified warrantless seizure.  See March 29 Tr. at 21:14-22:18 (Court, Dunn).  Accordingly, the Court holds that the search of J. Parsons' home, if there was one, cannot be justified to a reasonable jury as an investigatory search based on reasonable suspicion, but must be justified on other grounds -- namely, as a non-investigatory search based on exigent circumstances, as discussed Analysis § III(B), infra.

(10th Cir. 1998).  Consent to search and consent to a police officer's entry into the home are analyzed in the same way because "[n]o matter what the purposes, the entry itself qualifies as a 'search' within the meaning of the Fourth Amendment."  Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, §6.6 (6th ed. 2020)(no citation for quotation).

First, here, no reasonable jury could find other than that J. Parsons' consent was "unequivocal and specific and freely and intelligently given."  United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995).  When the Defendants arrived at J. Parsons' home, he held open the door and stated "come on in guys, come on in."  Barlow Lapel Video at 01:56-02:00; Velasquez Lapel Video at 01:58-02:02 (same).  See United States v. Pena, 143 F.3d 1363, 1367 (10th Cir. 1998)(explaining that, when the defendant stated "go ahead" to the officer, "the district court properly concluded that the statement was an unequivocal and specific consent").  M. Parsons, who also lived in the home, asked the Defendants to stay and speak with her, and even requested that the Defendants bring additional police officers.  See Velasquez Lapel Video at 02:11-03:52.  See also United States v. Cos, 498 F.3d 1115, 1124 (10th Cir., 2007)("Consent may be obtained . . . from a third party who possesses either actual authority or apparent authority to consent to the search.").  Further, at no point did Parsons ask the officers to leave his home.  See Barlow Lapel Video 00:00-39:17; Velasquez Lapel Video at 00:00-39:39.  See also United States v. McKerrell, 491 F.3d 1221, 1226 (10th Cir. 2007)(explaining that the fact that the defendant "never told the officers to stay out of his home" was relevant to holding that the defendant did not refuse consent to the police officers' search).

Second, there is nothing to indicate that the Defendants coerced Parsons to invite them into the home.  Before the officers said anything to Parsons, he opened the door and invited them inside the home.  See Barlow Lapel Video at 01:56-02:00; Velasquez Lapel Video at 01:58-02:02.  Cf.

United States v. Pikyavit, 527 F.3d 1126, 1131 (10th Cir. 2008)(explaining that the fact that the defendant "initiated the encounter with police" was relevant to its conclusion that the search was consensual).  Accordingly, the Court concludes that the facts presented, even viewed in the light most favorable to J. Parsons, compel the conclusion that, because J. Parsons consented voluntarily to the Defendants' entry into the home, the Defendants did not violate the Fourth Amendment's prohibition against unreasonable searches.

Next, a reasonable jury could not find that the Defendants unconstitutionally searched J. Parsons' kitchen, because Velasquez only observed objects that were in plain view.  See Barlow Lapel Video at 21:25-32; Velasquez Lapel Video at 21:27-34.  Under the plain view doctrine, "a truly cursory inspection -- one that involves merely looking at what is already exposed to view, without disturbing it -- is not a 'search' for Fourth Amendment purposes."  Arizona v. Hicks, 480 U.S. at 328 (no citation for quotation).  A law enforcement officer may not "violate the Fourth Amendment in arriving at the place from which" the object in question "could be plainly viewed." United States v. Villaba, No. CR 13-0664 JB, 2013 WL 4782206, at *39 (D.N.M. Aug. 21, 2013)(Browning, J.).  See Horton v. California, 496 U.S. 128, 136-37 (1990).  Here, Velasquez walked into the kitchen at J. Parsons' direction: in response to Velasquez' question where M. Parsons' medications were located, J. Parsons pointed toward the kitchen and stated that there was a "whole basket full of them" there.  Barlow Lapel Video at 21:25-32; Velasquez Lapel Video at 21:27-34.  Such an assertion, paired with J. Parsons' pointing gesture, amounts to an invitation to Velasquez to enter the kitchen -- no reasonable jury could find otherwise.  See United States v. Guerrero, 472 F.3d 784, 789-90 (10th Cir. 2007)("Consent may . . . be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer.").  Because a reasonable jury must find on the given facts that J. Parsons

consented to Velasquez' entry into the kitchen, the same jury must find that Velasquez did not "violate the Fourth Amendment in arriving at the place from which" M. Parsons' medications "could be plainly viewed." United States v. Villaba, No. CR 13-0664 JB, 2013 WL 4782206, at *39 (D.N.M. Aug. 21, 2013)(Browning, J.).  See Schneckloth v. Bustamonte, 412 U.S. at 219. Moreover, in the less-than-twenty seconds Velasquez was present in the kitchen, he did not touch or otherwise manipulate any objects therein.  See Velasquez Lapel Video at 21:37-50.  See also United States v. Moore, 795 F.3d 1224, 1232 (10th Cir., 2015)(noting that, where police officers "physically manipulate" evidence to bring it into plain view, such conduct falls outside the plain view exception).  The Court thus holds that the facts presented do not permit the conclusion that Velasquez' conduct in J. Parsons' kitchen constituted a search per the Fourth Amendment, falling within the Amendment's plain view exception.

J. Parsons' claim, failing on the constitutional-violation prong of the qualified immunity analysis, also fails on the clearly established prong.  As with the Analysis' other sections, he fails to analogize sufficiently to circuit precedent demonstrating that "an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." White v. Pauly, 137 S. Ct. at 552.  J. Parsons does not identify precedent for the proposition that he did not validly consent, because his consent was predicated on "the impression that the Defendant[s] [were] there to perform a welfare check no conduct an investigation into abuse of his mother."  Response at 20. The Court again has not found any clearly established precedent favoring J. Parsons' position. Accordingly, J. Parsons' argument cannot succeed on either the constitutional-violation prong or the clearly established prong of the qualified immunity analysis on the subject of his consent to the Defendants' entry into his home.

> **B.    THE FACTUAL RECORD COMPELS THE CONCLUSION THAT EXIGENT CIRCUMSTANCES JUSTIFY THE SEARCH, AND THE**

**SEARCH'S SCOPE AND MANNER WERE REASONABLE.**

Even if the plain view doctrine does not apply, the factual record compels the conclusion that exigent circumstances justify any potential search.  As with seizures, searches may be performed without a warrant when recognized exigent circumstances exist.  See United States v. Martinez, 643 F.3d at 1296.  The Court concludes, see supra Analysis § II(B), that a reasonable jury must find that exigent circumstances existed justifying the Defendants' warrantless detention of J. Parsons, even if the Defendants detained J. Parsons.  The same reasonable jury would be compelled to find that these exigent circumstances justify the Defendants' search of J. Parsons' home.

The factual record also compels the conclusion that the Defendants' search of J. Parsons home was reasonable in "manner and scope."  United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006).  The Defendants confined their presence in J. Parsons' home primarily to his porch and living room, along with M. Parsons' bedroom -- namely, those locations in the house where M. Parsons was present and in the rooms that had to be traversed to reach her.  See Barlow Lapel Video 00:00-39:17; Velasquez Lapel Video 00:00-39.39.  Velasquez was present in J. Parsons' kitchen for less than twenty seconds and only to ascertain the location of M. Parsons' medication. See Velasquez Lapel Video at 21:37-50.  The Defendants did not touch or move any objects in J. Parsons' home.  See Barlow Lapel Video 00:00-39:17; Velasquez Lapel Video 00:00-39.39. The Defendants' entry into and search of J. Parsons' home was limited to actions necessary to address M. Parsons' medical and behavioral health emergency; that is, the Defendants went only where they needed to go inside J. Parsons' house to render M. Parsons assistance.  Accordingly, the Court holds that a reasonable jury must find that, even if J. Parsons did not consent to the Defendants' entry, then exigent circumstances justify such entry as a non-investigatory search.

Because J. Parsons, moreover, does not cite on-point precedent beyond what supplies a general formulation of the exigent circumstances doctrine, see Response at 22-23, the Defendants are entitled to qualified immunity on J. Parsons' § 1983 claims for violating his Fourth Amendment right against unreasonable searches.

IV.     **THE FACTUAL RECORD DOES NOT PERMIT THE CONCLUSION THAT THE DEFENDANTS VIOLATED J. PARSONS' SUBSTANTIVE DUE PROCESS RIGHTS, BECAUSE THEIR BEHAVIOR DOES NOT SHOCK THE JUDICIAL CONSCIENCE.**

Neither J. Parsons nor the Defendants discuss the Fourteenth Amendment claims in the MSJ, the Response, or the Reply.   The Court is left only with J. Parsons' bare, conclusory allegations:

> Plaintiff has, and had, a Fourteenth Amendment right to be free of any deprivation of his liberty without due process of law, which included the full disclosure of exculpatory information at all stages of the criminal investigation; the failure to abide by known, lawful process was shocking to the conscience.
> . . . .
> Defendants deprived Plaintiff of these rights when they detained Plaintiff and searched his residence without permission to do so without probable cause.

The Court presumes that J. Parsons brings a substantive due process claim, because he employs the phrase "shocking to the conscience."   Complaint ¶ 57, at 10.   Where, as here, the "specific act of a governmental officer . . . is at issue," the Court evaluates whether the official's behavior "shocks the conscience."   Cty. of Sacramento v. Lewis, 523 U.S. 833, 846-47 (1998).   As the Court has explained, J. Parsons invited the Defendants into his home and spoke with them voluntarily.   See Barlow Lapel Video at 01:56-02:00; Velasquez Lapel Video at 01:58-02:02.   No reasonable jury could find that their behavior was at any point "egregious and outrageous," as the Tenth Circuit requires.   Hernandez v. Ridley, 734 F.3d, 1254, 1261 (10th Cir. 2013).   The Tenth Circuit has recognized recently conscience-shocking behavior where, for example, a social worker knowingly placed a child in a home where the child suffered severe physical and sexual abuse.

See T.D. v. Patton, 868 F.3d 1209, 1230 (10th Cir. 2017). By contrast, the Defendants' behavior here is in a different realm. See, e.g., Barlow Lapel Video at 00:00-39:17; Velasquez Lapel Video at 00:00-39:39. The Defendants chatted with J. Parsons for less than thirty minutes while determining whether to take his mother to the emergency room and, later, while awaiting paramedics' arrival. See Barlow Lapel Video at 00:00-39:17; Velasquez Lapel Video at 00:00-39:39. Moreover, J. Parsons conceded that the Defendants' conduct was not "egregious." March 29 Tr. at 24:10 (Dunn). While J. Parsons undoubtedly felt upset during the encounter, "the Court's conscience is not shocked." Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1075. Accordingly the Court holds that no reasonable jury could find that the Defendants violated J. Parsons' substantive Due Process rights. As noted above, J. Parsons does not argue this point beyond the conclusory allegations in his Complaint; not having identified any clearly established precedent, see Response at 18-23; March 29 Tr. at 2:01-32:23 (Dunn), J. Parsons' Due Process claim cannot overcome the Defendants' qualified immunity.

## V.    THE COURT WILL REMAND THE REMAINING STATE LAW CLAIMS, COUNT I OF THE COMPLAINT, TO STATE COURT UNDER THE NMTCA.

The Court having granted the Defendants summary judgment on all J. Parson' federal claims, will remand the case. "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998). Specifically, where "the federal claims are dismissed before trial . . . the state claims should be dismissed as well." United Mine Workers of Am. v. Gibbs, 383 U.S. at 726. The Court has dismissed the federal claims here at the summary judgment stage. Consequently, "[r]esolving the remaining state claims would require the Court to unnecessarily make decisions of state law." Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d at 1316. Accordingly, the Court remands the remaining state law claims to

the Second Judicial District Court, County of Bernalillo, State of New Mexico.  <u>See</u> Notice of Removal at 1.

**IT IS ORDERED** that: (i) the Defendants' Motion for Summary Judgment (Qualified Immunity Raised), filed November 18, 2020 (Doc. 18), is granted; (ii) all federal law claims are dismissed with prejudice; (iii) the remaining state claims and the case are remanded to Second Judicial District Court, County of Bernalillo, State of New Mexico; and (iv) the Court will enter a separate Final Judgment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

A. Blair Dunn
Western Agriculture, Resource and Business Advocates, LLP
Albuquerque, New Mexico

     *Attorney for the Plaintiff*

Sean E. Garrett
Michael S. Jahner
YLAW, P.C.
Albuquerque, New Mexico

     *Attorneys for the Defendants*